## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GREGORY MACLEAN, RICK VALLES, ARDESHIR PEZESHKI, JAMES GIBBS, and RONALD HEMENWAY, *individually and in their representative capacities*,<br><br>        Plaintiffs,<br><br>   vs.<br><br>WIPRO LIMITED,<br><br>        Defendant. | No. 20-3414<br><br>CLASS ACTION<br><br>Jury Trial Demanded |

## COMPLAINT

Plaintiffs Gregory MacLean, Rick Valles, Ardeshir Pezeshki, James Gibbs, and Ronald Hemenway bring this action on behalf of themselves and a class of similarly situated individuals to remedy pervasive, ongoing race and national origin discrimination by Defendant Wipro Limited ("Wipro"), and allege as follows:

## NATURE OF THE ACTION

1.     Wipro is an Indian company that provides information technology and consulting services. Wipro employs approximately 14,000 employees in the United States. While only about 12% of the United States' IT industry (the industry in which Wipro operates) is South Asian, at least 80% (or more) of Wipro's United States workforce is South Asian (primarily from India).[1] As discussed below, this grossly disproportionate workforce results from Wipro's intentional pattern and practice of employment discrimination against individuals who are not South Asian and who are not of Indian national origin, including discrimination in hiring, promotion, and

---

[1] As used herein, "South Asian" refers to individuals who trace their ancestry to the Indian sub-continent. "Indian" refers to individuals born in India, or whose ancestors came from India.

termination decisions, and its use of employment practices that result in a disparate impact on those same groups.

2.     Wipro's employment practices violate the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981, and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Plaintiffs seek, on their own behalf, and on behalf of three classes of similarly situated individuals, declaratory, injunctive, and other equitable relief, compensatory and punitive damages, including pre- and post-judgment interest, attorneys' fees, and costs to redress Wipro's pervasive pattern and practice of discrimination.

<h3 style="text-align:center"><strong>PARTIES</strong></h3>

3.     Plaintiff Gregory MacLean was born in the United States and is of American national origin and Caucasian race. He is a resident of California.

4.     Plaintiff Rick Valles was born in the United States and is of American national origin and Hispanic race. He is a resident of California.

5.     Plaintiff Ardeshir Pezeshki was born in Iran and is of Iranian national origin and Caucasian race. He is a naturalized U.S. citizen and a resident of California.

6.     Plaintiff James Gibbs was born in the United States and is of American national origin and Caucasian race. He is a resident of Tennessee.

7.     Plaintiff Ronald Hemenway was born in the United States and is of American national origin and Caucasian race. He is a resident of Florida.

8.     Plaintiffs are members of a protected class, as recognized by 42 U.S.C. § 1981 and Title VII.

9.     Plaintiffs MacLean, Valles, Pezeshki, and Gibbs have exhausted their Title VII administrative remedies by filing EEOC charges against Wipro and receiving notices of their right to sue. Plaintiff Hemenway has filed an EEOC charge and is awaiting notice of his right to sue.

10.     Defendant Wipro Limited is an Indian multinational corporation that provides consulting, technology, and outsourcing services. Wipro Limited is headquartered in Bangalore, India and employs over 160,000 workers worldwide, including over 14,000 employees in the United States.

## JURISDICTION & VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 2000e-5(f), and 42 U.S.C. § 1981(a).

12.     In addition, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d), as this matter is a class action with an amount in controversy of greater than $5 million, exclusive of interest and costs, and involves at least one class member who is a citizen of a state and is brought against a foreign corporation.

13.     This Court has general personal jurisdiction over Wipro, entitling it to hear all claims against the company, because Wipro's U.S. headquarters are in East Brunswick, New Jersey. The East Brunswick facility is Wipro's U.S. nerve center, hosting the largest concentration of its U.S. operations, administrative, and human resources personnel.

14.     Venue lies in this District pursuant to 42 U.S.C. § 1981 and 28 U.S.C. § 1391 because this Court has personal jurisdiction over Wipro. Venue lies in this district pursuant to 42 U.S.C. § 2000e-5(f)(3) because Wipro's pattern or practice of discrimination was committed in this District and Wipro maintains its employment records at its East Brunswick, New Jersey U.S. headquarters.

## STATEMENT OF FACTS

### Overview of Wipro's Business Model

15.     Wipro has approximately 22 offices in the United States and employs over 14,000 employees domestically. Wipro made over $8.5 billion in revenue in the past fiscal year, and

derives approximately 52% of its IT revenue from North and South America, the vast majority of which is from the United States.

