*NOT FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

GREGORY MACLEAN, RICK VALLES,
ARDESHIR PEZESHKI, JAMES GIBBS, and
RONALD HEMENWAY, individually and in their
representative capacities,

        Plaintiffs,

v.

WIPRO LIMITED,

        Defendant.

Civil Action No. 20-3414 (FLW)

**OPINION**

**WOLFSON, Chief Judge:**

Plaintiffs, Gregory MacLean ("MacLean"), Rick Valles ("Valles"), Ardeshir Pezeshki ("Pezeshki"), James Gibbs ("Gibbs"), and Ronald Hemenway ("Hemenway") (collectively, "Plaintiffs"), brought this employment discrimination action under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, on behalf of themselves and all others similarly situated, against their former employer, Defendant Wipro Limited ("Wipro" or "Defendant"). Plaintiffs allege that Defendant, an Indian company that provides technology and consulting services, engaged in an intentional pattern and practice of employment discrimination against individuals who are not South Asian[1] or of Indian national origin, including hiring, promotion, evaluation, and termination decisions. Presently before the Court is Defendant's second Motion to Dismiss Plaintiffs' First Amended Complaint ("FAC") on various grounds, including statute of limitations and failure to state a claim under Fed. R. Civ. P. 12(b)(6).

---

[1] According to Plaintiffs, "South Asian" refers to individuals who trace their ancestry to the Indian subcontinent. "Indian" refers to individuals born in India, or whose ancestors came from India.

For the reasons that follow, Defendant's Motion to Dismiss is **GRANTED** in part, and **DENIED** in part. Specifically, Defendant's motion is granted as to Plaintiffs' disparate impact claims under Title VII based on the Court's finding that the First Amended Complaint fails to identify a facially neutral employment practice. However, Defendant's motion is denied as to Plaintiff's disparate treatment claims under Title VII and Section 1981. Further, the Court finds that the individual Title VII disparate treatment claims asserted by Gibbs and Valles are time barred. Finally, Defendant's request to dismiss Plaintiffs' claims for prospective relief is denied as premature.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.   Factual Background

For the purposes of this motion, the Court takes as true all allegations of the FAC. Defendant is a multinational professional services company that provides information technology and consulting services to customers worldwide. (FAC, ¶ 1.) Plaintiffs are former Wipro employees who allege that Defendant engages in a pattern or practice of intentional race and national origin discrimination in violation of Title VII and § 1981, and that the company uses employment practices that result in a disparate impact on non-South Asians and non-Indians in violation of Title VII. (*See* FAC ¶¶ 1-2, 79-92; *see also* 42 U.S.C. §§ 1981, 2000e–2.)

More specifically, MacLean, a "Caucasian" man of "American national origin," was employed by Wipro from May 2011 until February 2019. (*Id.* at ¶¶ 3, 28, 32.) Defendant hired MacLean when Wipro acquired Science Application International Corporation ("SAIC") in 2011. (*Id.* at ¶ 27.) From May 2011 until December 2018, MacLean worked as a Software Analyst on a "project servicing BP Arco," a former client of SAIC. (*Id.* at ¶¶ 27-28.) When the project concluded, MacLean was placed on the "bench," a term defined by the FAC to mean that he was

placed in a "non-productive status," until Defendant selected him for a position on another project. (*Id.* at ¶¶ 16, 30.) MacLean claims that he "actively sought" new positions within Wipro, but "received very few responses" to his applications. (*Id.* at ¶ 30.) Indeed, the FAC alleges that MacLean expressed interest in two positions—one located in San Diego and the other in Los Angeles—but he was never selected for the positions. (*Id.*) MacLean further claims that Wipro "regularly" failed to provide him with an "appraisal," and that he was "never promoted." (*Id.* at ¶ 33.) Finally, MacLean alleges that in February 2019, Wipro "falsely submitted a 'resignation' letter" on his behalf through Defendant's intranet. After MacLean informed Wipro that he had not resigned, he was reinstated. (*Id.* at ¶ 31.) A few days later, on February 25, 2019, Wipro terminated MacLean's employment. (*Id.* at ¶ 32.)

Valles, an "Hispanic" man of "American national origin," was also hired when Wipro acquired SAIC. Like MacLean, Valles allegedly worked on the BP Arco project, was benched when the project ended, and Wipro never contacted him about opportunities within the company while benched. (*Id.* at ¶¶ 38-39.) On January 31, 2015, Wipro allegedly terminated Valles' employment. (*Id.* at ¶ 40.) Valles claims that he and the rest of his SAIC colleagues acquired by Wipro (who were allegedly all non-South Asian and non-Indian) were terminated and replaced by South Asian employees. (*Id.*) Valles further alleges that Wipro failed to provide him with an appraisal and never promoted him. (*Id.* at ¶ 41.) Instead, Valles purportedly received only either "very small" raises or no raise at all. (*Id.*) After Valles' termination, he also allegedly applied to several IT analyst positions within Wipro in the Los Angeles area, for which he was purportedly "well qualified," but Wipro never contacted him about his applications. (*Id.* at ¶ 43.)

Pezeshki, a "Caucasian" man of "Iranian national origin," was hired by Wipro as a "Practice Director of business process digitization" on July 2, 2012. (*Id.* at ¶¶ 5, 44-45.) While

working in Wipro's Mountain View, California office, Pezeshki allegedly observed that Wipro's management and employees "had a cultural preference for hiring and working with South Asians and Indians." (*Id.* at ¶ 46.) More specifically, Pezeshki alleges the majority of individuals selected for positions within the United States were South Asian, despite these individuals purportedly being "poorly skilled and unqualified for the positions." (*Id.*) Pezeshki further claims that he was "regularly treated with hostility by his South Asian managers and colleagues," and that he began to receive low appraisal ratings after he raised concerns about Wipro's employees not being truthful to clients about employees' qualifications. (*Id.* ¶ 47-48.) Finally, Pezeshki alleges that he was never promoted, and that he was passed over for a promotion in favor of his immediate manager, who was "South Asian" and purportedly "less experienced." (*Id.* at ¶¶ 49, 51.) Like MacLean and Valles, Wipro allegedly did not assist Pezeshki in finding a new position after he was benched in March 2018. (*Id.* at ¶ 49.) On June 1, 2018, Wipro terminated Pezeshki's employment. (*Id.* at ¶ 50.)

