# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
### TRENTON DIVISION

| | |
|---|---|
| GREGORY MACLEAN, *INDIVIDUALLY AND IN HIS REPRESENTATIVE CAPACITIES, et al.*, | ) Case No. 3:20-cv-03414-GC-JBD )<br>)<br>)<br>) Courtroom No. 7E |
| Plaintiffs, | ) Clarkson S. Fisher Building<br>) & U.S. Courthouse |
| versus | ) 402 East State Street<br>) Trenton, New Jersey 08608 |
| WIPRO LIMITED, | )<br>) March 18, 2024 |
| Defendant. | ) 9:33 a.m. |

TRANSCRIPT OF HEARING RE MARCH 1, 2024 JOINT LETTER RELATING TO
THE PRODUCTION OF THE PHILLIPS MATERIALS
BEFORE HONORABLE J. BRENDAN DAY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES VIA MS TEAMS:

For the Plaintiffs:       The Law Offices of Jonathan Rudnick LLC
                          By:  JONATHAN RUDNICK, ESQ.
                          788 Shrewsbury Ave, Suite 204
                          Tinton Falls, NJ 07724

                          Kotchen & Low LLP
                          By:  DANIEL A. KOTCHEN, ESQ.
                               LINDSEY GRUNERT, ESQ.
                          1918 New Hampshire Avenue, NW
                          Washington, DC 20009


ESR/COURTROOM DEPUTY:     Christopher Yoos

TRANSCRIPTION SERVICE:    TRANSCRIPTS PLUS, INC.
                          435 Riverview Circle
                          New Hope, Pennsylvania 18938
                          215-862-1115
                          CourtTranscripts@aol.com

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

```
APPEARANCES VIA MS TEAMS:
(continued)

For the Defendant:        Gibson Dunn & Crutcher LLP
                          By:  SOPHIE WHITE, ESQ.
                          200 Park Avenue
                          New York, NY 10166-0193

                          Gibson Dunn & Crutcher LLP
                          By: GRETA B. WILLIAMS, ESQ.
                          1050 Connecticut Avenue, NW
                          Washington, DC 20036-5306

                          Gibson Dunn & Crutcher LLP
                          By:  ELIZABETH A. DOOLEY, ESQ.
                          One Embarcadero Center, Suite 2600
                          San Francisco, CA 94111-3715
```

1      <u>TRENTON, NEW JERSEY  MONDAY,  MARCH 18, 2024  9:33 A.M.</u>

2            (Call to order of the Court)

3            THE COURT:  Hello.

4            MR. KOTCHEN:  Hey, Judge.  Hey, this is Dan Kotchen

5 from Kotchen & Low.  With me is Lindsey Grunert.  And you also

6 have our local counsel, Jonathan Rudnick.

7            THE COURT:  Good morning.  And for the defendant?

8            MS. WILLIAMS:  Good morning, Your Honor.  This is

9 Greta Williams from Gibson Dunn.  I'm joined by my partner,

10 Elizabeth Dooley, and our colleague, Sophie White from Gibson

11 Dunn.  And also my client, Umung Varma, in-house counsel at

12 Wipro, is on the line, as well.

13            THE COURT:  All right.  Good morning to everyone.

14            All right.  We set this telephone conference up

15 following a joint letter dated March 1st, 2024, outlining a

16 series of discovery disputes.  The Court is working through

17 those disputes, but I wanted to have this call today to

18 hopefully sort out discrete issues related to reproduction of

19 the documents that were previously produced in the other

20 putative class action in the Southern District of Texas, which

21 is referred to in the papers as the <u>Phillips</u> matter.

22            My hope is that we can bring a common sense solution

23 to some of the issues outlined in Paragraphs C and D of the

24 joint letter insofar as everybody agrees, as does the Court,

25 that the materials that were previously produced in the

4

1  <u>Phillips</u> matter should be reproduced in this case in some way,

2  shape, or form.

3          Let me ask, Mr. Kotchen, just an initial mechanical

4  question.

5          MR. KOTCHEN:  Okay.

6          THE COURT:  I understand from the letter that Kotchen

7  & Low is in possession of the full set of the <u>Phillips</u>

8  documents that were produced in the prior action, is that

9  right?

10          MR. KOTCHEN:  Yes, Your Honor, we are.

11          THE COURT:  So then mechanically, what are we talking

12  about when we're talking about production of those documents?

13  We're essentially just activating whatever you have in your

14  database and providing to co-counsel the documents that were

15  previously produced, or something else?

16          MR. KOTCHEN:  I think it's just that.  I mean, as I

17  understand it, this is a strange situation where both -- the

18  counsel for both sides has the actual -- the physical

19  productions.

20          THE COURT:  Right.

21          MR. KOTCHEN:  And so what we have sought for -- since

22  basically the outset of discovery, as everyone knows, that this

23  is -- that these documents will be used, so let us access

24  these, Kotchen & Low, without running afoul of any

25  confidentiality orders, for example.  And so we have them,

1  we've been wanting to use them, and we just need the okay from

2  Wipro, "Yes, you can use these in this case."

3        THE COURT:  All right.  Do you agree with that, Ms.

4  Williams, just mechanically, right?  You're not going to be

5  reproducing, re-Bates'ing.  Is this just a matter of

6  authorizing the plaintiffs to access what has previously been

7  produced?

8        MS. WILLIAMS:  Yes.

9        THE COURT:  Okay, all right.  My goal for this

10 morning as to Paragraph C is to find the most efficient common

11 sense solution to get the plaintiffs to start reviewing the

12 documents that were produced before.  I appreciate that there

13 are a couple of disputes related to what was previously

14 produced.

15        I will say at the outset that I'm not sure from my

16 perspective that each side is saying too -- is saying much

17 different things.  Mr. Kotchen, I mean, if you want to outline

18 from your perspective what the disputes are, I appreciate that

19 there are a set of redaction issues that we need to address,

20 but on my read of Paragraph C of the letter, I don't see a huge

21 gulf between the parties in terms of producing and reviewing

22 the materials.

23        It seems to me that all sides are going to end up

24 meeting and conferring on what else needs to be produced, if

25 anything, from the <u>Phillips</u> time period, and meeting and

6

1  conferring on the redactions.  And so my goal is -- for

2  Paragraph C is to find the most efficient path forward for you

3  to do that.

4           MR. KOTCHEN:  Judge, I mean, it's funny because in

5  preparing for this, I kind of -- I arrived exactly where you

6  are now, which is, look, as long as we have -- let's assume

7  that the outcome of today's hearing is, yes, we can now use the

8  Phillips information in this case.  I mean, I think that there

9  are two issues:

10          One is the redactions, the relevancy redactions.  And

11 we dispute it.  We -- we've -- like, that those are

12 appropriate.  My proposal, and I would bet dollars to doughnuts

13 this is where you are, is you all just go and confer about it.

14 Because once we have those documents and we can use them, we

15 can say, look, just eliminate redactions on this corpus of

16 documents, or let's confer about these issues -- these set

17 issues.  Something that we haven't been able to do until we get

18 confirmation we can use the documents.

19          THE COURT:  So in other words --

20          MR. KOTCHEN:  I'm assuming that --

21          THE COURT:  Let me just interrupt you.  I mean, that

22 is where I am.  And so from your --

23          MR. KOTCHEN:  Right.

24          THE COURT:  -- perspective, you're not seeking -- not

25 asking Wipro to reproduce -- or re-review, rather, the

1  production set, unredact of its own volition, and then

2  reproduce.  You're simply seeking an avenue to confer about

3  redactions that you would like to challenge.

4          MR. KOTCHEN:  If we have -- if we have the ability to

5  just access documents, that's absolutely right.  We'll just --

6  we'll look at the documents.  And how about we confer with

7  Wipro about the appropriateness of specific redactions?

8          THE COURT:  Okay.

9          MR. KOTCHEN:  I think that that is -- that's a

10 practical -- and I -- my -- I would also add dollars to

11 doughnuts that Wipro would agree with that.