16.     Wipro contracts with U.S. companies to provide IT-related services. Once Wipro secures a contract with a client, it hires individuals to fill positions to service the client. Both external applicants and existing employees must apply and interview for these positions. Once a position servicing a client comes to an end (or if an employee is removed from a position), employees are placed in a non-productive status referred to as being on the "bench."  Once on the bench, employees must again seek new positions within Wipro, going through an application and interview process, just as external applicants must.

### Overview of Wipro's Discriminatory Scheme

17.     Wipro operates under a general policy of discrimination in favor of South Asians and against individuals who are not South Asian and not Indian. This general policy of discrimination manifests itself in the same general fashion with respect to Wipro's hiring, staffing, promotion, and termination decisions. It consists of at least four inter-related, mutually reinforcing prongs, pursuant to which applicants and employees outside of Wipro's favored class are similarly disadvantaged and harmed.

18.     First, Wipro engages in a practice of securing H-1B, L-1A, L-1B, and B-1 visas (and other visas) for South Asian and Indian workers located overseas who will then be used to staff U.S. positions. The federal government annually awards 65,000 H-1B visas (plus an additional 20,000 for individuals with advanced degrees). These visas are awarded on a lottery basis. Given the cap on H-1B visas, companies compete to secure visas for prospective visa workers. Each year, companies submit H-1B visa petitions at the beginning of April for visas to be awarded later that year. H-1B visa petitions must identify an actual job at a specific location

that the prospective visa worker will fill if awarded a visa.

19.    To fulfill its employment preference for South Asians and Indians, Wipro seeks to maximize the number of visas it receives each year from the federal government. Wipro is consistently one of the top five H-1B visa recipients. Wipro submits visa petitions for more positions than actually exist in the U.S. in order to maximize its chances of securing the highest number of available H-1B visas from the lottery process. In this way, Wipro has been able to secure visas for far more individuals than it actually has a present need for. For example, in 2015, Wipro received 5,968 new visas, while in 2016, it received 6,831 new visas – far more positions that could actually exist given that Wipro employs less than 15,000 individuals in the United States.

20.    All, or substantially all, of the individuals for whom Wipro secures visas are South Asian and Indian. While both individuals already located in the U.S. and foreign individuals who are visa-ready are considered for open positions in the U.S., Wipro's South Asian and Indian visa-ready individuals are given preference for these positions. Similarly, non-South Asian and non-Indian individuals are often displaced from their current positions in favor of South Asian and Indian visa-ready individuals.

21.    Second, Wipro gives preference to South Asian and Indian applicants located in the U.S. over non-South Asian and non-Indian applicants. Wipro has an internal recruiting department responsible for locating talent within the U.S. These efforts are supplemented by third-party recruiting companies. On information and belief, both Wipro's internal recruiters and its third-party recruiters give preference to locating and recruiting South Asian and Indian candidates, who are then given preference throughout the hiring process. As a result, on information and belief, Wipro hires a disproportionately high percentage of South Asians and Indians within the United States that far exceeds the proportion of those individuals in the relevant labor market.

22.     Third, because of its discriminatory preference for South Asians and Indians, Wipro promotes South Asians and Indians at disproportionately high rates compared to non-South Asians and non-Indians. To be promoted, Wipro employees must receive a favorable appraisal score and must be nominated for a promotion by their immediate manager and have that nomination approved by their manager's manager (known as a "Level 2 manager"). Employees receive quarterly or annual appraisals. The appraisals include a rating of either outstanding, exceeds expectations, highly valued contribution, more contribution expected, or unsatisfactory contribution. Because of Wipro's preference for South Asians and Indians, these individuals are regularly awarded higher appraisal scores, compared to their non-South Asian and non-Indian colleagues. Additionally, some non-South Asian and non-Indian individuals are never given appraisal scores at all. Wipro's managers, almost all of whom are South Asian and Indian themselves, are also more likely to nominate South Asians and Indians for promotions. In turn, Level 2 managers are more likely to approve promotion nominations for South Asian and Indian individuals. Finally, on information and belief, Wipro regularly promotes unqualified junior South Asian employees to managerial positions in order to satisfy the legal requirements for L-1A visas. As a result, South Asians and Indians are regularly promoted at substantially higher rates than non-South Asians and non-Indians. This results in diminished career prospects for non-South Asian and non-Indian individuals, among other harms.