Gibbs, a "Caucasian" man of "American national origin," was hired by Wipro in 2012, as a Global Client Partner serving Wipro's FedEx client account, an organization with which he had a previous sales relationship. (*Id.* at ¶¶ 6, 53.) While employed by Defendant, Gibbs worked in Memphis, Tennessee. (*Id.* at ¶ 53.) Gibbs alleges that, despite his "strong performance," he was "never promoted." (*Id.* at ¶ 56.) Indeed, the FAC alleges that Gibbs attempted to discuss the promotion process with his boss, Devprasad Rambhatla, Wipro's Vice President of Travel, Transportation & Hospitality, but neither Rambhatla, nor others at Wipro, would discuss the promotion process or the possibility of promotion. (*Id.*) Gibbs further alleges that Rambhatla "quadrupled [his] sales and margin quotas to levels that were unrealistic," was "rude and condescending to [him]," and "forc[ed] him to work 70-80 hours each week." (*Id.* at ¶ 57.) In 2015,

Gibbs claims that he became aware that Wipro was advertising his position on LinkedIn, and "understood that Wipro was looking for a South Asian of Indian descent" to fill his position. (*Id.* at ¶ 58.) As a result, Gibbs alleges that he "decided to quit rather than be fired by Wipro." (Id.) In September 2015, Gibbs resigned, and he was allegedly replaced by Anand Shanmugham, "a South Asian of Indian descent," who was then "promptly" promoted. (*Id.*) At the time of his resignation, Gibbs claims that he was the only non-South Asian who reported directly to Rambhatla, that each of the other "seven or eight non-South individuals" who had previously reported to Rambhatla had been terminated or had quit, and that each of those positions was replaced by an employee of "South Asian of Indian descent." (*Id.* at ¶ 59.)

Hemenway, a "Caucasian" man of "American national origin," began working at Wipro as a Program Director in September 2019. (*Id.* at ¶¶ 7, 63.) After Hemenway was hired, he was assigned to a project with Capital One located in Richmond, Virginia. (*Id.* at ¶ 63.) While working on the Capital One project, Hemenway alleges that he observed that many of his South Asian colleagues "were unqualified for the work they were performing." (*Id.* at ¶ 65.) In addition, he claims that he was given "menial work," despite possessing a substantial amount of experience, and that his managers would "sometimes exclude [him] from workplace discussions by speaking in a South Asian dialect he could not understand." (*Id.* at ¶ 66.) In late November or early December 2019, Hemenway alleges that he was removed from the Capital One project and benched. (*Id.* at ¶ 67.) Hemenway further alleges that he actively sought a new position within Wipro, but he was not selected for any positions. (*Id.*) On February 26, 2020, Defendant terminated Hemenway's employment with the company. (*Id.*) In short, Hemenway claims that while he was employed at Wipro, Defendant failed to provide him with "a performance evaluation" and "never promoted" him. (*Id.* ¶ 68.) Since his termination, recruiters have allegedly contacted Hemenway

"regarding opportunities for employment with Wipro," and although he "was interested and asked to be considered," Wipro "never re-hired him." (*Id.* at ¶ 69.)

Together, Plaintiffs allege that Wipro engages in four distinct discriminatory employment practices that demonstrate a preference for South Asians and Indians. (Id. at ¶¶ 17-24.) First, Wipro allegedly submits "visa petitions for more positions than actually exist" in the United States.[2] (*Id.* at ¶ 19.) Plaintiffs claim that although individuals already located in the United States, and non-South Asian foreign individuals who are "visa-ready," applied for open positions located in the United States, Defendant's South Asian and Indian visa-ready individuals are given preference for these positions. (*Id.* at ¶ 20.) Similarly, "non-South Asian and non-Indian individuals are often displaced from their current positions in favor of South Asian and Indian visa-ready individuals." (*Id.*) Second, Plaintiffs allege that Wipro, both through its internal recruiting department and third-party recruiting companies, gives preference to South Asian and Indian applicants located in the United States over non-South Asian and non-Indian applicants. (*Id.* at ¶ 21.) Third, Plaintiffs allege that "because of its discriminatory preference for South Asians and Indians, Wipro promotes South Asians and Indians at disproportionately high rates compared to non-South Asians." (*Id.* at ¶ 22.) Critical to receiving a promotion, Wipro employees must receive a "favorable appraisal score" and "must be nominated for a promotion by their immediate manager and have that nomination approved by their manager's manager." (*Id.*) Plaintiffs claim that some non-South Asian and non-Indian employees never receive appraisals, and those that do receive appraisals, are given lower scores compared to South Asian and Indian employees. (*Id.*) Fourth, Plaintiffs allege that Wipro benches and terminates non-South Asians and non-Indians at disproportionately higher rates compared to South Asians and Indians. (*Id.* at ¶ 23.)

---

[2]   For example, the FAC alleges that although Defendant employs less than 15,000 individuals in the United States, Defendant received 5,968 new visas in 2015 and 6,831 new visas in 2016. (FAC at ¶ 19.)

Plaintiffs also seek to represent a class of applicants, employees, and former employees who were subject to Wipro's alleged discriminatory practices. (*Id.* at ¶¶ 70-78.) In that regard, Plaintiffs bring this action on behalf of the following three classes: 1) "all persons who are not of South Asian race or Indian national origin who applied for positions with Wipro in the United States and were not selected for the position," 2) "all persons who are not of South Asian race or Indian national origin who were employed by Wipro in the United States for the minimum amount of time necessary to be eligible for a promotion pursuant to Wipro's policies and/or practices, and were not promoted," and 3) "all persons who are not of South Asian race or Indian national origin who were employed by Wipro in the United States and were terminated." (*Id.* at ¶ 70.)

The FAC asserts three causes of action on behalf of Plaintiffs and the putative classes: 1) disparate treatment on the basis of race in violation of 42 U.S.C. § 1981; 2) disparate treatment on the basis of race and national origin in violation of Title VII; and 3) disparate impact on the basis of race and national origin in violation of Title VII. (*Id.* at ¶¶ 79-92.) Plaintiffs seek compensatory and punitive damages, a declaratory judgment, and a permanent injunction.

## B.   **Procedural History**

On December 1, 2017, two former Wipro employees, James Phillips and Robert Saemian ("Phillips Plaintiffs"), filed a putative class action ("*Phillips* Action") against Defendant in the United States District Court for the Northern District of California, alleging that Wipro discriminated against them because they are neither South Asian nor Indian. *See Phillips*, No. 4:18-cv-00821, ECF. No. 1. Substantially similar to the FAC, the Complaint in the *Phillips* Action asserts claims of disparate treatment on the basis of race in violation of § 1981, disparate treatment on the basis of race and national origin in violation of Title VII, and disparate impact on the basis

of race and national origin in violation of Title VII. On March 14, 2018, the *Phillips* Action was transferred to the United States District for the Southern District of Texas. *Id.* at ECF No. 25.

On November 26, 2019, the *Phillips* Plaintiffs moved for leave to amend to add MacLean, Valles, Pezeshki, and Gibbs as named plaintiffs. *Id.* at ECF No. 117. The district court, there, denied the motion on the ground that adding four additional named plaintiffs "so late in the litigation" would "substantially expand the scope of discovery" and "unduly prejudice Defendant, when ultimately the claims of the Proposed Plaintiffs would be included in any class that the Named Plaintiffs seek to certify." *See Phillips*, No. 4:18-cv-00821, ECF No. 134, at 2–3.