12         THE COURT:  Well, that's my --

13         MR. KOTCHEN:  So I think that's something that --

14         THE COURT:  That's my question.  So let me turn it

15 over to Ms. Williams.  I mean, I understood your objection on

16 the redactions issue to be, "we don't -- we shouldn't have to

17 go back and re-review in the first instance, and make decisions

18 on what to unredact, what to keep redacted.  Let us produce or

19 let the plaintiffs access what was produced in the form that it

20 was produced before."  And if there are issues, you'll meet and

21 confer.  And if there are disputes, you'll bring them back to

22 me.

23         MS. WILLIAMS:  This is Greta Williams, Your Honor.

24 Yes, that's right, with just a couple of caveats.  You know, I

25 think we don't dispute that, you know, we're going to reproduce

1   or give plaintiffs access to these documents.

2           What we're trying to avoid, and what I think Your

3   Honor's order denying bifurcated discovery recognized, is that

4   we shouldn't have to go back and duplicate all efforts, re-

5   review every document for responsiveness, re-review every

6   single redaction, which Mr. Kotchen's proposal previously had

7   proposed, although I'm taking it and I'm encouraged to see that

8   I think he may be moving off of that a little bit this morning.

9           So that's really what we're trying to do here.  We do

10  not want to duplicate efforts.  We've already produced over

11  60,000 documents in Phillips, over 400,000 pages.  Having to go

12  through that entire exercise again would just impose huge --

13  huge burden, and huge cost, and delay things further.

14          THE COURT:  Well, I don't --

15          MS. WILLIAMS:  So that's really what we're trying to

16  avoid here.

17          THE COURT:  Yeah -- no, I don't -- I don't disagree

18  with that at a high level.  I'm focusing right now specifically

19  on the redactions.  Obviously when I wrote the order denying

20  bifurcated discovery, I had no idea about, you know, a

21  universe of redacted documents that were produced in Phillips.

22  To this day, I don't have a good sense of how many documents

23  were redacted, for what reason.  And, you know, plaintiffs may

24  take issue with every single one of your redactions; I don't

25  know.

9

1          I certainly agree that you shouldn't have to go back
2    right now and re-review the production set to decide, you know,
3    whether to unredact particular documents or not.  It just seems
4    to me that once you give access to the plaintiffs, if they're
5    going to challenge the redactions, you're going to end up
6    having to re-review whatever they challenge, I would think,
7    during the meet and confer process.

8          So I agree with you at a high level, you don't have
9    to go back and re-review the entire production set.  But if
10   plaintiffs believe that these redaction -- these redacted
11   documents were improperly redacted, you know, simply giving
12   them access to the documents that were produced before doesn't
13   do them much good, right?

14          MS. WILLIAMS:  Just to -- Your Honor, just to give
15   you a quick overview to your point about you don't know exactly
16   what was produced and so forth, let me just give you a quick,
17   you know --

18          THE COURT:  I think it would be helpful, yes.

19          MS. WILLIAMS:  Let me just give you a quick, you
20   know, overview of that and just a quick refresher, right?  So
21   the Phillips case is, you know, it was filed in 2017 by two
22   former Wipro employees.  It was filed in the Northern District
23   of California initially, and it alleged that Wipro
24   discriminates against them on the basis of race and national
25   origin because they're neither South Asian nor Indian.  The

1  case was subsequently transferred to the Southern District of

2  Texas in March of 2018.  It's the same exact claims, right?

3  They have a disparate treatment claim under 1981 and Title VII.

4  There was also a disparate impact claim under Title VII,

5  although -- in both cases, although that claim was dismissed in

6  the MacLean case.  It's the exact same proposed nationwide

7  classes and -- relating to classes of all persons who are not

8  of South Asian race or Indian national origin who -- the first

9  classes applied for positions with Wipro in the U.S. and were

10  not selected; the second classes were employed by Wipro in the

11  U.S. for a minimum amount of time necessary to be eligible for

12  a promotion pursuant to Wipro policies or practices and were

13  not promoted; and the third class is the terminations class.

14  Those employees who were employed by Wipro in the U.S. and were

15  terminated.

16          As you know, the Court in _Phillips_ denied class

17  certification in March, 2022, and the case resolved later that

18  year.

19          Before _Phillips_ was resolved, Wipro produced a vast

20  amount of discovery.  The total amount of documents produced by

21  Wipro was over 63,000 documents, that was over 420,000 pages.

22  Wipro made 34 document productions between May of 2019 and

23  August of 2021.  And just to give you a sense of what was in

24  those productions, obviously they were documents related to the

25  named plaintiffs in that case, personnel files, appraisals, pay

1  stubs, and the like.  A bunch of email correspondence related

2  to the named plaintiffs, communications with HR and various

3  Wipro employees regarding positions while on the bench,

4  organizational charts, staffing reports, attrition reports,

5  profiles, time and data, description reports, benching reports,

6  hiring and staffing reports, employment policies, affirmative

7  action documents, EEOC charge data and right to sue letters.

8  And also tons of employee data; I know that's -- we're going to

9  cover that in Section D.  But that's just to give you a little

10 bit of a flavor, Your Honor, of the vast amount and what that

11 data and what those documents cover.

12         And so as we've noted, roughly 24 of the 34 RFPs that

13 the plaintiffs served in this case are identical or nearly

14 identical to those propounded in Phillips.  And of the ten that

15 are not identical, five of those relate to the named

16 plaintiffs.  And we have said that Phillips won't impact our

17 collection and production of documents with respect to the

18 named plaintiffs in MacLean at all.  And so, you know, we think

19 that the Phillips production should largely cover the class-

20 wide discovery that was, you know, produced in Phillips.  And

21 we were just --

22         THE COURT:  All right.  Where --

23         MS. WILLIAMS:  Go ahead.

24         THE COURT:  No, I appreciate that, and I'm sort of

25 putting that issue to one side right now.  I'm really, really

 1  just focusing -- and your summary was very helpful because I

 2  had a couple of questions that you just answered.  But right

 3  now, I'm really focusing only on the redactions issue.

 4          I appreciate, you know, that there's a second issue

 5  about what else Wipro may or may not need to go back and

 6  collect and produce, and we'll talk about that in just a

 7  second.

 8          Can you give me a sense of, if it's possible, the

 9  kinds of redactions that were made in the first instance in

10  Phillips?

11          MS. WILLIAMS:  Well, there were --

12          THE COURT:  Or it just sort of runs the spectrum?

13          MS. WILLIAMS:  I mean, there were -- so there's --

14  there's a dispute in this -- we'll get to this in the data.

15  But there is -- there's a dispute about whether, you know,

16  gender and age-related, you know, fields --

17          THE COURT:  Right, yep.

18          MS. WILLIAMS:  -- and information should be redacted.

19  There's a dispute about whether client names should be

20  redacted.

21          THE COURT:  All right, so that was sort of my initial

22  question.  Is it fair to assume that the redactions that we're

23  talking about in Paragraph D in the data are, more or less, the

24  same kind of redactions that were made to the ESI document

25  productions?

1          MS. WILLIAMS:  Yes.

2          THE COURT:  Is that a fair gloss?

3          MS. WILLIAMS:  Yes.

4          THE COURT:  Okay, all right.  Then getting back to my

5   initial point, do you agree in theory or in sort of at a high

6   level that to the extent that today's discussion doesn't answer

7   some of these redaction issues, and to the extent that the

8   plaintiffs are going to challenge any of Wipro's prior

9   redactions, they should have the opportunity to review the

10  documents, discuss, meet and confer with you what they believe

11  should be unredacted, if anything?  And if there are disputes,

12  bring them back to me.

13         MS. WILLIAMS:  Yes, Your Honor, I do.  Although I do

14  think we have -- the parties have met and conferred already

15  about some of the issues, and I'm speaking more about the data

16  here.  But have already met and conferred, to some extent,

17  about some of the issues that may be likely to arise with

18  respect to disputes regarding the redactions, right?