23.     Fourth, because of its discriminatory preference for South Asians and Indians, Wipro terminates non-South Asians and non-Indians at disproportionately high rates, compared to South Asians and Indians. Non-South Asians and non-Indians assigned to projects are terminated at substantially higher rates than South Asian and Indians. Additionally, because of Wipro's preference for filling positions with South Asian and Indian visa workers and South Asian and

Indian individuals hired within the U.S., non-South Asian and non-Indians are disproportionately relegated to the bench and disproportionately unable to locate new assignments. Wipro has a policy to terminate employees who are on the bench for four weeks. This results in substantially higher termination rates for non-South Asians and non-Indians.

24.     In addition, Wipro engages in employment practices that have a disparate impact on non-South Asian and non-Indian applicants and employees. First, Wipro's practice of relying on visa workers to staff U.S. positions results in available positions overwhelmingly going to visa holding South Asian and Indian individuals, to the exclusion of non-South Asian and non-Indian candidates. Second, Wipro's employee allocation practices result in available positions overwhelmingly going to South Asian and Indian individuals, to the exclusion of non-South Asians and non-Indians, who are then terminated at disproportionate rates. Third, Wipro's appraisal and promotion process results in South Asians and Indians receiving more promotions. Fourth, Wipro's benching and termination practices result in South Asians and Indians receiving positions more frequently, while non-South Asians and non-Indians remain on the bench for longer periods, resulting in diminished career prospects and disproportionate terminations for these individuals. Finally, Wipro's hiring and staffing decision-making process, as a whole, results in available positions overwhelmingly going to South Asians and Indians to the exclusion of non-South Asians and non-Indians.

25.     Wipro's U.S. workforce reflects the result of its discriminatory scheme. While only about 12% of the U.S. IT industry is South Asian, at least 80% (or more) of Wipro's United States-based workforce is South Asian and Indian, as is, the vast majority of its managerial and supervisory-level staff.

**Plaintiff Gregory MacLean's Experiences**

26.     Mr. MacLean is an experienced and highly skilled information technology professional. Mr. MacLean obtained a Bachelor of Science degree in Information and Computer Science from the University of California, Irvine in 2006. He has been employed in the IT industry since 1996, and has developed a wide variety of relevant skills, including retail site systems support, software testing, SQL, UML, Java, and others.

27.     Prior to May 2011, Mr. MacLean worked for Science Application International Corporation ("SAIC"), which provides information technology services to clients. At SAIC, Mr. MacLean worked on a project servicing BP Arco in Southern California as a Point of Sale software analyst.

28.     In or around May 2011, Wipro acquired the SAIC business unit Mr. MacLean was a part of and hired Mr. MacLean as a full-time employee to perform the same role at Wipro. Mr. MacLean's first job title at Wipro was that of a Software Engineer, though this title was later changed to an Associate Consultant at some point during Mr. MacLean's tenure with Wipro. His job responsibilities, however, remained the same.

29.     The BP Arco project Mr. MacLean was working on for Wipro ended in December 2018. Mr. MacLean was placed on the bench on December 29, 2018.

30.     While on the bench, Mr. MacLean actively sought a new position within Wipro. For instance, he contacted a number of individuals who had listed open positions within Wipro, but received very few responses. Mr. MacLean was put in touch with a Wipro employee located in India who he understood was a member of Wipro's Human Resources department. This individual sent him a list of open positions to which he could apply. One position was located in San Diego, close to his home. When Mr. MacLean expressed interest in that position roughly one

day after the individual sent him the list of open positions, the individual said the position had already been filled. Mr. MacLean then expressed interest in a job located in Los Angeles, but the individual never responded to his inquiry about the position. Between the time Mr. MacLean was benched until his termination (approximately two months), Wipro's Workforce Management Group ("WMG"), the group responsible for finding benched employees new projects, made no visible effort to locate Mr. MacLean a new position and never contacted him regarding any open positions within the company.

31.     In or around mid-February 2019, Wipro falsely submitted a "resignation" letter on Mr. MacLean's behalf through the company's intranet. Mr. MacLean promptly informed Wipro that he had not resigned, and the company allowed him to remain employed for a short time longer.

32.     Wipro terminated Mr. MacLean on February 25, 2019. Wipro also benched and then terminated all of Mr. MacLean's former SAIC colleagues with whom he worked with on a day-to-day basis and who became Wipro employees in or around 2011. These individuals were all non-South Asian and non-Indian.