After the Texas court's denial of their motion to amend, Plaintiffs filed charges with the Equal Employment Opportunity Commission (EEOC) in February and March 2020. (*See* Hart Decl., Ex. B (MacLean EEOC charge, filed February 11, 2020); Hart Decl., Ex. C (Valles EEOC charge, filed February 21, 2020); Hart Decl., Ex. D (Pezeshki EEOC charge, filed February 22, 2020); Hart Decl., Ex. E (Gibbs EEOC charge, filed February 13, 2020); Hart Decl., Ex. F (Hemenway EEOC charge, filed March 24, 2020).) Plaintiffs' EEOC charges allege that Wipro engages in the pattern of discrimination referenced in the instant Complaint, including "employment practices" that purportedly "have a disparate impact on non-South Asian applicants and employees." (Hart Decl., Exs. B-F at ¶¶ 10–16.) Plaintiffs received right-to-sue letters from the EEOC.

On March 30, 2020, Plaintiffs, represented by the same counsel as the plaintiffs in the *Phillips* Action, filed the instant Complaint in this Court, and amended their Complaint on June 1, 2020. (ECF Nos. 1 and 6.) The FAC adds a Title VII claim on behalf of Hemenway, who received a right-to-sue letter from the EEOC on May 19, 2020.

On June 11, 2020, Defendant moved to dismiss Plaintiffs' FAC, or in the alternative, to stay and to strike class allegations. ECF No. 11. Defendant sought to dismiss the FAC on the grounds that it was duplicative of the first-filed *Phillips* action, Plaintiffs' claims were time-barred, Plaintiffs failed to exhaust administrative remedies, and Plaintiffs failed to state a claim under Title VII or Section 1981. Defendant requested, in the alternative, a stay pending the resolution of the first-filed *Phillips* action and dismissal of class allegations seeking prospective and injunctive relief for lack of standing.

On December 4, 2020, this Court granted Defendant's motion to stay Plaintiffs' claims pending a class certification decision in *Phillips*. ECF No. 17. The Court did not consider the substantive merits of Defendant's arguments for dismissal of Plaintiffs' claims. Instead, the Court instructed that "[i]n the event class certification is denied" in *Phillips*, Defendant will "be permitted to renew its arguments for dismissal, including violation of the statute of limitations and failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6)." *Id.* at 22 & n.8.

On March 14, 2022, the *Phillips* court declined to certify a class. *See Phillips*, No. 4:18-00821, ECF No. 253. On April 7, 2022, this Court lifted the stay of this action and ordered a briefing schedule for Defendant's instant motion to dismiss. ECF No. 21.

## II.   LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss an action if a plaintiff fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When reviewing a Rule 12(b)(6) motion, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). A complaint survives a motion

to dismiss if it contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

To determine whether a complaint is plausible, courts in the Third Circuit conduct a three-step analysis. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the court "takes note of the elements a plaintiff must plead to state a claim." *Id.* (quoting *Iqbal*, 556 U.S. at 675). Second, the court identifies allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 131 (quoting *Iqbal*, 556 U.S. at 679). Third, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Santiago*, 629 F.3d at 131 (quoting *Iqbal*, 556 U.S. at 680). This last step is a "context-specific task that requires the [ ] court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Generally, the court may not "consider matters extraneous to the pleadings" when considering a motion to dismiss. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation omitted). However, the court may consider (1) exhibits attached to the complaint, (2) matters of public record, and all "document[s] integral to or explicitly relied upon in the complaint" without converting the motion to dismiss into one for summary judgment. *Angstadt v. Midd–West Sch. Dist.*, 377 F.3d at 342 (quoting *U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002)).

## III.  **DISCUSSION**

On the instant motion, Defendant argues that (1) Plaintiffs' disparate impact and disparate treatment claims under Title VII and Section 1981 should be dismissed for failure to state claim, (2) that, independent from those legal deficiencies, certain Title VII and Section 1981 claims

should be dismissed as untimely, and (3) Plaintiffs lack standing to pursue prospective relief. I will address each of Defendant's arguments, in turn.

### A.   <u>Failure to State a Claim</u>

The FAC alleges both disparate impact in violation of Title VII and disparate treatment in violation of Title VII and Section 1981. With respect to Plaintiffs' disparate impact claims, Wipro contends that Plaintiffs failed to exhaust their administrative remedies, and even if they did exhaust them, they failed to plead the existence of a specific, facially neutral employment practice to support a disparate impact claim under Title VII. Second, Defendant argues that Plaintiffs' disparate treatment claims fail under both Section 1981 and Title VII because they have not plausibly alleged that race or national origin was either a "but for" cause or a "motivating factor" in any adverse employment action. Rather, in this connection, Defendant maintains that "[d]iscrimination is no more plausible than other, nondiscriminatory reasons" for the purported adverse employment actions encountered by Plaintiffs, "such as sub-par performance, lack of qualifications for a particular position, or the existence of another more qualified candidate."

Under Title VII, a disparate impact violation arises when an employer is shown to have used a specific employment practice, neutral on its face, but causing a substantial adverse impact on a protected group and which cannot be justified as serving a legitimate business goal of the employer. *NAACP v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 476 (3d Cir. 2011); *Metal Service Co.*, 892 F.2d at 346 (3d Cir. 1990); 42 U.S.C. § 2000e-2(k)(1)(A)(i). "Title VII is meant to ensure that workplaces are free from discrimination and that employment decisions are made based on qualifications rather than extraneous factors such as race and color." *United States v. State of New Jersey*, No. 10-91, 2012 U.S. Dist. LEXIS 113175, at *25-26, 2012 WL 3265905

(D.N.J. June 12, 2012). "Unlike the disparate treatment theory of liability, a claim of disparate impact does not require proof of discriminatory motive." *Crawford*, 103 F. Supp. 3d at 606.

In order to state a claim for disparate impact, a plaintiff is required to identify the specific policy at issue. *Newark Branch, NAACP v. Twp. of Harrison*, 940 F.2d 792, 798 (3d Cir. 1991); *see N. Hudson Reg'l Fire & Rescue*, 665 F.3d at 476; *Williams v. Compassionate Care Hospice*, No. 16-2095, 2016 U.S. Dist. LEXIS 101669, at *11, 2016 WL 4149987 (D.N.J. Aug. 3, 2016). Thus, a plaintiff fails to state a disparate impact claim if he or she alleges "discrete incidents" that resulted in discrimination as opposed to "specific polices." *See Graves v. Ancora Psychiatric Hosp.*, No. 10-369, 2012 U.S. Dist. LEXIS 175128, at *13, 2012 WL 6153428 (D.N.J. Dec. 10, 2012) (concluding that, although the plaintiff referenced "discrete incidents, she mention[ed] no specific policies that resulted in discrimination against members of a protected class. The failure to do so is fatal to her disparate impact claim.").