19         THE COURT:  Got it.

20         MS. WILLIAMS:  Those are the issues --

21         THE COURT:  Got it.

22         MS. WILLIAMS:  -- I just talked about.

23         THE COURT:  Yes.

24         MS. WILLIAMS:  So it might be helpful to get the

25  Court's guidance --

```
1            THE COURT:  Yes.

2            MS. WILLIAMS:  -- sooner rather than later to sort of

3  head off any disputes that may arise.

4            THE COURT:  Got it, okay.  All right, very good.

5            Now, with respect to the sort of second issue that

6  you alluded to, Wipro's position that there is, you know, near

7  -- near total, total, substantial duplication in the RFPs that

8  were propounded in Phillips and in this matter such that the

9  Phillips production should sort of cover the waterfront, so to

10 speak, plaintiffs obviously disagree, right?  I mean, you would

11 agree that much, that the plaintiffs don't agree with you that

12 the Phillips production covered the landscape.

13           MS. WILLIAMS:  I do, Your Honor.  Although, again, I

14 was -- Mr. Kotchen seemed to be moving away from that a little

15 bit.  I don't want to put words in his mouth, but he did seem

16 to be moving away from that a little bit.

17           THE COURT:  Yeah.

18           MS. WILLIAMS:  But, yes, that --

19           THE COURT:  Okay.

20           MS. WILLIAMS:  I do understand that, and that's

21 precisely what we're trying to avoid, is to having to go back

22 to square one, recollect, and -- recollect documents from the

23 Phillips time period, re-review for responsiveness, re-do

24 redactions.

25           THE COURT:  Right.
```

1          MS. WILLIAMS:  I mean, that's just tremendously
2   burdensome --
3          THE COURT:  Yeah.
4          MS. WILLIAMS:  -- costly, time-consuming, etc.
5          THE COURT:  Again, I'm not hearing a lot of
6   difference between the two sides.
7          Would you further agree that once the plaintiffs have
8   full access to the documents that were produced in Phillips,
9   that you're going to end up meeting and conferring further on
10  what else plaintiffs think you need to do, you know, in the way
11  of backups, and archived, and shared folders, and the like?
12  And some of those issues I appreciate are elsewhere in the
13  letter, and we're going to deal with it at another time.
14         But, again, I'm trying to come to a common sense
15  solution to get the documents as they were produced,
16  reproduced, so to speak, and then whatever else needs to be
17  discussed can be discussed.
18         MS. WILLIAMS:  Yes, Your Honor.  I mean, I think this
19  is -- totally agree, we should have a common sense approach
20  here.  And I think that's, frankly, exactly what we proposed.
21         THE COURT:  Yeah.
22         MS. WILLIAMS:  That we would reproduce all the
23  documents in Phillips.
24         THE COURT:  Yes.
25         MS. WILLIAMS:  And that if, after re -- you know,

1  reviewing the reproduction, if you will, that plaintiffs

2  believe additional collections are needed, or have concerns

3  regarding a particular redaction or a privilege call, the

4  parties would meet and confer --

5              THE COURT:  Right.

6              MS. WILLIAMS:  -- and attempt to resolve the issue.

7              THE COURT:  Right.  Mr. Kotchen --

8              MS. WILLIAMS:  So that's our bottom line.

9              THE COURT:  Yeah, exactly.

10             Mr. Kotchen, do you agree with that also, in terms of

11  substantive collection, right?  You're going to end up in a

12  place where you're meeting and conferring further with Wipro on

13  what else, if anything, needs to be reviewed -- collected,

14  reviewed, and produced, to the extent it's not covered by the

15  Phillips production?

16             MR. KOTCHEN:  Your Honor, I -- let me respond, okay?

17  Because I think Ms. Williams is taking this in a much different

18  direction.  When I said that we should look at -- be able to

19  access the Phillips production and confer, I was talking about

20  the redactions.  I was not talking about the scope of the

21  production.

22             I'm going to give you some counterpoints to what Ms.

23  Williams discussed.  We got one discovery order from -- in the

24  Phillips case, and that was for Wipro to produce everything

25  accessible from its New Jersey location, and we think that that

1  discovery order was violated.  Backups were not searched, even

2  though Wipro has extreme limitations on email sizes such that

3  employees have to delete information to continue using email.

4  They have backups.  We haven't been able to get information --

5  complete information about their backups, enabling us to figure

6  out what from the backups have been maintained, preserved, and

7  need to be searched.

8            THE COURT:  Yeah, just --

9            MR. KOTCHEN:  They didn't --

10           THE COURT:  Just for the record --

11           MR. KOTCHEN:  Yeah.

12           THE COURT:  -- and for counsel's knowledge, I've

13 reviewed the entire letter --

14           MR. KOTCHEN:  Okay.

15           THE COURT:  -- multiple times, and so I'm familiar

16 with the other issues.

17           MR. KOTCHEN:  Okay.  And --

18           THE COURT:  And so we don't need to go, sort of, back

19 and forth.

20           MR. KOTCHEN:  That -- that's --

21           THE COURT:  But I'm familiar with the backup issues

22 and the dispute in that regard.

23           MR. KOTCHEN:  Okay.  And so I'll just -- I want to

24 give you another data point here.  Wipro -- to talk about kind

25 of what we view as how limited the information was that we

1  actually received in the <u>Phillips</u> case, okay?  Wipro keeps on

2  discussing that it's produced 60,000 documents.  Ms. Dooley,

3  who's on this -- who is on -- in this hearing, she and I are

4  trying a case in September against Wipro's core competitor,

5  Cognizant, where we have similar claims pending.  Cognizant

6  produced 650,000 documents, over ten times the number that

7  Wipro has.  And so what we're dealing with here is a situation

8  where we have a corpus of documents, and I think that the

9  outcome from this hearing is that both sides will probably now

10  be able to access the documents and confer further about the

11  issue of redactions.

12          I think that the broader issue is, from our

13  standpoint, that corpus of documents does not reflect in any

14  way, shape, or form a complete or anywhere close to a complete

15  production of discovery that we think is necessary in this

16  case, and that implicates the other issues in the letter.

17          THE COURT:  Right.

18          MR. KOTCHEN:  So, I mean, I thought we were going to

19  talk about the <u>Phillips</u> production, redactions.  When I heard

20  Ms. Williams start going into how the <u>Phillips</u> discovery should

21  be everything, by and large, that's where I have an issue.

22          THE COURT:  Okay.

23          MR. KOTCHEN:  And that's a much bigger and important

24  issue, I think.

25          THE COURT:  I agree with that, that it is a different

1  issue, and it's not going to be decided today.  I'm not

2  weighing in today on backups and gaps -- putative gaps in the

3  productions, and the like.

4       I will say, Ms. Williams, I largely agree with your

5  sort of method of reproducing the Phillips materials, except

6  with respect to the second bullet on Page 22 of the joint

7  letter.  In light of the plaintiffs' objection to or

8  disagreement with Wipro's position that the Phillips production

9  will, you know, cover the waterfront, today's -- or at least

10 this portion of the call is very mechanical in my mind, and I'm

11 not inclined to sort of bless reproducing the Phillips

12 materials as somehow satisfying Wipro's obligation to collect

13 and produce other ESI.

14      That's not to say at the end of the day that the

15 Court won't ultimately agree with Wipro on whether it has to go

16 back and produce backup tapes, etc., etc.  I don't know.  I may

17 agree with you, I may not.  But simply by reproducing and

18 giving plaintiffs access to what was produced before is not

19 going to absolve Wipro of its discovery obligations, whatever

20 they are.

21      With that said, and particularly in light of the

22 third bullet on Page 22 and what I've been saying, you're going

23 to end up either continuing to meet and confer on the scope of

24 what Wipro must produce, or you're going to tell me that those

25 meet and confers are fully exhausted, and they just need to be

1    decided by me insofar as they're set forth in other portions of
2    the letter.  I'm otherwise inclined to just order the <u>Phillips</u>
3    materials to be "reproduced," in quotes, or plaintiffs be given
4    access to the <u>Phillips</u> materials, leaving redactions to be
5    sorted out through meet and confers, and leaving the scope of
6    production issues to be sorted out.  Why is that not the most
7    efficient way, at least in terms of getting the <u>Phillips</u>
8    materials reproduced?

9          MS. WILLIAMS:  I agree, Your Honor; thank you.  You
10   know, and I think that's largely consistent with what we had
11   proposed, right?  We would produce -- we would reproduce
12   everything from <u>Phillips</u>.  And if the -- if, after reviewing
13   that reproduction, the plaintiffs believe that -- you know,
14   have concerns regarding, you know, a particular redaction, or a
15   privilege call, or what have you, they can raise it with us.
16   We can try to work it out through the meet and confer process.
17   And if we're unable to do so, we will raise it with the Court.