33.     Wipro regularly failed to provide Mr. MacLean with an appraisal, and Wipro never promoted Mr. MacLean.

34.     Over the course of his employment, Mr. MacLean regularly contacted Wipro's Human Resources department regarding various employment issues. Human Resources would often either ignore Mr. MacLean's emails entirely or tell him that certain favorable Wipro policies did not apply to him. For instance, Mr. MacLean received emails from Wipro regarding salary increases and bonuses for employees. When he contacted Human Resources about these issues, he was told that as an "off-shore" employee (*i.e.*, an employee not based in India), the raise and bonus policies discussed in the emails did not apply to him. Each year, Mr. MacLean generally received

either a very small raise or no raise at all.

35.     Other than his original SAIC team, every Wipro employee Mr. MacLean interacted with at Wipro was South Asian and Indian. Mr. MacLean observed that these individuals were often not well qualified for their positions, and clients were often unhappy with their performance.

### Plaintiff Rick Valles' Experiences

36.     Mr. Valles is an experienced and highly skilled information technology professional. Mr. Valles obtained an Associate of Science degree from East Los Angeles College and an Associate of Science degree in Electrical Engineering from ITT Technical Institute. He has almost 20 years of relevant experience in the IT industry, and has developed a wide range of software deployment and testing skills.

37.     Prior to May 2011, Mr. Valles worked for SAIC as a Systems Analyst supporting the BP Arco account in Southern California.

38.     In or around May 2011, Wipro acquired the SAIC business unit Mr. Valles was a part of and he joined Wipro as an employee, performing the same Systems Analyst role. In or around September 2014, Mr. Valles' role on the BP Arco project ended and he was placed on the bench by Wipro.

39.     While on the bench, WMG never contacted Mr. Valles regarding any opportunities within the company. Nevertheless, Mr. Valles located numerous positions on his own and let WMG know that he was interested in them.  These included positions in Hawaii and Northern California. However, Wipro never invited Mr. Valles to interview for these positions.

40.     Wipro terminated Mr. Valles on January 31, 2015. Wipro also terminated all of Mr. Valles' former SAIC colleagues who transferred to Wipro with him in 2011. These individuals were all non-South Asian and non-Indian and were replaced by South Asian employees. Mr. Valles

is not aware of a single South Asian who was terminated by Wipro during his tenure with the company.

41.     Wipro regularly failed to provide Mr. Valles with an appraisal over the course of his employment. Wipro never promoted Mr. Valles. Each year, Mr. Valles generally received either a very small raise or no raise at all.

42.     Mr. Valles observed that the vast majority of his Wipro colleagues were South Asian and Indian.

43.     After his termination, Mr. Valles applied to several IT analyst positions with Wipro located in the Los Angeles area. He applied for positions both directly through Wipro's job portal and through third-party job sites. Despite being well qualified for these positions, Wipro never contacted him regarding his applications and did not hire him.

**Plaintiff Ardeshir Pezeshki's Experiences**

44.     Mr. Pezeshki is an experienced and highly skilled operations transformation and information technology professional. Mr. Pezeshki holds a Bachelor of Science degree in Business Administration from the University of California, Berkeley, and a Master of Business Administration degree from the University of California, Davis. As a known subject matter expert in the areas of digital business operations transformation and business process digitization, Mr. Pezeshki is often invited by CIO Review magazine (which is read by most CIOs around the world) to write articles about best practices of and implementation methodologies for digital business operations transformation and business process digitization to be published in the magazine. Mr. Pezeshki has been employed in the high technology and IT industries for the past 22 years and has extensive business operations and IT consulting experiences on a worldwide basis.

45.     Wipro hired Mr. Pezeshki on or about July 2, 2012 as a Practice Director of business

process digitization. Mr. Pezeshki was assigned to an office in Wipro's Mountain View, California office, but as a practical matter, Mr. Pezeshki traveled most of the time while at Wipro. In general, Mr. Pezeshki provided IT consulting to Wipro's clients around the world, including numerous Fortune 500 companies.

46.     During his tenure with Wipro, Mr. Pezeshki observed that Wipro's management and employees had a cultural preference for hiring and working with South Asians and Indians. For instance, Mr. Pezeshki observed that the vast majority of individuals selected for U.S. positions were South Asian. These individuals were often poorly skilled and unqualified for the positions, which created tension with Wipro's clients. For example, based on Mr. Pezeshki's observations, clients often had two complaints with Wipro: (1) a lack of skilled workers on projects and (2) poor quality of work. On one occasion, during a periodic sales conference, Mr. Pezeshki heard several South Asian individuals discussing a client who was upset with the lack of skilled resources on a project. One of the individuals, upon hearing about the client's complaint, responded: "Fuck the Americans."