On the other hand, "[a] disparate treatment violation is made out when an individual of a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion under Title VII." *EEOC v. Metal Service Co.*, 892 F.2d 341, 347 (3d Cir. 1990). Importantly, a plaintiff must allege that the employer acted with a discriminatory intent, which can either be shown through direct evidence or indirect or circumstantial evidence.[3] *Id.* Stated differently, the plaintiff must allege facts and circumstances "to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." *Id.* at 348 (internal quotation marks and citation omitted); *see Crawford v. Verizon*

---

[3]      Similar to a claim for employment discrimination under Title VII, on a motion for summary judgment, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action if the plaintiff indirectly shows discriminatory intent. *Metal Services Co.*, 892 F.2d at 347; *see McDonnell Douglas Corp.*, 411 U.S. at 792. However, such burden shifting is not appropriate on a motion to dismiss.

*Pa., Inc.*, 103 F. Supp. 3d 597, 606 (E.D. Pa. 2015). However, the Third Circuit noted that "courts must be sensitive to the myriad of ways such an inference can be created." *Metal Service Co.*, 892 F.2d at 347. Similarly, to establish a discrimination claim under Section 1981, "a plaintiff must show (1) that he belongs to a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in § 1981." *Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 797 (3d Cir. 2010).

### 1. *Disparate Impact Under Title VII*

As a threshold matter, Defendant argues that Plaintiffs failed to exhaust their administrative remedies. Failure to exhaust administrative remedies is a defense that may be raised on a motion to dismiss. *Anjelino v. N.Y. Times Co.*, 200 F.3d 73, 87 (3d Cir. 1999). Indeed, "[a] complaint does not state a claim upon which relief may be granted unless it asserts the satisfaction of the precondition to suit specified by Title VII: prior submission of the claim to the [Equal Employment Opportunity Commission ("EEOC") ] for conciliation or resolution." *Robinson v. Dalton*, 107 F.3d 1018, 1022 (3d Cir. 1997) (quotation omitted). To properly exhaust administrative remedies under Title VII, a plaintiff must file a charge with the EEOC within 180 days after the alleged unlawful conduct occurred. 42 U.S.C. § 2000e–5(e)(1). If the plaintiff lives in a deferral state, such as New Jersey, and a charge is also filed with a state or local agency, this deadline is extended to 300 days. *Id.*; *see also Cardenas v. Massey*, 269 F.3d 251, 255 n.2 (3d Cir. 2001). Once a charge is filed with the EEOC, the agency has 180 days to investigate the allegations and notify the employee of its conclusions. 42 U.S.C. § 2000e–5(f)(1). If the EEOC does not respond within 180 days, or issues a "right–to–sue" letter to the employee before the 180 days has expired, the employee has 90 days to file a lawsuit. *Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465, 470 (3d Cir. 2001). "The purpose of this administrative exhaustion requirement is to put the EEOC on notice

of the plaintiff's claims and afford it the opportunity to settle disputes through conference, conciliation, and persuasion, avoiding unnecessary action in court." *Webb v. City of Phila.*, 562 F.3d 256, 262 (3d Cir. 2009) (citations omitted). A plaintiff cannot "bypass the administrative process." *Id.* (citation omitted). "[T]he parameters of the civil action ... are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Id.* (citation omitted). "Once a charge of some sort is filed with the EEOC, ... the scope of a resulting private civil action in the district court is 'defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination....' " *Hicks v. ABT Assocs., Inc.*, 572 F.2d 960, 966 (3d Cir. 1978) (quoting *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398–99 (3d Cir. 1976)). EEOC charges are given a "fairly liberal construction." *Schouten v. CSX Transp., Inc.*, 58 F.Supp.2d 614, 616 (E.D. Pa. 1999).

Here, Wipro argues that Plaintiffs failed to exhaust their administrative remedies because they identified only a "generalized policy," not a "specific employment practice" that supposedly causes a disparate impact. (Def. Mov. Br., 11.) Specifically, Defendant claims that Plaintiffs' EEOC charges cite the same alleged practices that they contend caused a "disparate impact on non-South Asian applicants and employees": (1) "relying on visa workers to staff U.S. positions," (2) "employee-allocation practices," (3) "appraisal and promotion processes," (4) "benching and termination practices," and (5) "hiring and staffing decision-making process, as a whole." However, according to Wipro, these alleged practices are either "too generic to properly apprise the EEOC of a disparate impact claim, or else do not constitute a 'neutral policy.'" Defendant further emphasizes that "[c]hallenges to Wipro's 'hiring and staffing decision-making process, as a whole' and 'employee-allocation practices,' are exactly the kind of 'generalized' policies or practices that fail to apprise the EEOC and the employer of the basis for the claim and thus fall

short of the exhaustion requirement." (*Id.* at 11-12.) As to the remaining practices alleged by Plaintiffs, including Wipro's hiring, promotion, and termination policies, Defendant argues that these also fail to satisfy the exhaustion requirement because they are "rooted in allegations of explicit preferences given to a specific group—individuals who are South Asian and Indian." (*Id.* at 12.) In other words, Defendant submits that there is nothing "intrinsic to these practices themselves that cause non-South Asians or non-Indians to be hired or promoted less often, or terminated more often, than Indians or South Asians." Therefore, Defendant argues that these alleged practices sound in disparate treatment and cannot form the basis for a disparate impact claim.

I find, however, that Defendant demands more than what the law requires. Wipro cites no authority in support of its claim that a plaintiff's charge must allege the elements of a *prima facie* case in order to exhaust administrative remedies. *Rupert v. PPG Indus., Inc.*, No. 07-705, 2009 WL 10689650, at *15 (W.D. Pa. Feb. 5, 2009) (rejecting a defendant's argument that the plaintiffs failed to exhaust administrative remedies because their charges lacked reference to any facially neutral policy, noting that a charge need not allege the elements of a *prima facie* case).  Indeed, "such a rule could not be reconciled with the broader rule followed in this circuit that exhaustion is determined by the scope of the EEOC investigation that would reasonably be expected to grow out of the charge." *Id.* Moreover, I find that the Title VII claims asserted in Plaintiffs' FAC are fairly within the scope of the EEOC charge. Indeed, Defendant admits, and the Court's independent review confirms, that Plaintiffs' EEOC charges cite the same alleged practices that they contend in this lawsuit caused a disparate impact on non-South Asian applicants and employees, namely: (1) "relying on visa workers to staff U.S. positions," (2) "employee-allocation practices," (3) "appraisal and promotion processes," (4) "benching and termination practices," and

(5) "hiring and staffing decision-making process, as a whole." Accordingly, it is undisputed that the language of Plaintiffs' EEOC charges is sufficient to encompass an EEOC investigation into the disparate impact claims asserted in this civil action.