18         THE COURT:  Correct on the redactions.

19         On the scope of production issue, I just want to make
20   sure I'm being clear.  You know, simply by reproducing the
21   <u>Phillips</u> materials, it's not going to, quote, "satisfy Wipro's
22   obligation to collect and produce other documents or ESI from
23   the <u>Phillips</u> time period," end quote.  I'm not agreeing to that
24   bullet point.  With the understanding that at the end of the
25   day, the Court is still going to be deciding the scope of

1    Wipro's additional discovery obligation.  Does that make

2    sense?

3            MS. WILLIAMS:  I'm not sure.  So are you saying that

4    -- but the -- but that the onus is then on the plaintiffs to

5    raise these issues and, you know, seek any additional discovery

6    on a sort of case-by-case basis?

7            THE COURT:  The concern, from my perspective, Ms.

8    Williams, is -- you heard what Mr. Kotchen just had to say.  I

9    mean, they're -- regardless of what is in the Phillips

10   production, they clearly take the view that that production was

11   insufficient or incomplete.  And so what I'm not inclined to do

12   is bless reproducing the Phillips materials as satisfying your

13   obligation because the plaintiffs clearly had a view that

14   there's more that you should collect.  Now, they may be right

15   or they may be wrong, but I'm not going to say right now, just

16   by reproducing the Phillips materials, you're good to go.

17           MS. WILLIAMS:  Understood, Your Honor.

18           THE COURT:  Okay.  Mr. Kotchen, does that make sense?

19           MR. KOTCHEN:  That makes sense, Your Honor.  I

20   think --

21           THE COURT:  Okay.

22           MR. KOTCHEN:  And, again, as I was preparing for

23   today's hearing, I would have bet dollars to doughnuts, that's

24   where you were going to end up, and I think it's very

25   practical.

1          THE COURT:  All right.  So then we're going to issue

2   an order simply directing that all materials be -- from the

3   Phillips matter be reproduced.  The order won't get into the

4   mechanics of it, but everybody understands that these materials

5   are other -- already in Kotchen & Low's possession.  They will

6   continue to have -- they'll be reproduced with all redactions

7   and privilege calls as they were made in Phillips.

8          And to the extent plaintiffs challenge any of the

9   redactions or otherwise, the parties will meet and confer.  And

10  there will be further meet and confers, as appropriate, on

11  whether Wipro needs to undertake the burden of collecting,

12  reviewing, producing additional documents or ESI from the

13  Phillips time period.

14         I'm going to leave it to counsel at this time as to

15  when those meet and confers happen.  And I appreciate that some

16  or all of those disputes might end up being decided when I get

17  through the other portions of the letter.  I'm not going to

18  order that those meet and confers be tabled until the

19  plaintiffs review the Phillips materials.  But, again, my

20  overarching goal for today is to get the Phillips materials

21  accessible so you all can at least start with that.  Okay?

22         MS. WILLIAMS:  Thank you, Your Honor.

23         THE COURT:  All right.

24         MR. KOTCHEN:  Thank -- thank you, Judge.

25         THE COURT:  All right.  Paragraph D -- and just for

1  the record, we've been discussing largely ESI and documents

2  that were reproduced in the <u>Phillips</u> matter.  The parties'

3  joint letter in Paragraph D sets forth a number of disputes

4  with respect to staffing data that was produced in the <u>Phillips</u>

5  matter.  And there are disputes regarding, again, fields that

6  <u>Phillips</u> had redacted, the plaintiffs would like unredacted, as

7  well as more detailed staffing data beyond what Wipro has

8  agreed to produce in the way of monthly staffing summary

9  reports.

10        Let me start with this.  Ms. Williams, can you, I

11  guess, flesh out a little bit more for me what the monthly

12  staffing reports look like, what they contain?  I assume

13  they're spreadsheets of some kind, but I think it would be

14  helpful if I understand a little bit more granularly what these

15  summary reports are.

16        MS. WILLIAMS:  Yes.  So these profile reports, they

17  contain 94 fields of information for tens of thousands of

18  employees, including employee names and identification numbers;

19  the location where they work, including whether they work

20  onsite or offsite; hire date and length of service; whether

21  they are assigned to billable work on the bench or in a non-

22  billable role; education level; nationality; supervisor names;

23  HR manager names; visa names; and prior employer information.

24        THE COURT:  And are they just -- are they

25  spreadsheets?

1          MS. WILLIAMS:  Yeah.

2          THE COURT:  Okay.  So, I mean, they're filterable,

3  etc.?

4          MS. WILLIAMS:  I believe so, yes.

5          THE COURT:  All right.  And you have agreed -- if I

6  understand it correctly, they were produced for quarterly

7  snapshots, up until a given point in the <u>Phillips</u> matter.  And

8  then it was converted to monthly, and you've committed to doing

9  monthly reports --

10          MS. WILLIAMS:  That's correct, Your Honor.

11          THE COURT:  -- on a going forward basis?

12          MS. WILLIAMS:  That's correct, Your Honor.

13          THE COURT:  All right.  Further, let me understand a

14  little bit more the fields with respect to the verticals.  What

15  are those showing?  And I understand from footnote, I believe

16  it's twenty -- 25 in the joint letter, that you're not, in

17  large part, objecting to unredacting the fields containing

18  vertical names, perhaps with minor exceptions.

19          MS. WILLIAMS:  Correct.

20          THE COURT:  Help me understand what those fields are,

21  and then confirm that you're not challenging unredacting those

22  fields.

23          MS. WILLIAMS:  Correct.  So, the vertical names

24  generally don't contain the confidential client name

25  information.  They would include, like, vertical, meaning,

1    like, which group a particular employee is assigned to.

2    Occasionally, those group names will include the name of a

3    client.  So in that case, for the reasons discussed in the

4    letter, and which I'm happy to go into now, we are proposing

5    that to the extent those fields contain a client name, we would

6    redact those.  But if they do not, if they just, you know,

7    contain the name of somebody's group or project that is, you

8    know, sort of more generic, and does not reveal any client

9    names, we're fine producing those unredacted.

10           THE COURT:  All right.  Maybe a front line question I

11   should have asked at the outset.  If I understand your burden

12   argument, it's not that insofar as these are spreadsheets, it's

13   not that unredacting -- the unredaction process is burdensome,

14   right?  It's the burden that you say you would have to

15   undertake to review client agreements and your obligations to

16   your clients, to the extent that you had to disclose client and

17   account names, is that correct?

18           MS. WILLIAMS:  Correct, right.

19           THE COURT:  Okay.

20           MS. WILLIAMS:  What this would effectively involve

21   would be reviewing the contracts with which each of Wipro's one

22   thousand, you know, 1,400 clients to assess and ensure

23   compliance with the confidentiality obligations.  And so this

24   would be a burdensome process that would require legal analysis

25   for each contract, right?  So for example, just to take one

1  example, right, there's one such confidentiality agreement that

2  requires Wipro, before disclosing certain information,

3  including the existence of the parties' agreement itself, to

4  notify the other party and give them an opportunity to seek a

5  protective order.  That same agreement also prohibits Wipro

6  from making public statements regarding the existing -- of the

7  parties' relationship.

8          So going through this process, this legal analysis

9  for tens of thousands of employees staffed to approximately

10 1,400 clients would require Wipro to review 1,400 contracts,

11 assuming each client has only one contract.  And depending on

12 the obligations of the contracts, send out up to 1,400 letters

13 notifying clients that information regarding the parties'

14 relationship may be shared, and coordinate with up to 1,400

15 clients who may then seek a protective order.

16         This also has the potential to potentially burden the

17 Court, as Wipro clients may potentially seek a protective order

18 in this case.

19         THE COURT:  This is why I asked about the

20 spreadsheets and whether it was filterable, right?  Plaintiffs

21 point out that, you know, tens of thousands of employees is

22 really sort of a side issue.  It's the 1,400, correct?  Right,

23 I mean, if you --

24         MS. WILLIAMS:  Correct.

25         THE COURT:  If you have 3,000 employees with

1  Client 1, right, you're filtering the spreadsheet down --

2              MS. WILLIAMS:  Yes.

3              THE COURT:  -- and you can see every employee that's

4  with Client 1, correct?