47.     Additionally, Mr. Pezeshki was regularly treated with hostility by his South Asian managers and colleagues. For instance, while his last immediate manager was in regular contact with Mr. Pezeshki's South Asian colleagues, he would often go months without speaking to Mr. Pezeshki. His manager also denigrated his abilities and contributions during meetings, and he was often excluded from meetings altogether. During the few meetings Mr. Pezeshki attended, his South Asian colleagues would often speak their native languages in his presence making it impossible for him to understand what they were discussing or to participate in the meeting.

48.     Towards the end of Mr. Pezeshki's time at Wipro, he raised concerns to his immediate manager, Pramod Nair, and Wipro's Client Delivery Manager at Mastercard, Sachin

Wankhede, both of whom are South Asian, about Wipro's employees not being truthful to clients regarding the qualifications of Wipro's South Asian employees being assigned to the client projects. After raising these concerns, Wipro began giving Mr. Pezeshki low appraisal ratings in Wipro's performance management system. The process of giving an employee consistently low appraisal ratings is referred to at Wipro as "conditioning for separation."

49.     On March 2, 2018, Mr. Pezeshki's project with Mastercard ended and Wipro placed him on the bench. WMG never contacted Mr. Pezeshki or otherwise assisted him in finding a new position while he was on the bench. Nor did his immediate manager at the time, Pramod Nair. Nevertheless, Mr. Pezeshki personally located and applied to several open positions for which he was well qualified. However, he never received any responses to his applications.

50.     Wipro terminated Mr. Pezeshki on June 1, 2018.

51.     Wipro never promoted Mr. Pezeshki. Mr. Pezeshki only observed South Asians receiving, or even being considered for, promotions at Wipro. For example, when Mr. Pezeshki noticed a drop in Wipro's business process digitization business, Wipro management asked Mr. Pezeshki to analyze the situation and submit his corrective recommendations. After a few months of in-depth root-cause analyses, Mr. Pezeshki formulated a sound set of recommendations to turn the situation around.  Wipro management approved of Mr. Pezeshki's strategic recommendations which included establishing a new practice titled, BPM Solutioning Center of Competency (BPM-SCC).  However, rather than selecting Mr. Pezeshki for the position, Wipro chose a far less experienced South Asian employee, Pramod Nair, to lead the practice.

**Plaintiff James Gibbs' Experiences**

52.     Mr. Gibbs is experienced and highly skilled in the field of information technology sales. He obtained a Bachelor of Science degree in Computer Science from the University of

Memphis. Mr. Gibbs has over fifteen years of sales experience and has consistently achieved excellent results. Before Wipro, Mr. Gibbs work as an executive for FedEx, Hewlett-Packard, and EMC.

53.     Wipro hired Mr. Gibbs in March 2012 as a Global Client Partner serving Wipro's FedEx client account, an organization with which he had a previous sales relationship. Mr. Gibbs worked in Memphis, Tennessee.

54.     When Mr. Gibbs joined Wipro, the company had fewer than 10 employees serving the FedEx client account, and the account had roughly $2.5 million in revenue. Mr. Gibbs spent his first six months at Wipro performing "damage control," meeting with FedEx vice presidents and senior vice presidents in an effort to repair what FedEx perceived as a broken relationship with Wipro.

55.     Mr. Gibbs' efforts were successful, and the FedEx account grew substantially. By 2015, FedEx accounted for roughly $32 million in revenue for Wipro with $46 million in "bookings" (which means planned revenue) for 2016. At Wipro's annual Sales Award Conference in Bangalore, India, Mr. Gibbs received the company's Best Account Award two years in a row: in 2014 and 2015.

56.     However, despite his strong performance, Wipro never promoted Mr. Gibbs. Mr. Gibbs attempted to discuss the promotion process with his boss, Devprasad Rambhatla, Wipro's Vice President of Travel, Transportation & Hospitality, who is South Asian. But neither Mr. Rambhatla, nor others at Wipro, would discuss the promotion process or the possibility of Mr. Gibbs being promoted with him.