Second, Defendant argues that even if Plaintiffs properly exhausted their administrative remedies, they cannot state a claim for disparate impact under Title VII. In this regard, Defendant again submits that the FAC does not allege a specific, facially neutral employment practice. Moreover, Wipro argues that even if the allegations of the FAC do identify a specific, facially neutral employment practice and sound in disparate impact, Plaintiffs "fail to connect the dots to show how these alleged practices caused disparities in Wipro's workforce, nor have they shown that these practices had an impact on them specifically." In response, Plaintiffs highlight allegations of the FAC that Wipro's hiring and project staffing process results in a disparate impact as a whole. In addition, they point to four specific employment practices that have a disparate impact on non-South Asians and non-Indians, which include: "(1) Wipro's practice of applying for large numbers U.S. work visas in excess of its staffing needs to maximize the number of visas it receives each year; (2) its practice of preferring South Asians (including visa holders) over internal and external candidates in staffing; (3) its appraisal and promotion practice which results in non-South Asian and non-Indians not nominated for promotions and consistently receiving lower appraisal scores; and (4) Wipro's policy of terminating employees who remain on the bench for more than approximately four weeks."

Here, I agree with Defendant's position that because Plaintiffs fail to allege a <u>facially neutral</u> employment practice, their claims sound in disparate treatment, as opposed to disparate impact. To better illustrate the Court's findings, I find a brief survey of disparate impact case law helpful. Examples of policies or practices cited in cases where disparate impact claims have been

successful include high school diploma requirements, *see Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), written aptitude tests, *see Albermarle Paper Co. v. Moody*, 422 U.S. 405 (1975), written test of verbal skills, *see Washington v. Davis*, 426 U.S. 229 (1976), or height and weight requirements, *see Dothard v. Rawlinson*, 433 U.S. 321 (1988). Unlike here, each of these cases share a common thread—the plaintiffs cited a facially neutral policy or practice that, when applied, had a discriminatory impact on a protected group. For example, in *Dothard*, the Supreme Court considered whether height and weight restrictions on prison guards in Alabama had a disparate impact on women. 433 U.S. at 323. There, the plaintiff's application for employment as a prison guard in Alabama was rejected because she failed to meet the minimum 120-pound weight requirement of an Alabama statute, which also established a height minimum of 5 feet 2 inches. *Id.* at 323-24. Affirming the district court's ruling that Title VII prohibited application of the statutory height and weight requirements under a disparate impact theory of liability, the Court found that the "gist of the claim that the statutory height and weight requirements discriminate against women does not involve an assertion of purposeful discriminatory motive." *Id.* at 328. Rather, the Court agreed that "these facially neutral qualification standards work in fact disproportionately to exclude women from eligibility for employment by the Alabama Board of Corrections." *Id.* at 329.

Instead, as discussed in detail *infra*, I find the allegations of the FAC more akin to those in *Healey v. Southwood Psychiatric Hosp.*, 78 F.3d 128, 131 (3d Cir. 1996), *Rauceo v. Philadelphia Gas Works*, No. 19-4279, 2020 WL 550613, at *3 (E.D. Pa. Feb. 3, 2020), and *Chavarria v. Philadelphia Gas Works*, No. 19-4428, 2020 WL 529892, at *3 (E.D. Pa. Feb. 3, 2020). In *Healey*, the plaintiff appealed the order of the district court granting the defendant's motion for summary judgment on her sex discrimination claim brought under Title VII. 78 F.3d at 130. Affirming the

district court's decision, the Third Circuit also noted that the trial court did not address the plaintiff's disparate impact claim under Title VII in dismissing her complaint. *Id.* at 131. In that regard, the Third Circuit explained that, like here, the plaintiff asserted that both disparate treatment and disparate impact theories were applicable to her case. *Id.* However, the Third Circuit disagreed as to the applicability of the disparate impact claim, because the policy alleged by the plaintiff was facially discriminatory. *Id.* Specifically, the plaintiff alleged that the defendant had a policy of scheduling both males and females to all shifts, but it considered sex in making its assignments. *Id.* According to the plaintiff, the defendant assigned her to the night shift because it needed a female child care specialist on that shift. *Id.* Thus, the Third Circuit emphasized that because the defendant "uses sex as an explicit factor in assigning its staff to the various shifts, and [the plaintiff] was assigned to the night shift because of her sex," the defendant's staffing policy was "facially discriminatory, rather than facially neutral." *Id.*

Similarly, in *Rauceo* and *Chavarria*, the court also dismissed portions of the plaintiffs' disparate impact claims based on findings that the policies or practices alleged in the complaints were deliberately discriminatory. In *Rauceo*, the plaintiff's disparate impact claim cited three different policies and practices—promotions, scheduling work, and scheduling overtime. No. 19-4279, 2020 WL 550613, at *3. As to the defendant's overtime policy, the plaintiff alleged that it "required even scheduling of overtime to be done [on] an objective standard scheduling." *Id.* However, according to the plaintiff, the defendant "disregarded the policy by not scheduling any African American, brown, or black supervisors for overtime[.]" *Id.* The district court, however, found that the plaintiff failed to state a disparate impact claim with respect to the overtime policy because, according to the allegations, the defendant "purportedly applied the rule in a deliberately discriminatory fashion." *Id.* Thus, because the defendant "allegedly only scheduled overtime for

nonprotected class members in violation of the policy," the court found that the plaintiff's claim is "one of intentional discrimination—not the result of adverse effects from a facially neutral policy." *Id.* In *Chavarria*, the plaintiff's disparate impact claim relied, in part, on a "no electronics policy" purportedly enforced by the defendant. No. 19-4428, 2020 WL 529892, at *3. Specifically, the plaintiff averred that the defendant instituted a personnel policy that prohibited employees from using personal electronics devices at a particular jobsite. *Id.* But, according to the plaintiff, the defendant only imposed the policy against black and brown employees. *Id.* Based on these allegations, the district court found that the plaintiff had failed to state a disparate impact claim because management purportedly applied the rule in a "deliberately discriminatory fashion." *Id.* Indeed, the district court noted that the fact the defendant allegedly "only enforced the rule against protected class members indicates that [the plaintiff's] claim is one of intentional discrimination— not the result of adverse effects from a facially neutral policy." *Id.*

While the Court does not find the practices to lack specificity or to be too "generic," Plaintiffs do allege that, with those policies, Wipro intentionally discriminated against non-South Asians and non-Indians.

### <u>Visa Policy</u>

For example, as to work visas, the FAC alleges that "[t]o fulfill its employment <u>preference</u> for South Asians and Indians, Wipro seeks to maximize the number of visas it receives each year from the federal government." (*Id.* at ¶ 19) (emphasis added.) According to Plaintiffs, Wipro has secured visas for "far more individuals than it actually has a present need for." (*Id.*) Once these visas are obtained, Plaintiffs claim that "[a]ll, or substantially all, of the individuals for whom Wipro secures visas are South Asian and Indian." (*Id.* at ¶ 20.) According to Plaintiffs, "[w]hile both individuals already located in the U.S. and foreign individuals who are visa-ready are

considered for open positions in the U.S., Wipro's South Asian and Indian visa ready individuals are given <u>preference</u> for these positions." (*Id.*) (emphasis added.) Thus, Plaintiff avers that "Wipro's practice of relying on visa workers to staff U.S. positions results in available positions overwhelmingly going to visa holding South Asian and Indian individuals, to the exclusion of non-South Asian and non-Indian candidates." (*Id.* at ¶ 24.)