5              MS. WILLIAMS:  Yes.

6              THE COURT:  So it's not the tens of thousands of

7  employees, it's the 1,400, which may be burdensome in its own

8  regard.  Do you have any sense, Ms. Williams, as we sit here

9  today, what sort of disclosure obligations there are of the

10 kind that you identified, the one example in your letter,

11 across the client base?

12             MS. WILLIAMS:  I mean, we have, of course, not

13 undertaken that exercise --

14             THE COURT:  Right.

15             MS. WILLIAMS:  -- right now because that would sort

16 of defeat the purpose.

17             THE COURT:  Right.

18             MS. WILLIAMS:  But, you know, we have -- you know,

19 you're right, Your Honor, that this is -- we're not talking

20 about tens of thousands of contracts; it's the employees.  But

21 that's why we've -- in our letter and what I'm saying now, it

22 is up to 1,400 different clients.  There may be different

23 agreements with respect to each of those clients.  We have done

24 some type of, you know, sort of review of a few of the

25 potentially relevant contracts here.  And, you know, the

1  example I just cited and described in terms of what the

2  obligations are in terms of client notification, and

3  disclosure, and giving them an opportunity to object and seek a

4  protective order, there's certainly, you know, several of those

5  just in the, you know, sort of very small sample that we have

6  reviewed.  So, this is really a large issue, a significant

7  burdensome issue for our client.

8         THE COURT:  Okay.  And then the only other question I

9  had -- I'm going to turn it over to Mr. Kotchen in a moment --

10  the second paragraph on Page 25 of the joint letter.  I guess

11  my question is, it appears that you're willing to undertake

12  this process for the ESI, to the extent client and account

13  names are identified in the documents.  And so, I guess I'm

14  just curious, if there are 1,400 clients named in the

15  documents, isn't that essentially the same burden that you're

16  complaining of with respect to the data?

17         MS. WILLIAMS:  No, we don't think so, Your Honor.  We

18  think it's much, much less significant.  It's burdensome, no

19  doubt, but we think it is manageable in the grand scheme of

20  things.  I mean, here in the data, we've agreed to produce, and

21  did produce in Phillips, and are agreeing to do so here, data,

22  you know, that's some of the data, staffing data, terminations

23  data, etc., for tens of thousands of employees, which would --

24  is likely to, you know, approach the level of implicating 1,400

25  clients.  We think that's a much, much smaller universe of

1  documents when it comes to the ESI.  And, frankly, in some

2  respects, this is -- that exercise has already been undertaken

3  with respect to documents produced from the <u>Phillips</u> time

4  period.  So, we think it's much less burdensome than --

5          THE COURT:  I guess I'm not --

6          MS. WILLIAMS:  -- (indiscernible - multiple

7  speakers) --

8          THE COURT:  I'm not -- I guess I'm not following

9  that.  You're saying that if -- to the extent that you have to

10 reveal in these data fields up to 1,400 clients, that that's --

11 that would require you to go back and review each client

12 agreement for those 1,400 clients to figure out your disclosure

13 obligation or -- with the client, right?  And what I'm -- and,

14 look, I don't know what's in the <u>Phillips</u> ESI production, but

15 to the extent that all of those clients in one way, shape, or

16 form appeared in a document, isn't -- I guess I'm struggling

17 why that's not the same burden.  Because to the extent that

18 you're going to produce a document that says Client 1, Client

19 2, Client 1,400, you're going to have to review the client

20 agreements for those documents, as well, no?

21         MS. WILLIAMS:  No.  No, Your Honor, because I think

22 we did not -- those client names were unredacted in the

23 <u>Phillips</u> data that was produced.  And with respect to the ESI

24 and documents, we didn't produce ESI.  You know, those were

25 collected from a -- you know, obviously, a smaller group of,

1  you know, it was 20 or so custodians that were collected from -

2  - in Phillips.  So necessarily, it's not going to contain

3  information about every single one of the, you know, putative

4  class members, which is what -- exactly what the Phillips data

5  that is being requested to with -- requested now -- sorry --

6  the data for MacLean that's being requested in MacLean is being

7  asked for now, which calls for data and client names for tens

8  of thousands of employees that was not -- that was not given in

9  Phillips.  And the ESI and, you know, emails and so forth that

10 was produced in the Phillips case did not reveal that

11 information, you know, on that sort of scope and volume with

12 respect to that number of employees, and client names, and so

13 forth.

14          THE COURT:  Okay.  All right; thank you.

15          Mr. Kotchen, let me hear from you.

16          MR. KOTCHEN:  Your Honor, I mean, let's

17 (indiscernible - multiple speakers) --

18          THE COURT:  Again, solely on the data fields, not --

19 we're not getting to the staffing data yet.

20          MR. KOTCHEN:  Okay, just on the data.  Well, let's

21 take the issue first of client names, okay?  There's a

22 protective order here and Wipro can designate -- you know, if

23 it has concerns about the confidentiality of client names, it

24 can designate it in accordance with the protective order to

25 protect the confidentiality of that.

1           What it can't do is use its concerns about producing
2  client names and the confidentiality of that as a way to avoid
3  producing and disclosing incredibly relevant discovery.  Let me
4  give you an example.  If Wipro has its preferred category of
5  employees, and those employees will not be working on Client A,
6  they'll be working on some other client, but they will
7  routinely, once they become visa-ready, for example, replace
8  their non-preferred category of employee who's been working on
9  Client A and replace that person.  And so the client names will
10 be helpful and probative and critical to showing that the non-
11 preferred category of employees, the non-Indians, the non-South
12 Asians are routinely taken out from servicing clients that
13 they've been working on, replaced by other people who are
14 preferred, and don't have any relationship to that client or
15 that account.  And it's part of the -- it is part of the
16 discriminatory scheme here.  And it's a very controversial and
17 horrible, you know, from our perspective, business model.  And
18 I think that one of the concerns that Wipro has is being
19 embarrassed by the fact that folks who are servicing certain
20 clients who happen not to be in the preferred category of
21 employee are routinely taken out from that client account and
22 replaced.
23          So if Wipro will stipulate that it routinely uses its
24 preferred category of employees to replace its non-preferred
25 category of employee on certain client accounts, then I would

1  agree, they shouldn't have to produce the data.  That's what we

2  want to show.

3            THE COURT:  Well --

4            MR. KOTCHEN:  But if they're going to say, no, that

5  doesn't happen, then by not producing that -- the client names

6  prevents us from doing that analysis.

7            THE COURT:  Why --

8            MR. KOTCHEN:  So --

9            THE COURT:  Go ahead.

10           MR. KOTCHEN:  Excuse me?  So that's -- that gives you

11  kind of an overview of kind of why this is relevant.  And I

12  haven't heard the argument --

13           THE COURT:  Well, and that's what I wanted to ask

14  you, Mr. Kotchen.  I mean, why is it relevant whether

15  particular employees, classes of employees are staffed to a

16  particular client as opposed to some other client?  I mean, I

17  guess I'm struggling to understand how relevant --

18           MR. KOTCHEN:  Here's --

19           THE COURT:  -- this information is, particularly if

20  Wipro is unredacting, for example, the vertical information.

21  Why is it so --

22           MR. KOTCHEN:  Well --

23           THE COURT:  -- important to you?  And how are we

24  going to know whether a particular client is sort of, to your

25  mind, a preferred client?

1          MR. KOTCHEN:  So -- well, it's not the preferred
2    client, it's the preferred employee coming in to service a
3    client.  So here's how it's relevant, Your Honor.  What you
4    will hear in this case is you will see disparities, for
5    example, in terminations, terminations from the bench.  And
6    there'll be -- you know, I'm going to make up numbers.  Non-
7    Indians will be terminated at ten times the rate as Indians.
8    And under <u>Teamsters</u>, that's how you show a pattern or practice
9    of discrimination.
10         What Wipro will argue is, like, "well, you know what,
11   we're only doing this on the basis of, you know, capabilities,
12   for example, or willingness to service a client, or willingness
13   to move within a client, or for another account."  And they're
14   going to claim that their preferred category of employee is
15   better and more -- and better able to and, you know, more
16   proficient at servicing a specific, for example, client.  And
17   so they're -- by -- if we have a non-Indian who's taken off a
18   client account and benched, servicing that client for three
19   years, if that non-Indian has, you know, 20 years of
20   experience, and then you have an Indian who hasn't serviced
21   that client ever and is two years out of school, it kind of
22   makes it hard for that -- for Wipro's claim to hold up.  That
23   somehow this is geared towards -- their staffing model is
24   geared towards putting the right people in the right place with
25   the right skill set and the right client account.  That's how -

1  - that's how it holds up and that's why it's relevant.