57.     Instead, Mr. Rambhatla was rude and condescending to Mr. Gibbs, forcing him to work 70-80 hours each week, and caused him extraordinary stress, to the point where his health

suffered. In addition, in 2015, it became evident that Wipro was trying to get rid of Mr. Gibbs. For instance, Mr. Rambhatla quadrupled Mr. Gibbs' sales and margin quotas to levels that appeared unrealistic. Nevertheless, Mr. Gibbs was able to meet these quotas.

58.     However, around the time Mr. Gibbs received the Best Account Award in 2015, Wipro began advertising his Global Client Partner position on LinkedIn. Mr. Gibbs understood that Wipro was looking for a South Asian of Indian descent to fill his position. Accordingly, Mr. Gibbs decided to quit rather than be fired by Wipro. Mr. Gibbs left the company in September 2015.  One week before his departure—and without knowing that he was planning to leave—Wipro hired a South Asian of Indian descent to take over Mr. Gibbs' position. This individual, Anand Shanmugham, was then promptly promoted.

59.     At the time he left Wipro, Mr. Gibbs was the only non-South Asian who reported directly to Mr. Rambhatla. Each of the other seven or eight non-South individuals who had previously reported to Mr. Rambhatla had been terminated or had quit. Each was replaced by a South Asian of Indian descent.

60.     Beyond his own experiences, Mr. Gibbs observed Wipro's cultural preference for employing and advancing South Asians of Indian descent. For example, Mr. Gibbs observed that Wipro preferred to hire South Asians and Indians. For instance, during his tenure with Wipro, the FedEx account grew from fewer than 10 employees to over 100 individuals working in Memphis and Pittsburg. At least 95% of these employees were South Asians of Indian descent. When Mr. Gibbs commented to Wipro management that Wipro should hire more people locally who were not South Asian (to culturally mirror the FedEx account), he was told that Wipro was not interested in doing that.

61.     Mr. Gibbs also observed that South Asians were given preference in both promotion

and termination/retention decisions. During the course of his employment, Mr. Gibbs only saw South Asians being promoted and did not observe a single non-South Asian receive a promotion. In addition, even though non-South Asians were the distinct minority within Wipro, the vast majority of terminations Mr. Gibbs observed were of non-South Asian employees. In Mr. Gibbs' experience, South Asians were protected from adverse employment actions at Wipro.

## Plaintiff Ronald Hemenway's Experiences

62.     Mr. Hemenway is an experienced and highly skilled IT professional. He has been employed in the IT industry since 1985 and has developed a wide variety of relevant skills, particularly in information security.

63.     On September 27, 2019 Wipro offered Mr. Hemenway the position of Program Director. He accepted, and his employment with the company commenced on September 30. Although Wipro had initially contacted Mr. Hemenway about working on a project in the San Antonio, Texas area, his first assignment was with Capital One in Richmond, Virginia. Mr. Hemenway would travel from his home in Florida to Richmond every week.

64.     The Capitol One project required employees to work with RSA Archer, a legacy operating system that few people have experience with. Mr. Hemenway, however, had worked with RSA Archer for many years.

65.     Although thousands of people worked on the Capitol One project, Mr. Hemenway didn't observe any other non-South Asian employees at the client site. He also observed that many of his South Asian colleagues were unqualified for the work they were performing. For example, one worker informed Mr. Hemenway that he had no experience with RSA Archer. and that he was previously a programmer, which had little to do with their current work.

66.     Although Mr. Hemenway was hired at the director level, had substantial experience

16

with RSA Archer, and received praise from the client, Wipro managers assigned him menial work and called him a "gopher." Managers would sometimes exclude Mr. Hemenway from workplace discussions by speaking in a South Asian dialect he could not understand.

67.     In late November or early December 2019, Mr. Hemenway was removed from the Capital One project and placed on the bench. While on the bench, Mr. Hemenway actively sought a new position within Wipro, applying to 25 positions. Despite these efforts, he was not selected by Wipro for a new position, and the company terminated his employment on February 26, 2020. At the time of his termination, he had 15 outstanding project applications.

68.     Wipro failed to provide Mr. Hemenway with a performance evaluation and never promoted him.

69.     Since his termination, recruiters have twice contacted Mr. Hemenway regarding opportunities for employment with Wipro. Mr. Hemenway was interested and asked to be considered for the positions. However, despite his interest Wipro never re-hired him.