According to Plaintiff's own allegations, Wipro's visa policy intentionally secures visas for South Asian and Indian individuals; thereby deliberately discriminating against non-South Asians and non-Indians. To that end, the Court's conclusion might be different had the FAC alleged simply that Wipro engaged in a practice of maximizing its visas to increase its workforce, and this practice resulted in more South Asians and Indians obtaining visas and working at the company. However, that is not what Plaintiffs have alleged. Rather, they alleged that because of this discriminatory practice, "non-South Asian and non-Indian individuals are often displaced from their current positions <u>in favor of</u> South Asian and Indian visa-ready individuals." (FAC, ¶ 20.) This is not facially neutral, but intentional discrimination.

### <u>Employee Allocation and Hiring Practices</u>

Similarly, as to Wipro's hiring and employee allocation practices, the FAC alleges that "Wipro gives <u>preference</u> to South Asian and Indian applicants located in the U.S. over non-South Asian and non-Indian applicants." (*Id.* at ¶ 21) (emphasis added.) As such, I find that Plaintiffs again allege that Wipro's hiring practices deliberately target South Asian and Indian candidates to the detriment of non-South Asians and non-Indians. Indeed, Plaintiffs claim that Wipro's internal recruiting department and third-party recruiters <u>locate and recruit</u> South Asian and Indian candidates, and that "as a result, on information and belief, Wipro hires a disproportionately high percentage of South Asians and Indians within the United States that far exceeds the proportion of

those individuals in the relevant labor market." (*Id.* at ¶¶ 21, 24.) These affirmative actions suggest a conscious pattern and practice to intentionally discriminate—not a facially neutral policy that innocently, and without a discriminatory motive, unfairly impacts a protected group.

**Promotion Practices**

Third, Plaintiffs allege that Wipro's employee-promotion practice elevates South Asians and Indians at disproportionately high rates. (*Id.* at ¶ 22.) According to Plaintiffs, Wipro employees must receive a favorable appraisal score and must be nominated for a promotion by their immediate manager and have that nomination approved by their "manager's manager" in order to receive a promotion. (*Id.*) The appraisals include a rating of either outstanding, exceeds expectations, highly valued contribution, more contribution expected, or unsatisfactory contribution. Critically, however, for purposes of this motion, Plaintiffs claim that "[b]ecause of Wipro's <u>preference</u> for South Asians and Indians, these individuals are regularly awarded higher appraisal scores, compared to their non-South Asian and non-Indian colleagues," and "some non-South Asian and non-Indian individuals are never given appraisal scores at all." (*Id.*) (emphasis added.) The inference drawn from these allegations is clearly that Wipro favors South Asian and Indian employees, and therefore, the company practice is to ensure these individuals receive higher scores and better evaluations. To be clear, this is not a case of a purportedly flawed appraisal system that happens to benefit South Asians and Indians more than non-South Asians and non-Indians. Rather, Plaintiffs allege that Wipro's practice is to purposely give South Asians and Indians more favorable scores. Again, these allegations sound in disparate treatment, not disparate impact.

**Termination and Benching Practices**

Finally, Plaintiffs allege that "because of its discriminatory <u>preference</u> for South Asians and Indians," Wipro terminates non-South Asians and non-Indians at disproportionately high rates,

compared to South Asians and Indians. (*Id.* at ¶ 23.) To this end, the FAC emphasizes Wipro's purported "preference for filling positions with South Asian and Indian visa workers and South Asian and Indian individuals hired within the U.S.," which results in non-South Asian and non-Indian employees being relegated to the bench and/or unable to locate new assignments with disproportionately greater frequency. (*Id.*) (emphasis added.) Again, the inference drawn from these allegations is that in order to employ more South Asian and Indian workers, Wipro purportedly intentionally benches non-South Asians and Indians. Once these non-South Asian and Indian employees are benched, they are then either terminated or, like Gibbs, leave the company after a period of prolonged inactivity.

When accepting all factual allegations in the FAC as true, and construing them in a light most favorable to Plaintiffs, the Court finds that Plaintiffs fail to state a claim for disparate impact under Title VII because the allegations sound more in disparate treatment, which is discussed *infra*. Put simply, Plaintiffs have identified four allegedly discriminatory employment practices, but none of those practices are facially neutral. Rather, the allegations suggest that these practices have been enacted and enforced by Wipro to carry out the company's preference for South Asian and Indian workers. These deliberate and intentional discriminatory policies and practices do not amount to the types of disparate impact that the Supreme Court has sanctioned. *Williams v. Twp. of Lakewood*, 17-11401, 2020 WL 7391009, at *18 (D.N.J. Dec. 15, 2020) (dismissing a plaintiff's disparate impact claim because the plaintiff asserted that the defendant maintained a facially discriminatory practice in its treatment of Latina employees); *Robbins v. Camden City Bd. of Educ.*, 105 F.R.D. 49, 56 (D.N.J. 1985) (dismissing a plaintiff's disparate impact claim based on a failure to allege a facially neutral policy or practice). Indeed, disparate impact discrimination is a "brand of 'unintentional discrimination,' whereby 'employment practices that are facially neutral

in their treatment of different groups but that in fact fall more harshly on one group than another' are prohibited." *United States v. Pennsylvania*, 110 F. Supp. 3d 544, 549 (M.D. Pa. 2015) (citing *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15 (1977). While there is no debate that Plaintiffs are entitled to proceed under alternative theories of liability, the allegations "must be sufficient to support both theories." *Zawacki v. Realogy Corp.*, 628 F. Supp. 2d 274, 281 (D. Conn. 2009) (dismissing disparate impact claim based on the plaintiff's failure to allege a facially neutral practice or policy). Accordingly, Defendant's motion to dismiss is granted as to Plaintiffs' disparate impact claim arising under Title VII.

### 2. *Disparate Treatment Under Title VII or Section 1981*

Next, Defendant argues that Plaintiffs' disparate treatment claims under Title VII and Section 1981 are deficient. According to Defendant, Plaintiffs claim they were subjected to three categories of adverse employment actions: (1) Wipro's failure to hire and rehire them, (2) failure to promote them, and (3) termination of their employment. However, Defendant contends that when the FAC is "stripped of legal conclusions disguised as facts," Plaintiffs fail to allege sufficient facts to support an inference that race or national origin was a "motivating factor"—let alone the "but for" cause—of any of these adverse employment actions.