2        And I -- you know, Wipro has not undertaken a

3  confidentiality review, apparently, of their contracts.  We

4  have heard from Ms. Williams as to one contract that had that.

5  And it was interest -- her description was kind of interesting

6  because in that client -- in that contract, apparently there's

7  a provision that Wipro can't publicly disclose that they are

8  servicing this client.  That speaks volumes because the

9  staffing model is so controversial and so problematic that even

10 the clients don't want Wipro -- don't want the public to know

11 that they're using Wipro for their IT needs.

12       And so I think that that speaks to the controversial

13 nature of the staffing model at issue and why it's so important

14 that we have this information.

15             THE COURT:  Even --

16             MS. WILLIAMS:  Your Honor, if I can respond.

17             THE COURT:  Well, hold on.  Ms. Williams, I'll give

18 you an opportunity to respond.

19             Mr. Kotchen, even accepting for sake of argument, the

20 relevance, you know, I took a look at the <u>Lubrizol</u> case, and I

21 know you tried to distinguish it.  Of course, there is a point

22 at which undue burden, you know, becomes a barrier to you

23 accessing particular discovery.

24             MR. KOTCHEN:  Right.

25             THE COURT:  And I didn't hear Ms. Williams, nor did I

35

1   see in the letter any argument that this data was categorically
2   irrelevant.  And so I do appreciate that reviewing 1,400 client
3   agreements is burdensome.

4           MR. KOTCHEN:  Correct.

5           THE COURT:  You don't disagree with that.

6           MR. KOTCHEN:  I mean, certainly if they had to review
7   1,400 agreements, I do -- I do believe that that would
8   constitute some degree of burden, yes.

9           THE COURT:  All right.  And you're saying it's --

10          MR. KOTCHEN:  Whether it's undue -- I mean, my
11  counterpoint to that is the information is relevant, highly
12  relevant.  And the question is, can a corporation avoid
13  discovery obligations simply by including a provision like that
14  in agreements?  I mean, if -- and, Your Honor, I agree that if
15  you -- if I was to sit down and review 1,400 agreements, I
16  wouldn't want to do it, just personally.  If that is where
17  you're thinking, and I certainly understand that, and I can't
18  tell you that that's something that -- I can't tell you that
19  would be a simple exercise, because I don't think it would be.

20          Somehow the plaintiffs then need the ability to make
21  the argument that if we see routine replacements of their
22  preferred category of employee against non-preferred categories
23  of employees, if Indians are routinely replacing non-Indians,
24  we should be able to assume they're doing it in the same client
25  accounts.  That would be my -- that would avoid the burden of

36

1  what Wipro has to do.  And if Wipro --

2                THE COURT:  All right.

3                MR. KOTCHEN:  Wipro can -- can dispute us and say,

4  no, the routine replacements don't occur; I think the data will

5  show that they do.  And so then the question is that occurs

6  within, you know, an Indian not servicing a client is replacing

7  a non-Indian servicing a client.

8                THE COURT:  All right; thank you.

9                MR. KOTCHEN:  I think may be a way to --

10               THE COURT:  Thank you, Mr. Kotchen, because that's

11  exactly what I was going to ask.  And, Ms. Williams, I'll turn

12  it over to you in a minute to respond.  But I did note that

13  Wipro cited in its letter Exhibit O, which is the Cognizant

14  case, I believe --

15               MS. WILLIAMS:  Correct.

16               THE COURT:  -- at Page 9.  And I suppose I read the

17  order somewhat differently, because at the bottom of Page 9 of

18  Exhibit O, it says, quote, "The Court finds that Plaintiffs

19  have demonstrated, and Defendants have essentially conceded,

20  the relevance of the information being sought.  The Court also

21  determines the protective order issued in this action is

22  sufficient to address most of Defendant's client- and project-

23  related confidentiality concerns.  With that in mind, only if

24  Defendants have a confidentiality agreement in place with a

25  particular client that requires confidentiality of the fact of

1  Cognizant's work for that client, then, and only then, may

2  Defendants -- then Defendants may redact client and/or project

3  names that reflect the name of the client.  If they do so,

4  however, they must provide a method for Plaintiffs to track

5  Defendants' staffing across project names and clients," etc.,

6  etc., end quote.

7          And so I read that order not to be writ large you can

8  avoid undertaking the burden, but only in particular cases

9  where you have a client agreement that has these disclosure

10  prohibitions can you then redact.  Am I wrong in that sense?

11          MS. WILLIAMS:  I think that's --

12          MR. KOTCHEN:  That is -- that's --

13          MS. WILLIAMS:  Okay.

14          MR. KOTCHEN:  Oh, go ahead.  Go ahead, Ms. Williams.

15          THE COURT:  No, the question, first, was to Mr.

16  Kotchen, then I'll turn it over to Ms. Williams.

17          MR. KOTCHEN:  That's how I read the order, as well --

18  as well, Your Honor.

19          THE COURT:  So, Mr. --

20          MR. KOTCHEN:  I mean, that gave us -- that gave us

21  kind of what we were looking for.

22          THE COURT:  All right.  So, Mr. Kotchen, my question

23  to you is, and you just mentioned it a moment ago, is there

24  some acceptable substitute that would alleviate Wipro's burden

25  that is not just client names, but as some other designation,

1  like an ID number or otherwise, that would -- without revealing

2  the client name, that would essentially get you the data that

3  you are looking for insofar as you're trying to show a company-

4  wide, client, you know, client-base wide, sector-wide

5  discrimination?

6        MR. KOTCHEN:  That's absolutely -- that's absolutely

7  right.  I mean, if we had -- we don't need -- we don't need,

8  you know, the name of one particular client.  If they could --

9  if there's some identifiers that we could track clients, you

10 know, and who's staffed where and when, and that -- that would

11 give us what we need.

12        THE COURT:  Okay.

13        MR. KOTCHEN:  It's not the name of the client.  It's

14 the ability to do the analysis that we were talking about.

15        THE COURT:  Thank you.

16        Ms. Williams, you heard what I just read from the

17 Cognizant order.  Let me just say before you respond, some of

18 what Mr. Kotchen said goes to the -- goes to the merits of the

19 underlying dispute, and I fully appreciate that Wipro disagrees

20 in all respects with respect to plaintiffs' discrimination

21 claim, so you need not respond to the merits-based arguments.

22        But with that said, let me hear from you.  And I'm

23 particularly interested if there is a workaround for you to

24 provide client IDs that would keep the names confidential, but

25 still give plaintiffs access to the information they're looking

39

1  for.

2         MS. WILLIAMS:  Thank you.  Thank you, Your Honor.  I

3  think that some type of workaround is doable.  I -- you know, I

4  need to sort of see exactly, you know, exactly what is

5  workable.  But what we -- the bottom line is we are trying to

6  avoid undertaking this analysis for 1,400 clients.  And it's

7  not for the reasons that, you know, Mr. Kotchen suggests, which

8  is these confidentiality agreements are somehow, you know,

9  designed to obscure and cover up, you know, improper staffing

10  models.  I won't say anything more about that.

11         But it's just trying to -- it's not just reviewing

12  1,400 contracts.  It's then to the extent that those contracts

13  have those obligations, notifying each one of those clients

14  where it is prohibited to reveal even the fact of the

15  agreement, right, and giving them an opportunity to respond.

16  And the -- and Mr. Kotchen's arguments about the protective

17  order -- that the protective order in this case undermines the

18  burden argument makes no sense just for that reason.  The

19  protective order does not in any way prevent -- you know, mean

20  that Wipro does not have to undertake this analysis.