## CLASS ACTION ALLEGATIONS

70.     Plaintiffs bring this Class Action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4), seeking injunctive, declaratory, equitable, and monetary relief for Wipro's systematic pattern and practice of discriminatory employment practices based upon individuals' race and national origin. This action is brought on behalf of the following three classes:

Hiring Class

All persons who are not of South Asian race or Indian national origin who applied for positions with Wipro in the United States and were not selected for the position;

Promotions Class

All persons who are not of South Asian race or Indian national origin who were employed by Wipro in the United States for the minimum amount of time

necessary to be eligible for a promotion pursuant to Wipro's policies and/or practices, and were not promoted; and

Terminations Class

All persons who are not of South Asian race or Indian national origin who were employed by Wipro in the United States and were terminated.

71.     Members of the classes are so numerous and geographically dispersed across the United States that joinder is impracticable. While the exact number of class members is unknown to Plaintiffs, it is believed to be in the thousands. Furthermore, the classes are readily identifiable from information and records in Wipro's possession.

72.     There are numerous questions of law and fact common to the classes. Among the common questions of law or fact are:  (a) whether Wipro has engaged in a pattern and practice of discrimination  against non-South Asian and non-Indian individuals in its hiring, promotion, and termination/retention decisions; (b) whether Wipro's employment practices have resulted in a disparate impact against non-South Asian and non-Indian individuals; (c) whether Wipro has violated 42 U.S.C. § 1981; (d) whether Wipro has violated Title VII; (e) whether equitable and injunctive relief is warranted for the classes; and (f) whether compensatory and/or punitive damages are warranted for the classes.

73.     Plaintiffs' claims are typical of the classes. All members of the classes were damaged by the same discriminatory policies and practices employed by Wipro, *i.e.*, they were denied the opportunity to fairly compete for and obtain employment with Wipro, were denied positions and promotions within the company, and/or were terminated by the company.

74.     Plaintiffs will fairly and adequately protect the interest of other class members because they have no interest that is antagonistic to or which conflicts with those of any other class member, and Plaintiffs are committed to the vigorous prosecution of this action and have retained

competent counsel experienced in class litigation to represent them and the classes.

75.     Because of Wipro's actions, which were taken intentionally and/or with reckless disregard for the federally protected rights of Plaintiffs and the classes, Plaintiffs and the classes have suffered substantial harm for which punitive damages is warranted.

76.     Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Wipro has acted and/or refused to act on grounds generally applicable to the classes, making declaratory and injunctive relief appropriate with respect to Plaintiffs and the classes. Members of the classes are entitled to declaratory and injunctive relief to end Wipro's discriminatory policies and practices.

77.     Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) for determination of the damage claims of individual class members because the issue of whether Wipro engages in a pattern and practice of discrimination and/or its corporate practices result in a disparate impact against non-South Asian and non-Indian individuals is common and predominates over individual issues of proof. Class certification under Rule 23(b)(3) would be superior to other methods for fair and efficient resolution of the issues because, among other reasons, certification will avoid the need for repeated litigation by each individual class member. The instant case will be manageable as a class action. Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

78.     In the alternative, class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(c)(4) to litigate Plaintiffs' claims for prospective classwide compliance and affirmative injunctive relief necessary to eliminate Wipro's discrimination. Certification under this rule is also appropriate to decide whether Wipro has adopted a systemic pattern and practice of racial and national origin discrimination and/or has engaged in practices that have resulted in a

disparate impact against non-South Asian and non-Indian individuals. Certification under this rule is also appropriate to determine classwide damages, including punitive damages.

## CLAIMS

### COUNT I
**Disparate Treatment on the Basis of Race in Violation of 42 U.S.C. § 1981**
*On behalf of all Plaintiffs and the Putative Classes*

79.     Plaintiffs re-allege each preceding paragraph as though fully set forth herein.

80.     This claim is brought by Plaintiffs on behalf of themselves and the Hiring Class, the Promotions Class, and the Terminations Class.

81.     Throughout the class liability period, Wipro has engaged in a pattern and practice of discriminating against individuals who are not of South Asian race by: (a) knowingly and intentionally favoring South Asian individuals in employment decisions, including hiring, promotion, and termination decisions, (b) knowingly and intentionally disfavoring non-South Asian individuals (including Plaintiffs) in employment decisions, including hiring, promotion, and termination decisions, and (c) knowingly and intentionally creating and maintaining an overwhelmingly disproportionate workforce in the United States consisting of at least 80% (or more) South Asian employees.

82.     As a direct and proximate result of Wipro's intentional discrimination, Plaintiffs and members of the classes have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities with regard to promotion and/or continued employment with Wipro.