In response, Plaintiffs claim that they have asserted "pattern or practice" claims, which are governed by the framework set forth in *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977). According to Plaintiffs, under this framework, their disparate treatment claims are adjudicated in two phases. In Phase I, Plaintiffs claim that they have the burden to prove that "racial discrimination was [Wipro's] standard operating procedure[,] the regular rather than the unusual practice." (Pls. Opp., 13) (citing *Int'l Bhd. of Teamsters*, 431 U.S. at 336, 361 n.46). If Plaintiffs prevail in Phase I, by establishing a pattern and practice of discrimination, Plaintiffs

submit that in Phase II, Defendant becomes a "proved wrongdoer" and each class-member "need only show that [he or she] unsuccessfully applied for a job[, was not promoted, or was terminated] and therefore was a potential victim of the proved discrimination." (Pls. Opp., 13-14.) According to Plaintiffs, the burden in Phase II shifts to the defendant employer "to demonstrate that the individual applicant [or employee] was denied an employment opportunity for lawful reasons." *Id.* Therefore, to plead a pattern or practice claim, Plaintiffs maintain that they need only "sufficiently allege that 'discrimination was the company's standard operating procedure-the regular rather than the unusual practice.'" (Pls. Opp., 14) (citing *United States v. Nobel Learning Cmtys., Inc.*, 676 F. Supp. 2d 379, 383 (E.D. Pa. 2009)). Applying that framework, Plaintiffs argue that they have sufficiently alleged that Wipro engaged in a pattern and practice of intentional racial and national origin discrimination against non-South Asians and non-Indians in hiring, promotion, staffing, and termination decisions. (Pls. Opp., 14) (citing FAC, ¶¶ 1, 17-23, 81, 86.)

As a threshold matter, "pattern or practice" is not an independent cause of action, but merely an "evidentiary framework" for proving a discrimination claim. *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 185 (3d Cir. 2009). Accordingly, the statutory requirements of Title VII and Section 1981, "not the *Teamsters* evidentiary framework," "control[] the substantive assessment of what elements must be determined to prove" a disparate treatment claim. *Id.*

That said, the Court finds that Plaintiffs have sufficiently alleged disparate treatment under Title VII and Section 1981. First, Caucasian plaintiffs, like MacLean, Pezeshki, Gibbs, and Hemenway, subjected to reverse discrimination may invoke Section 1981 and Title VII against defendants for discriminatory treatment on the basis of race.[4] *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 286-87 (1976); *Hicks v. ABT Assocs., Inc.*, 572 F.2d 960, 967 (3d Cir. 1978).

---

[4]     Plaintiff Valles is also a member of a protected class, as he is Hispanic. *Tucker v. Merck & Co.*, No..03-5015, 2004 WL 1368823, at *4 (E.D. Pa. June 17, 2004), *aff'd*, 131 Fed. Appx. 852 (3d Cir. 2005).

Next, Plaintiffs rely on the same four employment practices discussed at length above, and, as discussed previously, those allegations suggest that Wipro acted with discriminatory intent in denying opportunities to non-South Asian and Indian employees and prospective employees. Further, while Defendant challenges whether the FAC contains sufficient facts to support an inference that race or national origin was a "motivating factor"—let alone the "but for" cause—of any of these adverse employment actions, I disagree with that position. Each of the four individual plaintiffs allege adverse employment decisions based on a discriminatory criterion illegal under Title VII and Section 1981. Indeed, MacLean, Valles, Pezeshki, Gibbs, and Hemenway allege that they were either terminated, benched, or not promoted.[5] And, while the FAC may not expressly allege that Plaintiffs were terminated, benched, or not promoted because of their race, I find that the totality of the allegations make clear that Plaintiffs claim to have been adversely impacted because of their race based on Wipro's intentional discriminatory preferences for South Asian and Indian employees. (FAC, ¶¶ 29-35, 39-43, 49-51, 56, 67-69.) Accordingly, I find that when construing the FAC in a light most favorable to Plaintiffs, they have sufficiently alleged claims for disparate treatment under Title VII and Section 1981.[6]

## B.    **Statute of Limitations**

Next, independent from the deficiencies raised by Wipro above, Defendant also argues that certain Title VII claims and Section 1981 claims are untimely and should be dismissed.

---

[5]      The Court notes that while Plaintiff Gibbs alleges that he left Wipro in September 2015, Title VII and Section 1981 "encompasses employer liability for a constructive discharge." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 143 (2004); *Levendos v. Stern Entertainment, Inc.*, 860 F.2d 1227 (3d Cir.1988).

[6]      To the extent that Defendant argues that Plaintiffs' claim must fail because they do not allege causation, I note that the pleading standard post-*Twombly* does not require a *prima facie* case to be established in the complaint, it "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016) (quoting *Twombly*, 550 U.S. at 556). A *prima facie* case is an evidentiary standard, not a pleading requirement; thus, it cannot be used to measure whether a complaint fails to state a claim. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009).

Specifically, Wipro argues that Title VII claims asserted by Valles, Pezeshki, Gibbs, and MacLean, as well as Section 1981 claims asserted by Valles and Gibbs run afoul of the statute of limitations.

"Under Title VII, a charge of race or sex discrimination in employment must be filed with the EEOC within 180 days of the occurrence of the alleged unlawful employment practice." *Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465, 469 (3d Cir. 2001). The 180-day deadline is extended to 300 days when the plaintiff lives in a so-called deferral state, such as New Jersey. *Scocozza v. New Jersey*, No, 14-2095, 2014 WL 6674453, at *4 (D.N.J. Nov. 25, 2014) (citing 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d)); *Cardenas v. Massey*, 269 F.3d 251, 255 n.2 (3d Cir. 2001)). The EEOC must investigate the charge "and the complainant must allow a minimum of 180 days for the EEOC investigation to proceed." *Burgh*, 152 F.3d. at 470. If the EEOC has not resolved the charge after 180 days, it must advise the plaintiff through a "right-to-sue" letter "that it sees no reason to take action on the complaint." *Id.* (citations omitted). A plaintiff cannot bring a Title VII suit without having first received a "right-to-sue" letter. *Id.* (citation omitted). Indeed, "[i]f a plaintiff brings suit under Title VII [ ] before receiving a right-to-sue letter, the matter may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to exhaust administrative remedies." *Small v. Rahway Bd. of Educ.*, No. 17-1963, 2017 WL 1351400, at *2 (D.N.J. Apr. 6, 2017) (citations omitted); *see, e.g.*, *Robinson v. Univ. of Med. & Dentistry of N.J.*, No. 06–1158, 2006 WL 3371748, at *2 (D.N.J. Nov. 17, 2006) (granting motion to dismiss ADA claims where plaintiff admitted that she did not file an EEOC charge or receive a right to sue letter). If the plaintiff does choose to bring a Title VII action, "it must be filed within 90 days of the date on which the complainant has notice of the EEOC's decision not to pursue the administrative charge." *Id.* (citing 42 U.S.C. § 2000e-5(f)(1)). The start of 90-day period is generally triggered by the date the plaintiff receives the right-to-sue letter. *Id.* (citing *Seitzinger v.*

*Reading Hosp. and Med. Ctr.*, 165 F.3d 236, 239 (3d Cir. 1999); *Mosel v. Hills Dept. Store, Inc.*, 789 F.2d 251, 252 (3d Cir. 1986)). "Both the [300]-day period for filing the administrative complaint and the 90-day period for filing the court action are treated as statutes of limitations." *Id.* (citation omitted). The Third Circuit strictly construes these periods and has held that "even one day late is time-barred and may be dismissed." *Id.*

As for Valles' and Gibbs' claims asserted under Section 1981, it is well-settled that the statute of limitations for these claims is four years. *Jones v. R.R. Donnelley & Sons Co.*, 124 S. Ct. 1836, 1845 (2004).