21         THE COURT:  Oh, I agree with you --

22         MS. WILLIAMS:  It absolutely does.

23         THE COURT:  I agree with you there.  I don't think

24  that there is any dispute, and I don't disagree that this is

25  burdensome.  I also don't hear you saying that this information

1  is irrelevant, and I agree that it is relevant.

2        And so the question comes down to, is the burden

3  undue?  And I look at the Cognizant order, and it seems to side

4  on the end of it's not undue.  You are only permitted to redact

5  the information where there's a particular agreement that

6  prohibits you from doing it.  And so I would very much

7  encourage, you know, a sort of one- or two-week review.  We'll

8  get to the staffing issue in a minute.  But for you to go back

9  and see if there is a workaround to produce client IDs, client

10 identifiers that would, you know, allow you to avoid the

11 burden, or at least mitigate the burden because I do think this

12 data is relevant.

13       MS. WILLIAMS:  Thank you, Your Honor.  Yes, we can

14 absolutely sort of undertake that analysis to see whether, you

15 know, assigning client IDs is workable -- is workable here and,

16 you know, minimizes the burden.

17       I also just wanted to note, you know, on the

18 relevance point, it's not like Wipro is totally foreclosing Mr.

19 Kotchen getting information about client names.  We've already

20 produced that -- we've already produced client name information

21 for the named plaintiffs.  As we've discussed before, the

22 client names will be in the ESI productions.  We have agreed to

23 produce those -- we have agreed to undertake the analysis, you

24 know, with respect to the ESI in terms of the confidentiality

25 obligations.

1          And so what we're really trying to do is strike a

2  reasonable balance here and not have to go through that

3  exercise for, you know, up to 1,400 clients.  But we will

4  absolutely see whether this workaround that you've suggested

5  makes sense, and we can report back to the Court on that.

6          THE COURT:  All right, very good.

7          MS. WILLIAMS:  Or however you'd like us to do that.

8          THE COURT:  Yeah, we'll circle back after we talk

9  about the staffing data in a moment.

10          Let me just -- before I get there.  I do, Mr.

11  Kotchen, find that the request that Wipro be required to

12  produce fields of gender and dates of birth to be irrelevant to

13  what you are seeking to prove in this case.

14          I've reviewed the case law, and I am comfortable

15  ruling at this time that those fields are not relevant to the

16  claims at issue in this case, which are specific to race and

17  national origin discrimination.  The case law, on my view -- on

18  my read is clear that other forms of potential discrimination

19  are not relevant.  And, indeed, the joint letter does not

20  establish any other basis to find that this information is

21  relevant other than speculation that it might show other forms

22  of discrimination.

23          So, I will enter an order directing that Wipro need

24  not unredact the fields of gender and dates of birth.  Okay?

25          MR. KOTCHEN:  Yes, Your Honor, understood.

1          THE COURT:  Okay, all right.  Let me -- let's move

2    finally to the staffing issue.  Well, before I do that, to the

3    extent that that ruling affects any other issue in the joint

4    letter or the redaction issue that we were discussing before,

5    counsel has heard my views as to gender and age-related issues,

6    okay?

7          MR. KOTCHEN:  Understood, Your Honor.  We'll address

8    future discovery issues accordingly.

9          THE COURT:  Okay, all right.  Staffing data.  As I

10   understand it, Mr. Kotchen, the monthly summary reports are

11   insufficient because they do not show on a particular day

12   whether -- on an employee-wide basis what employees were

13   removed from the bench on a particular day.  Is that ultimately

14   what you are trying to learn, or is it something in addition to

15   that?

16         MR. KOTCHEN:  Your Honor, I mean, I think you have it

17   almost exactly right.  I mean, the key thing with the staffing

18   -- the shortcomings of what's been -- of what the staffing data

19   would show is we cannot show length of time on the bench for a

20   specific category of employee, and a project start and end

21   date, as well.  Those two things, I think --

22         THE COURT:  Can I ask a question in that regard,

23   though?  If I understand the monthly reports, right, the

24   monthly reports show on an employee-by-employee basis whether

25   an employee is on the bench or off the bench at the moment the

1  profile report was run, is that right, Ms. Williams?

2          MS. WILLIAMS:  Yes, that's correct.

3          THE COURT:  Okay.  So, in other words, Mr. Kotchen,

4  what I have in my mind is, you know, you receive a report that

5  was run January 15th that shows, you know, Employees 1 through

6  1,000 are not on the bench, and then you receive a monthly

7  report February 15th that shows Employees 1 through 500 are off

8  the bench.  Why is that not getting you essentially what you

9  need?

10          MR. KOTCHEN:  So, it's a snap -- just as Your Honor

11  has gleaned, it's a snapshot in time.  And so the ability to

12  show, for example, that Indians, if they go on the bench,

13  they're there for two days before they're removed from the

14  bench, while non-Indians are there for three months.  That is -

15  - or two months before they're fired, whatever the time frame

16  is.  That's the type of analysis that we're foreclosed from

17  doing.  It's the amount -- it's the amount of time.  And what

18  the data will show, sure, is that Indians, to the extent

19  they're benched, are there for almost no time at all before

20  they're allocated to a project.  While non-Indians, if they're

21  benched, they're there for a long time in comparison, and

22  ultimately, in many instances, terminated.

23          THE COURT:  But aren't you going to get that on sort

24  of -- because you're looking at sort of -- you're looking at

25  the big picture ultimately.  And so if there's -- if there's,

1  you know, the non-protected class of plaintiffs and putative
2  class members who are sitting on the bench for weeks or months
3  on end, you're going to see that in the sort of overarching
4  picture through the monthly reports, no?

5            MR. KOTCHEN:  Well, there are -- you know, there
6  could be instances where we will not be able to do an analysis
7  comparing lengths of time on the bench.  You know, the most we
8  could do with it is showing at any one month the, you know,
9  percentage or number of folks, you know, in the protected
10 class, the non-Indians here, how many are on the bench compared
11 to the Indians.  And so, the folks who are preferred.  And so,
12 that is, like, you know, being able to track it.  You know, the
13 analysis that we've done is something different where, you
14 know, in a case like Cognizant, where you're able to do a --
15 you know, analyze the length of time those who are preferred
16 are on the bench compared to those who are not preferred.

17           THE COURT:  All right, I'll come back to you.

18           Ms. Williams, let me hear from you, first, in regards
19 to make sure that my understanding of these profile reports on
20 a monthly basis is correct.  And then, I'd like to hear a
21 little bit more about how Wipro maintains or doesn't maintain
22 the staffing data that plaintiffs are seeking.

23           MS. WILLIAMS:  Right.  So, Wipro does not maintain
24 reports showing the exact dates employees are placed on and
25 removed from the bench.  Plaintiffs seem to assume that we can

45

1  just click a button or run a simple query and everything -- you
2  know, all the data that they seek would come out.  That's just
3  not the case.
4          THE COURT:  Well, you have --
5          MS. WILLIAMS:  Instead --
6          THE COURT:  Just to be clear, you have it somewhere.
7  It's just a manner in which it can be produced on an aggregate
8  basis quickly --
9          MS. WILLIAMS:  Right, there is --
10         THE COURT:  -- is that right?
11         MS. WILLIAMS:  There is no way to produce that in an
12 aggregate basis -- on an aggregate basis quickly.  In fact,
13 it's the opposite of quickly, and would require culling data
14 from a number of different sources.  And that's why, it just
15 does -- Wipro just does not maintain it that way.
16         So Wipro would need to prepare, with the assistance
17 of an outside firm, a profile report for each day in the 11-
18 year discovery period sought by the plaintiffs, and this would
19 be expensive and costly.  And even if these reports were
20 created, the parties would then need to go through the reports
21 checking each day to determine when each employee changed
22 assignments.  So it's culling information from multiple sources
23 and pulling the pieces together that way.  And this is likely
24 to offer marginal benefit in light of the information Wipro has
25 already agreed to produce, right?

1          We've already agreed to investigate the exact dates

2     on which the five named plaintiffs were placed on and removed

3     from the bench, and provide that information; to reproduce

4     snapshot reports from _Phillips_, which were prepared on a

5     quarterly basis from 2017 and then monthly from 2017 forward;

6     and to create and produce the same reports on a monthly basis

7     for the post _Phillips_ time period.  These profile reports that

8     we've agreed to produce will show on a monthly basis whether an

9     employee was placed on the bench or assigned to a client.