83.     Wipro's actions constitute unlawful discrimination on the basis of race in violation of 42 U.S.C. § 1981.

**COUNT II**
**Disparate Treatment on the Basis of Race and National Origin**
**In Violation of Title VII, 42 U.S.C. § 2000e-2**
*On behalf of Plaintiffs MacLean, Valles, Pezeshki, and Gibbs and the Putative Classes*

84.     Plaintiffs re-allege each preceding paragraph as though fully set forth herein.

85.     This claim is brought by Plaintiffs on behalf of themselves and the Hiring Class, the Promotions Class, and the Terminations Class.

86.     Throughout the class liability period, Wipro has engaged in a pattern and practice of discriminating against individuals who are not of South Asian race or Indian national origin by: (a) knowingly and intentionally favoring individuals of South Asian race and Indian national origin in employment decisions, including hiring, promotion, and termination decisions, (b) knowingly and intentionally disfavoring individuals who are not of South Asian race and Indian national origin (including Plaintiffs) in employment decisions, including hiring, promotion, and termination decisions, and (c) knowingly and intentionally creating and maintaining an overwhelmingly disproportionate workforce in the United States consisting of at least 80% (or more) South Asian employees (primarily from India).

87.     As a direct and proximate result of Wipro's intentional discrimination, Plaintiffs and members of the classes have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities with regard to promotion and/or continued employment with Wipro.

88.     Wipro's actions constitute unlawful discrimination on the basis of race and national origin in violation of 42 U.S.C. § 2000e, *et seq.*

**COUNT III**
**Disparate Impact on the Basis of Race and National Origin**
**In Violation of Title VII, 42 U.S.C. § 2000e-2**
*On behalf of Plaintiffs MacLean, Valles, Pezeshki, and Gibbs and the Putative Classes*

89.     Plaintiffs re-allege each preceding paragraph as though fully set forth herein.

90.     This claim is brought by Plaintiffs on behalf of themselves and the Hiring Class, the Promotions Class, and the Terminations Class.

91.     Throughout the class liability period, Wipro has used policies and practices related to hiring, promotion, and termination of individuals that have had a disparate impact on the basis of national origin and race (harming those who are not of South Asian race or Indian national origin) that are neither job-related for the positions at issue nor consistent with business necessity.

92.     Wipro's actions constitute unlawful discrimination in violation of 42 U.S.C. § 2000e, *et seq*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the classes pray for relief as follows:

a)      Certification of the case as a class action pursuant to Federal Rule of Civil Procedure 23;

b)      Designation of Plaintiffs as representatives of the classes;

c)      Designation of Plaintiffs' counsel as counsel for the classes;

d)      A declaratory judgment that the practices complained of herein are unlawful and violate 42 U.S.C. § 1981;

e)      A declaratory judgment that the practices complained of herein are unlawful and violate Title VII;

f)      A permanent injunction against Wipro and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in unlawful policies, practices, customs, and usages set forth herein;

g)      Order Wipro to adopt a valid, non-discriminatory method for hiring, promotion,

22

termination, and other employment decisions;

h)      Order Wipro not to retaliate against individuals who complain of racial or national origin discrimination;

i)      Order Wipro to post notices concerning its duty to refrain from discriminating against employees on the basis of race and national origin, or retaliating against those who complain of racial or national origin discrimination;

j)      Award Plaintiffs and the classes damages – including (without limitation) punitive damages and compensatory damages – for the harm they suffered as a result of Wipro's violations of § 1981 and Title VII;

k)      Award Plaintiffs and the class pre- and post-judgment interest at the prevailing rate on damages as a result of Wipro's discrimination against them in violation of § 1981 and Title VII;

l)      Award Plaintiffs and the classes front- and back-pay, reinstatement or instatement to an appropriate position, and such other equitable relief as the Court deems just and appropriate;

m)      Award reasonable attorneys' fees, expert witness fees, expenses, and costs of this action and of prior administrative actions; and

n)      Award Plaintiffs and the class such other relief as this Court deems just and appropriate.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs and the classes respectfully demand a trial by jury on all issues properly triable by a jury in this action.

Dated: March 30, 2020

By: /s/Jonathan Rudnick
Jonathan Rudnick, Esq.
LAW OFFICES OF JONATHAN
RUDNICK, LLC.
788 Shrewsbury Avenue
Tinton Falls, NJ 07724
Telephone: (732) 842-2070
Facsimile: (732) 879-0213
jonr@jonrudlaw.com

*Attorney for Plaintiffs and Putative
Class*