Here, I find, and the parties agree, that the individual Title VII claims asserted by Pezeshki and MacLean, and the individual Section 1981 claims asserted by Gibbs and Valles are timely based on application of the equitable tolling doctrine in *American Pipe & Construction Co. v. Utah (American Pipe)*, 414 U.S. 538 (1974).[7] *See Commc'ns Workers of Am. v. N.J. Dep't of Pers.*, 282 F.3d 213, 216–17 (3d Cir. 2002) (finding that the exhaustion and filing requirements of Title VII are non-jurisdictional prerequisites to filing a lawsuit and are subject to waiver, estoppel, and equitable tolling principles). Beginning with the Title VII claims, the FAC alleges that Wipro "terminated Mr. Pezeshki on June 1, 2018," but Pezeshki did not file his EEOC charge until February 22, 2020—631 days after his termination. (FAC, ¶ 50; Declaration of Grace E. Hart, Esq. in Support of Defendant's Motion to Dismiss ("Hart Decl."), Ex. D.) Similarly, Plaintiffs allege that Wipro terminated MacLean on February 25, 2019," but he did not file his EEOC charge until February 11, 2020—351 days after his termination. (FAC, ¶ 32; Hart Decl., Ex. B.) As to Gibbs, the FAC alleges that he "left [Wipro] in September 2015," however, he did not file his EEOC

---

[7]    Because the putative class in this case has not yet been certified, the Court only addresses the timeliness of Plaintiffs' individual claims.

charge until February 22, 2020—approximately 1606 days after he left Wipro.[8] (FAC, ¶ 58; Hart Decl., Ex. E.) Finally, with respect to Valles, the FAC alleges that Wipro "terminated Mr. Valles on January 31, 2015," but Valles did not file his EEOC charge until February 21, 2020—1847 days after his termination. (FAC, ¶ 40; Hart Decl., Ex. C.)

While the Title VII claims asserted by Pezeshki, MacLean, Gibbs, and Valles would normally be time barred based on their failure to file an EEOC charge within 300 days of termination, Pezeshki's and MacLean's Title VII claims are saved by the equitable tolling doctrine set forth in *American Pipe*. In that case, the Supreme Court held that the filing of a putative class action complaint tolls the applicable statute of limitations as to the individual claims of absent class members. Specifically, the state of Utah filed a putative class action antitrust lawsuit on behalf of several public entities eleven days before the expiration of the applicable statute of limitations. Eventually, the District Court denied class certification for want of Rule 23 numerosity, at which point several of the putative class members moved to intervene. The District Court allowed intervention despite the expired statute of limitations. The Supreme Court affirmed, holding that "[t]he commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Id.* at 554. The court reasoned that "[a] contrary rule allowing participation only by those potential members of the class who had earlier filed motions to intervene in the suit would deprive Rule 23 class actions of the efficiency and economy of litigation which is a principal purpose of the procedure." *Id.* at 553. While the *American Pipe* tolling rule originally appeared to apply only to purported members of the class who made timely motions to intervene after the trial court denied class certification, the Supreme Court, in *Crown, Cork & Seal*

---

[8]     Because the FAC does not provide a specific date for when Gibbs left Wipro, the Court gives Gibbs the benefit of the doubt for purposes of this motion and assumes that he left Wipro on September 30, 2015.

*Co. v. Parker*, 462 U.S. 345 (1983), extended it to all members of the asserted class, including those who subsequently filed their own suits. *Id.* at 353-354. In doing so, the court explained that a contrary result would "be a needless multiplicity of actions-precisely the situation that Federal Rule of Civil Procedure 23 and the tolling rule of *American Pipe* were designed to avoid." *Id.* at 351.

The *Phillips* Action was filed on December 1, 2017, and therefore, the parties agree that the 300-day limitations period was tolled with respect to Pezeshki's and MacLean's individual Title VII claims. As for Gibbs and Valles, however, Plaintiffs acknowledge that equitable tolling under *American Pipe* is futile because even when the Complaint in the *Phillips* Action was filed, Gibbs' and Valles' claims were already time barred. Indeed, at the time the Complaint in the *Phillips* Action had been filed, on December 1, 2017, Gibbs' EEOC charge was already 493 days late, while Valles' EEOC charge was 735 days late. [9] That said, because the statute of limitations for claims asserted under Section 1981 is four years, the parties also agree that equitable tolling under *American Pipe* does save Gibbs' and Valles' claims in that regard. Accordingly, I find that the individual claim asserted by Pezeshki and MacLean for violation of Title VII and the individual claims asserted by Gibbs and Valles for violation of Section 1981 are timely. I find, on the other hand, that the individual Title VII claims asserted by Gibbs and Valles are time barred.

---

[9]     I also note that Valles further alleges that "[a]fter his termination," he "applied to several IT analyst positions with Wipro," but Wipro failed to rehire him. (FAC, ¶ 43.) Although the Court recognizes that this allegation could support a Title VII claim based on Wipro's failure to rehire Valles, Plaintiffs do not allege when that decision was made by Wipro. Accordingly, the Court cannot assess compliance with the statute of limitations for that portion of Valles' Title VII claim. As a result, Valles' Title VII claim based on Wipro's failure to rehire Valles is dismissed without prejudice; however, should he have the ability to provide additional factual allegations demonstrating compliance with the statute of limitations, he may move to amend.

## IV.    **<u>CONCLUSION</u>**

For the reasons set forth above, Defendant's Motion to Dismiss is **GRANTED** in part, and **DENIED** in part. Specifically, Defendant's motion is granted as to Plaintiffs' disparate impact claims under Title VII based on the Court's finding that the First Amended Complaint fails to identify a facially neutral employment practice. However, Defendant's motion is denied as to Plaintiff's disparate treatment claims under Title VII and Section 1981. Further, the Court finds that the individual Title VII disparate treatment claims asserted by Gibbs and Valles are time barred. Finally, Defendant's request to dismiss Plaintiffs' claims for prospective relief is denied as premature.

Dated: September 29, 2022                                  <u>/s/ Freda L. Wolfson</u>
                                                         Freda L. Wolfson
                                                         U.S. Chief District Judge