10    These will show a vast amount of information.  Each of these

11    reports -- I mentioned this at the outset, Your Honor, but just

12    to remind you, each of these reports contain 94 fields of

13    information for tens of thousands of employees, including

14    employee names and ID numbers; the location where they worked,

15    including whether they worked onsite or offsite; the hire date

16    and the length of service; whether they're assigned to billable

17    work on the bench or in a non-billable role, and so forth.

18         So we just think there is marginal benefit to be

19    gained, and this is a reasonable common sense approach to do

20    these monthly snapshots, which will give Mr. Kotchen the bulk

21    of the information he's looking for to run this analysis

22    without the level of granularity that then imposes this undue

23    burden on Wipro, given that this is just simply not how this

24    data is maintained, and it would be sort of a herculean effort

25    to put all of those pieces together and produce it on a daily

1  basis when that's just not how this data is maintained.

2          THE COURT:  All right; thank you.

3          Mr. Kotchen, I'll hear from you briefly.

4          MR. KOTCHEN:  Your Honor, I mean, this is -- again,

5  in preparing for today, this is the issue I don't understand

6  with Wipro.  They have staffing data.  They -- I mean, they

7  have to have personnel staffing data that has to be maintained

8  in a way that you know where folks are allocated at any given

9  time.

10          THE COURT:  Why?

11          MR. KOTCHEN:  We've never --

12          THE COURT:  Why?

13          MR. KOTCHEN:  Excuse me?

14          THE COURT:  Why?  It's a matter -- it's not a matter

15  of how -- whether they have the data.  It's a matter of how

16  it's housed and how it can be produced.  And I don't -- I have

17  no idea --

18          MR. KOTCHEN:  Well --

19          THE COURT:  -- but it seems to me that --

20          MR. KOTCHEN:  I mean, the -- right.  I mean, this is

21  like -- it's -- it's just -- and I'm -- this is where -- this

22  is one where I think, just like you, we are -- you know,

23  they're saying they don't have data that can easily tell who's

24  on the bench when, and where they're allocated.  I'm with you,

25  I don't understand that at all.  It doesn't make any sense to

1  me because -- and, you know, they can make that representation

2  now, and I, you know, we can accept it.  We may be back to you

3  because I don't -- you know, this is one where I think they may

4  be out over their skis a little bit because a company cannot

5  run if that somehow, for any one employee, there are ten

6  different data sources to see where that person is at any given

7  time.  I just don't understand how that -- how a business can

8  run that way.

9        And so I'm -- I'm in exactly the same situation that

10 you are where I don't understand this.  And --

11       THE COURT:  Well, I wouldn't characterize my view so

12 -- so cleanly.

13       MR. KOTCHEN:  Okay.  Okay, I mean, I understand.  I

14 mean, I -- like, this is one where I don't have a rebuttal I

15 can make that's grounded in fact to respond to Ms. Williams.

16       THE COURT:  That -- so, all right, let me --

17       MR. KOTCHEN:  And the only thing I can do --

18       THE COURT:  Let me stop you there.

19       MR. KOTCHEN:  Okay.

20       THE COURT:  Because I do agree with that much.

21       MR. KOTCHEN:  Yeah.

22       THE COURT:  I've reviewed this, and I've given this

23 quite a bit of thought over the last week, week and a half.  I

24 am tentatively inclined to agree with Wipro, that the burden as

25 it is described, both in the joint letter and by Ms. Williams

1  today, would become undue when compared to the monthly profile
2  reports that have been and will be produced.

3          However, I'm not comfortable at this moment making
4  that final determination without some sort of more fulsome
5  declaration by a person with knowledge as to these systems and
6  how the data is kept.  It seems to me that the plaintiffs have
7  articulated a basis for which they could use the granular daily
8  information with respect to employee benching, and that that
9  information could be highly relevant to their claims.

10          But Wipro keeps its data how it keeps its data.  And
11  as it has been described to me -- and, again, it seems to me
12  that that would be prohibitively burdensome and expensive.
13  But, Ms. Williams, I'm not prepared to make that final
14  determination without seeing more information through a
15  declaration as to how Wipro maintains its data, and exactly how
16  it would have to pull, and cull, and work with a vendor to
17  produce this type of information.

18          MS. WILLIAMS:  Thank you.

19          THE COURT:  So I do -- I am going to order Wipro to
20  file a declaration before I make a final determination.

21          And then finally, all of this, to Mr. Kotchen's last
22  point, is going to be without prejudice to the extent that
23  discovery sheds additional light on the way that Wipro houses
24  and can produce this data.  Obviously, if it happens down the
25  line that we learn something else, or that there is another

1  way, then we can revisit, as necessary.

2          MS. WILLIAMS:  Thank you, Your Honor.

3          THE COURT:  Does that makes sense?

4          MR. KOTCHEN:  Very good, Your Honor.

5          MS. WILLIAMS:  Yeah, we can provide --

6          MR. KOTCHEN:  That -- that --

7          MS. WILLIAMS:  -- that declaration.

8          THE COURT:  All right.  So then ultimately, where

9  we're going to end up, I will be entering an order with respect

10 to Paragraph C, as we've discussed, order -- directing that the

11 <u>Phillips</u> ESI be produced and made available with the

12 understanding that other issues with respect to redactions and

13 other collections be -- the continued -- continued fodder for

14 meet and confers, and disputes as necessary.

15         With respect to the <u>Phillips</u> data, Wipro will not be

16 required to redact -- sorry -- will not be required to unredact

17 fields containing gender and age information.  With respect to

18 client and account information, the parties will meet and

19 confer to see if there is a workaround to provide client IDs or

20 other designations.

21         Ms. Williams, how long do you think you need to get a

22 declaration on the staffing data issue?  I was thinking two

23 weeks.

24         MS. WILLIAMS:  Yeah, that sounds fine, Your Honor;

25 thank you.

1        THE COURT:  Okay.  So then why don't you report back

2   in a joint letter on both the client ID or other designation

3   issue, and you can file a declaration in two weeks, as well.

4        MS. WILLIAMS:  Thank you, Your Honor.

5        THE COURT:  All right?  Mr. Kotchen, anything else we

6   need to cover from your perspective?

7        MR. KOTCHEN:  No.  We appreciate your time and

8   attention to this, Judge.

9        THE COURT:  Any questions with respect to my rulings

10  or guidance?

11       MR. KOTCHEN:  Not -- not at all, they are clear to

12  me.

13       THE COURT:  All right.  Ms. Williams, how about for

14  you?

15       MS. WILLIAMS:  No, everything's clear.  I appreciate

16  the time and you going through this in such detail.

17       THE COURT:  No, you're very welcome.  And, again, I

18  have reviewed the rest of the letter.  I'm going through it in

19  a little bit more detail and, as I think I indicated in a text

20  order -- and just for the record, I appreciate counsel's

21  proposed extended discovery schedule in light of these

22  disputes.  We're going to keep that tabled.  I do anticipate

23  bringing everybody in in court to address the remainder of the

24  disputes.  So give me a little bit of time, and I'll give you

25  as much heads up as I can, and bring you in as quickly as I

52

1    can.

2              MS. WILLIAMS:  Great; thank you, Your Honor.

3              THE COURT:  All right.

4              MR. KOTCHEN:  Thank you.

5              THE COURT:  Thank you, everyone.

6              MR. KOTCHEN:  Thank you, Your Honor.

7              THE COURT:  Have a good day.

8              MR. KOTCHEN:  Okay.  Bye-bye.

9              MS. WILLIAMS:  Bye-bye.

10        (Whereupon, at 10:46 a.m., the hearing was adjourned.)

11

12

13                CERTIFICATE OF TRANSCRIBER

14

15        I, KAREN HARTMANN, a certified Electronic Court

16   Transcriber, certify that the foregoing is a correct transcript

17   from the electronic sound recording of the proceedings in the

18   above-entitled matter.

19

20

21   *Karen Hartmann*

22

23

24   Karen Hartmann, AAERT CET 475  Date: May 13, 2024

25   TRANSCRIPTS PLUS, INC.