# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## TRENTON DIVISION

```
GREGORY MACLEAN, INDIVIDUALLY  ) Case No. 3:20-cv-03414-GC-JBD
AND IN HIS REPRESENTATIVE      )
CAPACITIES, et al.,            )
                               ) Courtroom No. 6W
              Plaintiffs,      ) Clarkson S. Fisher Building
                               ) & U.S. Courthouse
versus                         ) 402 East State Street
                               ) Trenton, New Jersey 08608
WIPRO LIMITED,                 )
                               ) June 4, 2024
              Defendant.       ) 11:32 a.m.
```

TRANSCRIPT OF HEARING RE: OUTSTANDING DISCOVERY DISPUTES
IN MARCH 1, 2024 JOINT LETTER
BEFORE HONORABLE J. BRENDAN DAY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiffs:        The Law Offices of Jonathan Rudnick LLC
                           By:  JONATHAN RUDNICK, ESQ.
                           788 Shrewsbury Ave, Suite 204
                           Tinton Falls, NJ 07724

                           Kotchen & Low LLP
                           By:  DANIEL A. KOTCHEN, ESQ.
                           1918 New Hampshire Avenue, NW
                           Washington, DC 20009


ESR/COURTROOM DEPUTY:      Christopher Yoos

TRANSCRIPTION SERVICE:     TRANSCRIPTS PLUS, INC.
                           435 Riverview Circle
                           New Hope, Pennsylvania 18938
                           215-862-1115
                           CourtTranscripts@aol.com


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

```
APPEARANCES:
(continued)

For the Defendant:        Gibson Dunn & Crutcher LLP
                          By:  STEPHANIE SILVANO, ESQ.
                               ALEX DOWNIE, ESQ.
                          200 Park Avenue
                          New York, NY 10166-0193

                          Gibson Dunn & Crutcher LLP
                          By:  GRETA B. WILLIAMS, ESQ.
                          1050 Connecticut Avenue, NW
                          Washington, DC 20036-5306
```

1   <u>TRENTON, NEW JERSEY  TUESDAY,  JUNE 4, 2024  9:33 A.M.</u>

2          (Call to order of the Court)

3          THE COURT:  All right.  We're here in the matter of

4   MacLean, et al., versus Wipro Limited, Docket Number 20-3414.

5          May I have the appearances of the counsel, starting

6   with plaintiff?

7          MR. KOTCHEN:  Good morning, Your Honor.  Daniel

8   Kotchen from Kotchen & Low on behalf of the plaintiffs, the

9   putative class.  And with me is my colleague, Jonathan Rudnick.

10          THE COURT:  Good morning, gentlemen.  Mr. Kotchen, I

11   hope your back is doing all right.

12          MR. KOTCHEN:  I appreciate your moving the hearing.

13   The back is not perfect, but it's very doable.

14          THE COURT:  All right.

15          MR. KOTCHEN:  It wasn't doable the last time.

16          THE COURT:  Welcome to Trenton.

17          MR. KOTCHEN:  Thank you.

18          THE COURT:  And for the defendant?

19          MS. WILLIAMS:  Good morning, Your Honor.  Greta

20   Williams on behalf of Wipro Limited.  And I am joined by my

21   colleagues, Alex Downie and Stephanie Silvano, who's our local

22   counsel in this case.

23          Also, I want to introduce the Court to Umung Varma,

24   who is Associate General Counsel at Wipro.

25          THE COURT:  Good morning, Counsel.  Mr. Varma, how

1  are you?

2          MR. VARMA:  Doing well; thank you.

3          THE COURT:  All right.  We are here following a

4  telephone conference held on the record on March 18th, 2024,

5  continuing on a series of discovery disputes in this matter

6  that was set forth in a joint letter dated March 1st, 2024.

7  During the March 18th conference call, the Court resolved a

8  number of disputes set forth in that letter.  And I figured

9  I'd just confirm with counsel before we move on to other

10 disputes that the disputes set forth in Paragraphs C and D in

11 the March 1st, 2024 letter related to the Phillips production

12 have been resolved.  I assume that the transfer or the

13 reopening of the data that was the subject of those disputes is

14 either ongoing and the -- and review is underway.  My

15 assumption is that there's nothing lingering that we need to

16 discuss today.  Is that correct, Mr. Kotchen?

17         MR. KOTCHEN:  I don't think there's anything to

18 discuss on those issues today, but --

19         THE COURT:  All right.  Ms. Williams?

20         MS. WILLIAMS:  That's correct, Your Honor.  We have

21 produced all of the Phillips documents to Mr. Kotchen; 63,000

22 documents and counting.

23         THE COURT:  Okay, very good.

24         All right.  Well, then let's start.  I've reviewed

25 the letter, and I think the most efficient course would be go

1   issue-by-issue, starting with the dispute with respect to

2   backups, ESI preservation, destroyed ESI, and a proposed

3   30(b)(6) deposition regarding those issues.

4           I'll say at the outset, I have reviewed the letter,

5   I've given this quite a bit of thought, but I do want to have a

6   fulsome discussion from counsel to understand exactly where the

7   disputes lie.  And there are certain -- as before, when we

8   talked on March 18th, I think there are certain areas where the

9   parties seem not to be too terribly far off, and then certain

10  areas where that's not the case.  And so I may have quite a bit

11  -- quite a few questions from counsel.

12          But, Mr. Kotchen, let me start with you and

13  understand --

14          MR. KOTCHEN:  Okay.  Your --

15          THE COURT:  -- plaintiffs' perspective.

16          MR. KOTCHEN:  Sure.  Sure, Your Honor.  I mean, this

17  is a -- and would you like me to, I can --

18          THE COURT:  Please.  Yeah, start from the beginning,

19  if you would.

20          MR. KOTCHEN:  Okay.

21          THE COURT:  I've got all day.

22          MR. KOTCHEN:  So, look, at the beginning of the case

23  -- and certainly the Local Rules contemplate -- contemplate

24  this.  It's important to understand what sort of ESI issues

25  there may be, including backups, that the -- the

1  discoverability and the applicability of backups to a case.

2  That's particularly true in this case because of size

3  limitations that Wipro had for its employees and executives.

4        So if you go back to a prior system they referred to

5  as their Microsoft Exchange System, they had a -- an email size

6  limits of one gigabyte, which is very, very small.  And once

7  employees and executives hit that limit, they couldn't send or

8  receive emails unless they deleted things or transferred them

9  to PSTs.  And so the applicability of backups -- if emails

10  were deleted, and we think that they were pursuant to that, to

11  the size limitations, it's critically important to have -- to

12  have backups.

13        Now, according to Wipro, from 2016 to 2023, they

14  migrated employees and executives, although we don't know who

15  was migrated and when, to a new system that they referred to as

16  the Microsoft Office 365 System.  That system had larger emails

17  -- box sizes.  So for the primary email box, there's a hundred

18  gigabyte limitation.  For an online archive of that, there's a

19  hundred gigabyte size limitation for employees that were below

20  C-1, and 1.5 terabyte --

21        THE COURT:  Mr. Kotchen, can I just stop you?  I just

22  want to make sure, just organizationally in the letter, the --

23  Paragraph A, the issue is broken down in sort of sub disputes.

24        MR. KOTCHEN:  Correct.

25        THE COURT:  And I just want to make sure I keep these

1  clear in my mind.  Right now you're on backups, right?  And

2  we'll go --

3          MR. KOTCHEN:  I'm on backups now.

4          THE COURT:  All right.

5          MR. KOTCHEN:  Which is --

6          THE COURT:  We're just going to -- we're talking

7  about that discrete subcategory, correct?

8          MR. KOTCHEN:  That discrete issue, why it's

9  important.

10         So even their large -- so there was a new system that

11  folks were migrated to that ended -- the migration ended, as we

12  understand it, in 2023.  There's still size limitations.  It's

13  larger, but there's still size limitations, and still the issue

14  of backups is relevant.

15         So we need to understand on our side what backups

16  actually exist.  And Local Rule 26.1(d) certainly requires

17  counsel to, both, familiarize themselves with the existence of

18  backups, and then discuss in the context with opposing counsel,

19  the need and discoverability of backups in this case.

20         We understand that there are -- we don't know what

21  backups exist with respect to the Microsoft Exchange of the

22  backups.  We don't understand what backups exist with Microsoft

23  Office 365 backups.

24         We understand from counsel that backups could have

25  been created for SharePoint, OneDrive and Google -- or Google

1    Drives if there's a litigation hold, but we don't understand

2    what backups exist there.

3            So the first issue, and that we think is a critically

4    important issue considering the size limitations employees had

5    at Wipro, is what backups exist.

6            THE COURT:  With respect to particular custodians,

7    particular repositories, particular data sets, is that the sort

8    of --

9            MR. KOTCHEN:  Well --

10           THE COURT:  -- level of granularity you want at this

11   point?

12           MR. KOTCHEN:  We need -- yeah, who -- who has

13   backups?  When were folks migrated?  That is important because

14   there's going to be a time when we need to discuss with these

15   folks who the relevant custodians are for this case for ESI

16   discovery.  And that question -- in order to really address

17   that question, we need to understand whose documents actually

18   exist and for what time period.

19           So for one custodian, if there's zero backups, and

20   that person deleted emails up until, we'll say 2023, that

21   person is going to be of less interest to us than somebody who

22   has backups that date back to the mid 2010s.  And that's just -

23   - you know, it's an important threshold issue for us.

24           And one of the -- one of the -- on our side, one of

25   the frustrations that we've had is, notwithstanding the Local

1  Rule requirements about counsel familiarizing themselves with

2  backups, and then discussing it with opposing counsel, we don't

3  have a sense as to what backups actually exist.

4          THE COURT:  Do you have a sense more generally in

5  your discussions with counsel that backups -- and you touched

6  on this a minute ago, I want to drill down a little bit more --

7  whether backups writ large may exist?

8          MR. KOTCHEN:  We do not.  We understand that if

9  there's a litigation hold -- as we understand from counsel,

10  there could be backups for SharePoint, OneDrive, and Google

11  drive.

12          With respect to the Microsoft Exchange backups, we

13  don't know what exists.  With respect to Microsoft Office 365,

14  we've been informed those are -- those data centers are housed

15  primarily in Singapore, secondarily in Hong Kong.

16          But Wipro is a publicly traded corporation, an 11

17  billion dollar per year publicly traded corporation.  If you

18  Google Microsoft Office 365, the first thing you see about

19  backups is they -- Microsoft recommends that backups be kept.

20  And we think that it would be -- we think that Wipro should

21  have backups, but we don't know for sure where they exist or

22  what they -- what backups do exist.

23          THE COURT:  Would it -- I mean, would it satisfy you

24  to know, yes or no, say, you know, employees at Wipro who were

25  employed as of 2015, if there was a litigation hold, yes, there

1    are backups?  If there was not a litigation hold, then, no,

2    there are no backups.  And I ask that question because I'll

3    tell you one concern I have, and I'm happy to hear you, is I'm

4    not certain that Local Rule 26.1(d) contemplates the level of

5    granularity that you're seeking at this juncture.  And if

6    you're asking Wipro to do some sort of an advanced

7    investigation as to which specific custodians' email accounts

8    have backups, which particular repositories there are back --

9    then it very much seems to me to be putting the cart before the

10   horse.

11           MR. KOTCHEN:  That is -- it's a very fair point.  I

12   mean, I -- you know, in fact, I hadn't thought about it that

13   way where we're asking them to figure out if it has backups, if

14   they have, you know, 15,000 U.S. employees, or how many of --

15   that's not what we're looking for.  I think that's a very fair

16   point.

17           Our interest is there are going to be custodians who

18   are relevant, and that we're going to have to discuss with them

19   about the ESI discoverability of, and we need to understand

20   certainly as part of that discussion, what backups for those

21   individuals exist, or which ones don't have any backups.  That

22   is -- that's -- I think it's a very good point, Judge.

23           THE COURT:  All right.  So then, again, I mean, I can

24   understand more generally, right?  What exactly is the ask

25   here, right?  Do backups exist?  Do they not?  Is that sort of

1  the level of information you're looking --

2          MR. KOTCHEN:  The ask is, you know, generally do

3  backups exist for Microsoft Exchange?  Do backups exist for

4  Microsoft Office 365?  If SharePoint and the other share drives

5  have backups, generally what exist and for what time period?

6          THE COURT:  Okay.

7          MR. KOTCHEN:  That's high level, what we're looking

8  for.

9          THE COURT:  Okay.

10          MR. KOTCHEN:  I think that your point, which is a

11  good one, is once you drill down to the individual custodians,

12  those are certainly -- I mean, those, it's really relevant as

13  we discuss with Wipro who the custodians are in this case that

14  should -- should be --

15          THE COURT:  Right.  Just -- it seems to me that based

16  on the Phillips production, and based on good faith efforts

17  between counsel, you can identify a set of potential

18  custodians, and then figure out from there whether their data

19  is still there.

20          MR. KOTCHEN:  I think --

21          THE COURT:  Right?

22          MR. KOTCHEN:  I think that that's -- is a very fair

23  point.

24          THE COURT:  Yeah, okay.

25          MR. KOTCHEN:  Yeah.

1          THE COURT:  All right.  Thank you, Mr. Kotchen.

2          Let me hear from you, Ms. Williams, on the backup

3 issue.

4          MS. WILLIAMS:  Okay.  Thank you, Your Honor.

5          Just to -- can I -- can I just make a few preliminary

6 points --

7          THE COURT:  Absolutely.

8          MS. WILLIAMS:  --  before I move to the --

9          THE COURT:  Sure.

10          MS. WILLIAMS:   -- to the -- our favorite backup --

11 backups issue, and servers, and on-premises software?

12          THE COURT:  Sure.

13          MS. WILLIAMS:  I just want to -- I just want to --

14 before we just get into the weeds of that, we've been engaging

15 in document production for nine months now.  As you know, this

16 is not the first time we've been before Your Honor.  Plaintiff

17 has moved to compel on six categories of issues, which adds up

18 to about 16 discrete issues.  Your Honor has resolved two of

19 them, and I think generally -- and has agreed with our client's

20 position that much of the documents and discovery that Mr.

21 Kotchen has been seeking goes beyond the needs of the case.

22 And you did not force us to compel the detailed staffing data

23 last time, you did not force us to turn over age and gender

24 data that has nothing to do with the issues in the case, and we

25 are deeply appreciative of the time you've spent looking into

1  this, all the lengthy issues spelled out in our joint letter.

2  And we appreciate the balanced approach you've taken here, and

3  being mindful of the, you know, what's proportional to the

4  needs of the case.

5       And so -- but since the last conference, plaintiffs

6  have not backed away from any of their positions here.  We did

7  meet and confer, as Your Honor directed us to do, but they have

8  not moved away from any of the positions, and we haven't been

9  able to narrow those issues.

10      I think one thing that concerns us in particular

11  about the discovery excesses here is the fact that this is

12  copycat litigation, right?  And it's really the same case as

13  Phillips.  And pursuant to the Court's order, as I mentioned,

14  we have now produced all of the documents from the Phillips

15  case.  We've reproduced them in this litigation, right?  So

16  that's nearly 65,000 documents.  That's in addition to and over

17  400,000 pages, right?  That's in addition to the over 7,000

18  pages of documents and, you know, hundreds of documents we have

19  already produced in this litigation.

20      This is not a case where we're just trying to slow

21  roll or delaying our production obligations.  We want to get to

22  the merits of this case.  And we're concerned that these issues

23  like backups, to use your words, are putting the cart before

24  the horse and really just creating a sideshow; I will get to

25  the backups in a minute.

1    It's worth noting too, Your Honor, that we've tried

2  time and again through meet and confers, through extensive

3  correspondence back and forth with the other side to resolve

4  these, but to no avail.  So we're back here today and we're

5  hoping that we can get past these discovery disputes, and to

6  rein in some of the excessive requests we're seeking, and

7  proceed with discovery and litigating the merits.

8    On the backups, I think you're exactly right.  As I

9  said, the plaintiffs are putting the cart before the horse.

10 They've asked for extensive, extensive information about our

11 backups practices.  We've provided responses in writing for

12 different emails and letters back and forth.

13   You asked if they're seeking information about

14 particular custodians or particular individuals as opposed to

15 just all of our practices in general and what backups exist out

16 there in the world.  We have provided some of that, but as you

17 said, Your Honor, I think this -- what they're seeking here

18 goes far beyond what Rule -- Local Rule 27.1(d) [sic]

19 contemplates.

20   And, in fact, we have already provided more than what

21 the Local Rule calls for.  We have provided a full list of the

22 custodians who received the litigation hold in the <u>Phillips</u>

23 case and in this case.  If there are particular questions about

24 what backups exist for those individuals, we could address

25 that.  But what they're seeking here goes well beyond that.  We

1  have already expended significant resources trying to

2  understand and get our arms around all of the various backup

3  practices at the company --

4           THE COURT:  Well, let me ask you -- I mean, Ms.

5  Williams, I appreciate the background.  Specifically, right --

6  and I don't know if this is the right way to think about it,

7  but Mr. Kotchen sort of outlines two separate buckets, right?

8  You have potential custodians' own email accounts, and whether

9  there are backups for individual email accounts, or whether

10 those accounts were saved as PST files, and that's sort of a

11 sort of hit or miss, I think.  It's fair to say that, you know,

12 it depends on whether a particular employee saved his or her

13 email accounts to a PST file or not.  So that's one bucket.

14           And then sort of more central or particular, I mean,

15 maybe it's -- it can be individualized to employees, but

16 SharePoint, and OneDrive, and Google Drive type data sets.  And

17 I understood Mr. Kotchen's understanding to be that Wipro would

18 have backups of those data sets to the extent that there was a

19 litigation hold, is that accurate?

20           MS. WILLIAMS:  Yes, that's correct, Your Honor.

21           THE COURT:  Okay.

22           MS. WILLIAMS:  They would have backups of those

23 SharePoint sites and OneDrive, to the extent that there was a

24 litigation hold in place.

25           THE COURT:  For that particular custodian.

1          MS. WILLIAMS:  I'm sorry?

2          THE COURT:  Sent to that particular custodian.

3          MS. WILLIAMS:  Correct.  Correct, but not otherwise.

4          THE COURT:  Okay.  Okay.  Does the same go for

5    custodians' individual email accounts, whether on the old

6    Microsoft Office -- what was it, Exchange?  Is that what it was

7    called?

8          MS. WILLIAMS:  It was the on-premises software.

9          THE COURT:  Okay.  And/or the Office 365 that was the

10   newer system.

11         MS. WILLIAMS:  Right.  So starting in 2016, employees

12   started getting migrated over to the M365, right?  And so the

13   emails are stored at two data centers, as Mr. Kotchen alluded

14   to, in Hong Kong and Singapore, right?  So there's a service

15   interruption at one, then information can be pulled from the

16   other and -- so Wipro's services are not impacted.

17         We have not revealed in our investigation to date,

18   which has been quite extensive as I mentioned, we haven't

19   revealed any other backups or disaster recovery systems with

20   respect to emails other than those -- the ones that we've

21   discussed.  And as I said, we don't -- that Wipro does not

22   maintain backups of the SharePoint, OneDrive, and Google Drive

23   absent a litigation hold.

24         THE COURT:  Yeah, but go back to the emails.  What

25   did you just say?  You've not discovered whether there's?

1              MS. WILLIAMS:  Right.  We haven't discovered -- aside

2      from these data centers in Hong Kong and Singapore, we're not

3      aware of other backup --

4              THE COURT:  I see.

5              MS. WILLIAMS:  -- systems but --

6              THE COURT:  I see.

7              MS. WILLIAMS:  Right?  But there's certain storage --

8      storage limits.  You know, Mr. Kotchen has noted that the one

9      gigabyte storage limit and how that's very small, that

10     limitation was only in place until 2016.  And that's when

11     everybody began being migrated, and now -- this is all set

12     forth in detail in our papers, but it's up to, like, 100

13     gigabytes.  So it's much -- it's much, much larger.  And so,

14     you know, it seems like the number of people who would be

15     reaching that limitation is very, very small.  And, again, just

16     not a real issue here.  This just seems like a sideshow and

17     we're putting the cart before the horse.

18             THE COURT:  So, I mean, it's -- I think it's -- it's

19     helpful for my mind, at least, to think about this in more real

20     -- real sort of on-the-ground terms.  You have -- as an

21     example, an employee A who was employed by Wipro in 2015,

22     right, and there was a one gigabyte email limitation, right,

23     that employee left, say, in 2018, for whatever reason, right?

24     Say hypothetically that the parties agree that this person is a

25     relevant custodian who may -- whose emails may contain

1 discoverable information.  What is Wipro's general position as

2 to whether that person's email account will be accessible via

3 one of these two data centers?

4          MS. WILLIAMS:  If that person was on a litigation

5 hold, or no?

6          THE COURT:  No.

7          MS. WILLIAMS:  If they're not on a litigation hold, I

8 mean, I think that you would have to do more digging around and

9 more inquiry.

10          THE COURT:  With respect to that particular

11 custodian.

12          MS. WILLIAMS:  With respect to that particular

13 custodian, if he was not on a lit hold and this was back in

14 2016.  I mean, I think we would want to do a little bit more

15 digging on the circumstances of that particular employee to

16 better understand that, right?  We can't speak to every single

17 employee and the individual circumstances.  You know, certainly

18 that -- certainly the typical practice was for their emails to

19 be preserved until the time that their employment ended, and

20 then some -- and then, you know, it would -- there was no auto

21 deletion in place.  But depending on the size of the email box,

22 their emails may have, you know, may have been deleted at some

23 point.

24          THE COURT:  I guess what I'm saying, I do have the

25 concern that I expressed to Mr. Kotchen, but it does seem that

1  there's a more concrete answer out there with respect to these

2  two data centers where you could say, right, for employees who

3  were not subject to a litigation hold, as a general matter, the

4  data centers have backups or they don't.  With the caveat,

5  right, that, you know, when we get down into the nitty-gritty

6  and select individual custodians, all of this could change when

7  we do the investigation as to those particular -- you know what

8  I'm saying?  I mean, it seems to me that there's something more

9  you can provide, but that still, you know, accommodates for my

10  -- what I believe is a well-grounded concern, that you're not

11  doing a full-blown investigation, right, before you even get

12  into data production.

13        MS. WILLIAMS:  Right.  Your Honor, what -- I

14  appreciate -- appreciate, you know, your thinking here.

15        THE COURT:  Yeah.

16        MS. WILLIAMS:  And -- but what I would suggest is

17  we've already, in terms of who are the relevant custodians,

18  they have all the Phillips documents.  They have everybody who

19  was sent a litigation hold in the Phillips case.  They have

20  everybody who was sent a litigation hold in this case.  We

21  haven't heard a peep about that, or taken -- they haven't

22  raised any questions about those people --

23        THE COURT:  We're going to get to that at the end of

24  this.  I mean, because I do think at the end of, right, today,

25  and we are -- to your point, we are going to put all of these

1  issues behind us one way or another and get into actual

2  discovery.  But if there is an answer, right -- hypothetically,

3  if the data centers have no backups, period, for any employees

4  who are not subject to a litigation hold, then they know that,

5  right?  Then you don't even have to go to the trouble of doing

6  these individualized investigations, right?  And if there's not

7  sort of a one size fits all answer, then you can say that,

8  right?

9         And so what I'm trying to find, is there -- is there

10  a middle ground, particularly with respect to emails and these

11  data centers?  I think, you know, it seems to me that you've

12  satisfied me with the litigation hold, and the SharePoint, and

13  OneDrive, and Google Drive bucket.

14         But I'm trying to avoid everybody spinning their

15  wheels if there's a more general answer that these employees,

16  if they were not subject to a litigation hold, their emails are

17  not likely to be there.  Does that make sense?

18         MS. WILLIAMS:  Yes, that makes sense.  I think if

19  there are particular individuals that they are concerned about,

20  above and beyond the people on the litigation hold, well, then

21  they could let us know about that, presumably.  Or if there are

22  questions about specifically what data is out there for the

23  people on the list of litigation hold recipients, perhaps

24  that's a middle ground approach to think about here.

25         I just raised the fact that we provided this

1  information because we do have in play, Your Honor, the

2  universe of relevant people and custodians here.  So doing a

3  broader investigation in -- you know, it just doesn't seem

4  necessary.

5          THE COURT:  Yeah, I just --

6          MS. WILLIAMS:  But I appreciate your point about, you

7  know, if there's a simpler, you know, easier answer.

8          THE COURT:  Have you gotten into with the plaintiffs

9  yet any specific discussion about potential custodians to be

10 searched here beyond the ESI that's been produced in <u>Phillips</u>?

11         MS. WILLIAMS:  We have not, Your Honor.

12         THE COURT:  Okay; all right.  Thank you, Ms.

13 Williams.

14         Mr. Kotchen, here's -- on the backups issue.  What

15 I'm inclined to do is direct the parties to engage in

16 negotiating individual custodians with respect to their emails.

17 Unless you tell me otherwise, I understand there to be a pretty

18 firm answer on the SharePoint, OneDrive, and Google Drive data,

19 that if it was subject to a litigation hold, then, yes.  If

20 not, then, no.

21         At the same time, direct Wipro to begin this general

22 investigation, right?  If they can tell you, no, there's no

23 data at these data centers for any custodians if they weren't

24 subject to a litigation hold, then you have your answer.  But

25 at the same time, it seems to me you're probably ultimately

22

1  going to get into these individual sub investigations --

2          MR. KOTCHEN:  Fair enough.

3          THE COURT:  -- once you agree on a custodian set.

4          MR. KOTCHEN:  Fair enough.  I mean, that is -- I

5  think that that is -- I mean, the discussion that you folks

6  just had is exactly the discussion that we -- the answers that

7  we were hoping for.  But we could certainly -- can -- can defer

8  that and get into the individual custodian-specific folks.

9          THE COURT:  Yeah, I just -- I think you're going to

10 end up there anyway.

11         MR. KOTCHEN:  I think so, too.

12         THE COURT:  And so you might as well start.

13         MR. KOTCHEN:  I think so, too.  And, I mean, look,

14 that is -- so we're happy to do that.  We'll certainly meet and

15 confer for -- on those.  You know, they're -- in this Section

16 A --

17         THE COURT:  Yeah.

18         MR. KOTCHEN:  -- of our joint letter, there's also

19 kind of what lost PSI is there for the <u>Phillips</u> collection

20 effort.

21         THE COURT:  I was going there next.  Yeah, so --

22         MR. KOTCHEN:  I mean, I think it seems like those

23 discussions can be had again on an individual custodian level

24 basis.

25         THE COURT:  You read my mind.

```
 1            MR. KOTCHEN:  Okay.
 2            THE COURT:  I can't -- I mean, I feel even more
 3  strongly on that subcategory than I do the first --
 4            MR. KOTCHEN:  I -- right.
 5            THE COURT:  -- because asking Wipro to identify what
 6  data has been lost without tying it to particular, you know,
 7  repositories or custodians is a task that I'm not going to
 8  impose.
 9            MR. KOTCHEN:  That makes -- that makes sense.  And I
10  would even say that the -- they have provided, which we
11  appreciate, what was collected in Phillips, and search terms.
12            THE COURT:  Right.
13            MR. KOTCHEN:  But we -- you know, I think there are -
14  - there are a number of questions that we have about that that
15  perhaps we can take up with them, or if Your Honor wanted to
16  discuss that now, we'd be happy to do it.
17            THE COURT:  No, I mean, I understood on the -- on
18  the, quote, "gaps" in the Phillips production, my understanding
19  was that there was -- Wipro had said, if you have any
20  questions, let us know.  And you just never came to ground on
21  that --
22            MR. KOTCHEN:  Right.
23            THE COURT:  -- further discussion, is that a fair --
24            MR. KOTCHEN:  I think that's -- that's a fair
25  characterization.
```

1            THE COURT:  Okay.

2            MR. KOTCHEN:  Yes, Your Honor.

3            THE COURT:  All right.

4            MR. KOTCHEN:  And so we have -- we do have a number

5    of questions about, you know, search terms were run against 14

6    individuals' documents.  We don't know which documents, and we

7    really don't know --

8            THE COURT:  Yeah.

9            MR. KOTCHEN:  -- you know, when we're talking about

10   emails, we're talking about other things, what exactly was

11   searched.

12           THE COURT:  I mean, look, that might help you ground

13   the discussion on --

14           MR. KOTCHEN:  Yes.

15           THE COURT:  -- what backups exist in the first place,

16   right?

17           MR. KOTCHEN:  Yes.

18           THE COURT:  And so I think that that sort of organic

19   discussion will cover all of these --

20           MR. KOTCHEN:  I think so, too.

21           THE COURT:  -- all of these subcategories.

22           MR. KOTCHEN:  I think --

23           THE COURT:  Right?

24           MR. KOTCHEN:  I think that's exactly right.

25           THE COURT:  All right.

1          MR. KOTCHEN:  We're happy to do that.

2          THE COURT:  Okay.  Is everybody on the same page of

3   what we're doing then with Subcategory A?

4          MS. WILLIAMS:  Yes, Your Honor.

5          THE COURT:  We're going to get into individual

6   discussions about proposed custodians, meet and confers,

7   discussing questions about gaps --

8          MR. KOTCHEN:  Right.

9          THE COURT:  -- or, you know, supplemental information

10  with the Phillips data collection.

11          And I think with respect to lost or destroyed ESI,

12  you know, to the extent general universal answers come out of

13  those discussions, fine.

14          MR. KOTCHEN:  Right.

15          THE COURT:  But it very much seems to me that you're

16  going to be having all of these questions on a custodian-by-

17  custodian, repository-by-repository basis.

18          MR. KOTCHEN:  I think that's a good approach, Your

19  Honor.

20          THE COURT:  Okay; all right.

21          MR. KOTCHEN:  Thank you.

22          THE COURT:  Which sort of segues me into the

23  30(b)(6).

24          MR. KOTCHEN:  Correct.

25          MS. WILLIAMS:  Can I --

26

```
 1              THE COURT:  No.

 2              MR. KOTCHEN:  Yeah, we'll defer.

 3              THE COURT:  No.

 4              MR. KOTCHEN:  I -- I -- in preparing for this, I knew

 5   that's what you would do.

 6                        (Laughter)

 7              THE COURT:  All right.

 8              MR. KOTCHEN:  All right.

 9              THE COURT:  Very good.

10              MR. KOTCHEN:  Okay.

11              THE COURT:  Let's -- I think that takes care of A.

12              MR. KOTCHEN:  Good.

13              THE COURT:  All right; okay.  Category B.  Let me

14   outline -- so this section covers four different document

15   requests.  And I want to make sure I understand the --

16   understand the exact issue that's in dispute.

17              MR. KOTCHEN:  Okay.

18              THE COURT:  If I understand it correctly, the only

19   outstanding issue with respect to all four of those requests

20   concerns the visa-related practices and data, is that -- is

21   that accurate?

22              MR. KOTCHEN:  I think that's accurate.  The visa --

23              THE COURT:  Ms. Williams, has Wipro agreed to produce

24   documents within those requests, to the extent that they cover

25   other issues that aren't related to visas or visa practices?
```

```
 1              MS. WILLIAMS:  Yes, we have, Your Honor.
 2              THE COURT:  Okay; all right.  So it's only -- it's
 3  the visa aspect of each of those requests.
 4              MS. WILLIAMS:  That's right, Your Honor.
 5              MR. KOTCHEN:  Correct.
 6              THE COURT:  Okay; all right.
 7              MR. KOTCHEN:  Correct.  I think that -- I think
 8  that's right, but maybe -- perhaps --
 9              THE COURT:  We'll see if something comes out of --
10              MR. KOTCHEN:  -- (indiscernible - not at microphone)
11  complaints, I'm not sure.
12              MS. WILLIAMS:  Oh, yes.  Sorry.
13              MR. KOTCHEN:  Yeah.
14              MS. WILLIAMS:  There's -- separate --
15              MR. KOTCHEN:  Yes.
16              MS. WILLIAMS:  -- there's the visa issues.  There's
17  RFPs that deal with visa-related practices, and then there's
18  RFPs that deal with complaints about --
19              THE COURT:  Right.
20              MS. WILLIAMS:  -- other types of discrimination.
21              THE COURT:  Right, okay.  Fair enough.
22              MS. WILLIAMS:  So there's sort of two sub buckets.
23              THE COURT:  All right, that's right.  That's right.
24              MR. KOTCHEN:  But the visa issue is a commonality
25  (indiscernible - not at microphone)
```

28

1           THE COURT:  Got it.

2           MR. KOTCHEN:  And, look, I'll start with -- if you

3  want me to address it.

4           THE COURT:  Please.

5           MR. KOTCHEN:  Okay.  Let's first talk about visa

6  policies, procedures, mandate, directives, you know, reports

7  and so forth, which I think are Request Number 8 and 16, that

8  are separate from an investigation or complaints.

9           If you look at our complaint, and if you look at, you

10 know, Paragraphs 18 to 20, 23, if you look at the motion to

11 dismiss that Wipro filed with respect to disparate treatment

12 and disparate impact, and their arguments that our focus on

13 Wipro's visa policies and procedures sounded in intentional

14 discrimination such that disparate impact not be at issue in

15 this case.  And then if you look at the motion to dismiss order

16 -- Judge Cantor's [sic] motion to dismiss order, she also

17 focused on visa-related issues at a number of different points

18 in her motion to dismiss order.

19          And in the briefing, in the -- in our joint discovery

20 letter, I mean, Wipro devotes one sentence to this issue saying

21 they shouldn't have to produce policies, procedures and so

22 forth relating to visas.  But that is exactly -- their use of

23 the visa system is exactly how they effect their discriminatory

24 objectives.  And so --

25          THE COURT:  You agree there's not a visa

1  discrimination claim in the complaint.

2           MR. KOTCHEN:  There's not a visa discrimination

3  claim.  But their visa employees are either all or almost

4  entirely of Indian -- Indian nationals or South Asian descent.

5  And so when there is a use of the term saying let's -- let's

6  create a visa-ready workforce, let's focus on visa utilization,

7  that is what they're saying, in effect.  Their practice is

8  let's put the Indian -- let's give Indian nationals who require

9  visas first priority when it comes to staffing.

10          And so it's impossible to separate out our visa

11 allegations from the intentional discrimination.  And that's

12 exactly what Wipro argued in their motion to dismiss, and Judge

13 Cantor [sic] agreed with them.

14          THE COURT:  I think it was Judge Wolfson at the time.

15          MR. KOTCHEN:  Judge Wolfson, yeah, that's exactly

16 right.  Agreed that that is -- that's exactly what happened

17 here.

18          THE COURT:  So hypothetically, if Wipro had a policy

19 of directing 100 percent of its energies, resources, and focus

20 on securing H-1B visas for Indians to the exclusion of all

21 other nationalities, that is relevant in your mind to

22 intentional race discrimination.

23          MR. KOTCHEN:  That's exactly right, it's absolutely

24 intentional.  And the data will show that -- will show that

25 their visa employees, or H-1B employees are either a hundred

1  percent or over 99 percent from -- folks from India.

2        And so that is why when you have a policy in place,

3  for example, saying "prioritize visa employees," that is a

4  policy that means prioritize folks of Indian national origin

5  and South Asian descent.

6        And so when you look at our complaint, you look at

7  their motion to dismiss, you look at the motion to dismiss

8  order, that this is an issue of critical importance to the

9  case.  And if we're deprived of the policies, procedures, plans

10  and so forth pertaining to visa employees, we're deprived of

11  discovery that we need to prove what Wipro has held us to here,

12  which is intentional discrimination, if we're complaining about

13  their visa policies and programs.

14        THE COURT:  Can I ask you a question specifically

15  with respect to RFP 16?

16        MR. KOTCHEN:  Sure.

17        THE COURT:  And in the prior conference call, we had

18  a very fulsome discussion on the monthly or the quarterly

19  reports with respect to staffing, etc.

20        MR. KOTCHEN:  Correct.

21        THE COURT:  And the visas are lumped into that.  Do

22  you know or suspect there to be reports of the kind that we

23  were talking about before that pertain in some way to visas?  I

24  guess a different way of asking that is, what sort of reports

25  are you envisioning pertain to visas?

1          MR. KOTCHEN:  There will be utilization reports.  So,

2    for example, they will -- Wipro will track utilization of visa

3    employees.  And so if there are visa-ready employees that

4    haven't been deployed yet in the U.S. who reside in India,

5    there will be reports that direct folks, "here's the

6    utilization," "here's who's available," "here's who needs to be

7    staffed," "here's who needs to be allocated to these business

8    units," and so forth.  That type of report -- those types of

9    plans will definitely exist.

10          THE COURT:  I'm sorry, I'm not quite following.  I

11    mean, if the theory, though, is that all or almost all of their

12    visa recipients are Indian or South Asian nationality, then

13    what are the utilization reports going to show or assist with,

14    you know, visa-related discrimination?

15          MR. KOTCHEN:  They -- the utilization reports will

16    show we have a thousand visa-ready employees, and they need to

17    be staffed ASAP --

18          THE COURT:  Right.

19          MR. KOTCHEN:  -- in the U.S.  Here's where they can

20    go, here's where they can be placed.  They will track

21    utilization, they will map employees to specific positions.  At

22    the same time that they're doing that, folks who are in the --

23    non-Indians in the U.S. working will be taken out of positions,

24    put in the non-productive status --

25          THE COURT:  Oh, I see.

32

1          MR. KOTCHEN:  -- referred to as being benched, and

2   those folks will come in and take the jobs.

3          THE COURT:  And do the reports that we discussed

4   before that Wipro has either agreed or been ordered to produce

5   not already contain data points or evident data as to whether

6   particular employees were visa workers?

7          MR. KOTCHEN:  I mean, my understanding is that Wipro

8   -- if there is a utilization that folks on -- here's

9   utilization -- hypothetically speaking, a report, utilization

10  of our visa employees, that that is something that they're not

11  -- they're not going to produce because it relates to visa

12  employees.  And that is the type -- specifically the type of

13  report, plan, whatever you want to refer to it, that we need --

14  we need to -- in discovery to prove our claims and to certify a

15  class, by the way.

16         THE COURT:  Oh, I guess I hadn't understood that.  Is

17  -- your understanding of Wipro's position is that if an

18  employee is a visa worker, they're not providing any

19  information as to that employee?

20         MR. KOTCHEN:  They're not -- they're not providing

21  discovery on visa workers for -- I mean, in theory, I guess

22  that they could be providing -- if a visa worker -- if there's

23  a document that talks about staffing generally, and it includes

24  visa workers, perhaps --

25         THE COURT:  Well, but in the monthly or quarterly

1  snapshots that you're receiving, those don't include employees

2  or former employees?

3          MR. KOTCHEN:  Oh, no, they -- I think the snapshots

4  would include visa employees.

5          THE COURT:  Okay; all right.

6          MR. KOTCHEN:  But, yeah --

7          THE COURT:  All right.  That was my --

8          MR. KOTCHEN:  But --

9          THE COURT:  They're -- they're not refusing to

10  produce information as to employees who are visa workers.

11  They're refusing to provide data with respect to visas.

12          MR. KOTCHEN:  They're -- they're refusing to -- if

13  there are business plans, if there are reports responsive to

14  Request Number 8 and 16 --

15          THE COURT:  And I'm going to -- look, I'm going to

16  silo those off, and we'll -- we'll --

17          MR. KOTCHEN:  Okay.

18          THE COURT:  I'll hear from Ms. Williams.

19          MR. KOTCHEN:  My understanding is if they involve

20  visa issues, they're not producing them.

21          THE COURT:  Okay; all right.

22          MR. KOTCHEN:  That --

23          THE COURT:  Thank you, Mr. Kotchen.

24          MR. KOTCHEN:  That's my understanding.  And if they

25  are withholding from us the policies, procedures, directives

34

1  pertaining to visa employees, that is -- what they're doing is

2  preventing us from both certifying a class, because that's

3  critical to class certification, and proving our

4  discrimination --

5          THE COURT:  Well, let me ask you this, just to make

6  sure that I understand the lay of the land correctly.  What

7  percentage of Indian employees are visa workers as opposed to -

8  - I mean, they -- they must all be visa workers, to the extent

9  they're working in the United States, is that correct, or am I

10 mistaken?

11         MR. KOTCHEN:  Well, what percentage of -- in the

12 U.S., it has changed over time as it -- there's been kind of

13 legislative pressure, you know, public pressure.  So, if you

14 look at the -- at the bands where -- like, these are -- these

15 are the critical jobs.  They're not the lowest level, they're

16 the mid -- the mid-tier jobs.  They're largely, predominantly

17 visa employees.  And, again, by definition, they're largely or

18 predominantly employees of Indian national origin, South Asian

19 descent.

20         And so when you look at the critical bands over time,

21 that is -- that's what you'll see.

22         THE COURT:  Yeah.  I'll hear from Ms. Williams.  I

23 think it would be surprising if they say that they're -- well,

24 let me hear what --

25         MR. KOTCHEN:  Okay.

35

1          THE COURT:  -- what Ms. Williams has to say.

2          MR. KOTCHEN:  Okay; fair enough.

3          THE COURT:  Answer just that question first.  To the

4    extent that you've already been producing monthly or quarterly

5    snapshots with respect to employees, right?  You're not

6    excising employees who happen to be visa workers.

7          MS. WILLIAMS:  No, Your Honor.

8          THE COURT:  You're just not producing the data as to

9    the visa, is that correct?

10         MS. WILLIAMS:  Well, actually, Your Honor, so -- so -

11   - right, we are not excluding employees --

12         THE COURT:  Got it.

13         MS. WILLIAMS:  -- who happen to have visas from --

14   from information but --

15         THE COURT:  It would have been surprising had you

16   said that, okay.

17         MS. WILLIAMS:  That sounds like a whole other

18   headache.  But -- and I just want to be clear about what we are

19   producing with respect to visas.

20         THE COURT:  Yeah.

21         MS. WILLIAMS:  So -- and to be very clear, our

22   position is that this -- this -- the information related to

23   visa policies and practices is not relevant, because as you

24   noted, there is no visa discrimination case -- claim in this

25   case.  And cases in the Third Circuit have not permitted

36

1  discovery into other types of discrimination.  Those cases are

2  cited in our papers at Page 17.

3        We have agreed, though -- and this is with respect to

4  the data, right?  We have agreed to pull and produce updated

5  visa data containing the same fields in the same format that

6  such data was produced in Phillips, right?  This was -- partly

7  goes to our discussion at the last conference.  But those

8  fields do contain information about each employee's visa type,

9  status, and the date.

10        So even though our position is that this information

11  is not relevant, plaintiffs will be receiving this data in this

12  case, and updated data from the Phillips time period to the

13  present.

14        THE COURT:  And what data points are those?  Say that

15  again, whether they were --

16        MS. WILLIAMS:  It's the --

17        THE COURT:  -- whether they were --

18        MS. WILLIAMS:  It's the --

19        THE COURT:  -- visa recipients.

20        MS. WILLIAMS:  Yeah.

21        THE COURT:  The type of visa --

22        MS. WILLIAMS:  Each employee's visa type, the status,

23  and the dates of the visa.

24        THE COURT:  Mr. Kotchen, is that the sort of

25  information you're looking for in these reports?

37

1          MR. KOTCHEN:  Judge, we are looking for -- there will

2    be -- it's different.  We're looking for policies --

3          THE COURT:  No, no, no.  With respect to -- with

4    respect to the RFP 16.

5          MR. KOTCHEN:  Okay.

6          THE COURT:  To the extent that you're requesting

7    reports with respect to visas, on the monthly or quarterly

8    snapshots, Ms. Williams is saying, you're going to get a data

9    field that says this employee was a visa recipient, was an H-1B

10   visa recipient, etc.

11         MR. KOTCHEN:  No, that request would have been

12   covered by staffing.  Staff -- a staffing request that

13   specifically calls for data.

14         Request number 16 asked for plans or reports

15   concerning a number of issues, including visas.  And so what

16   you'll see is you will see things like utilization.  We are

17   tracking utilization.  Utilization has increased from 60

18   percent --

19         THE COURT:  I see.

20         MR. KOTCHEN:  -- to 80 percent.

21         THE COURT:  I see.

22         MR. KOTCHEN:  And so we have to increase that

23   further.

24         THE COURT:  I see.

25         MR. KOTCHEN:  Because here's what's going to happen.

1   Let's focus on class certification.  They're going to say there

2   is no policy.  There is no glue that binds the class together

3   pursuant to the Dukes case.  And we're going to point to things

4   like utilization reports.

5              THE COURT:  I got it.

6              MR. KOTCHEN:  You track utilization --

7              THE COURT:  Got it.

8              MR. KOTCHEN:  You're under --

9              THE COURT:  Got it.

10             MR. KOTCHEN:  -- a mandate to increase utilization.

11             THE COURT:  Okay.

12             MR. KOTCHEN:  It's something separate from the raw

13  data.

14             THE COURT:  Got it, all right.

15             MR. KOTCHEN:  Yeah.

16             THE COURT:  So the data is -- I appreciate Wipro's

17  position on relevance; we'll address that in a minute.  The

18  data is now addressed.  There are going to be data fields.

19             Why don't I hear from you on the relevance argument

20  more generally?

21             MS. WILLIAMS:  Yeah.  I mean, I think we've laid this

22  out pretty well in our briefs here.  But courts in the Third

23  Circuit have routinely limited discovery regarding prior

24  allegations of discrimination to those involving the same type

25  of discrimination in this case.  So in the Robbins case, for

1  example, which is a District of New Jersey case, the plaintiff

2  brought claims for race and age discrimination, but she sought

3  discovery regarding other acts of discrimination.  And the

4  court there ultimately held that there was no relevance to

5  discrimination based on sex, religion, and other things.

6          And, therefore, limited the type of discovery to the

7  type of discrimination --

8          THE COURT:  And --

9          MS. WILLIAMS:  -- documents.

10          THE COURT:  And I did exactly that on the last call,

11  right?

12          MS. WILLIAMS:  Right.

13          THE COURT:  I excluded from the --

14          MS. WILLIAMS:  That's exactly what you did on age and

15  gender.

16          THE COURT:  Correct.

17          MS. WILLIAMS:  You said, no, there's no relevance to

18  that.  This is an -- this is a race and national origin case,

19  you don't have to provide information regarding age and

20  gender --

21          THE COURT:  Right.

22          MS. WILLIAMS:  -- in the data.  And so we think a

23  similar approach is warranted here.

24          And just to cite one other case, this is the

25  Ross-Tiggett case, another District of New Jersey case from

1  2019.  And there, the court denied a motion to compel where the

2  request was not limited to, quote, "the type of discrimination

3  alleged" because, according to the court, "discovery requests

4  for prior acts of discrimination that contain no limitations as

5  to time, type of action complained of, or type of

6  discrimination alleged are overbroad and impose an undue

7  burden."

8           THE COURT:  What do you do about what <u>Phillips</u> itself

9  did in Texas, right?  Because the plaintiffs cite that <u>Phillips</u>

10  -- this -- I'm looking at Page 14, and they've cited a

11  transcript, but, "In regards to visa policies and practices, if

12  there are any documents relating to those visa policies and

13  practices, that would be included in what Wipro is required to

14  produce."  What -- so I mean, you have essentially --

15           MS. WILLIAMS:  We didn't -- we didn't produce --

16  they didn't -- the documents that they're seeking here with

17  respect to the reports and so forth related to visas, those

18  documents were not produced in the <u>Phillips</u> case, as I

19  understand it.

20           THE COURT:  Okay.

21           MS. WILLIAMS:  Anything else on relevance?  But, I

22  mean, but the bottom line is, this is not a visa discrimination

23  case.  It's a race and national origin case.

24           THE COURT:  Yeah, I mean, I'll cut to the chase.  I

25  disagree.  I will reaffirm and reinforce what I said before on

1    the call on March 18th, that age and gender discrimination is

2    irrelevant to these issues here.  And I appreciate that there

3    is not a direct visa discrimination claim at issue in this

4    case, but the plaintiffs are articulating a theory of the case

5    in which Wipro's visa practices and visa policies are proxies

6    for intentional race discrimination.  And so the age and gender

7    cases and issues are distinguishable in my mind.

8          You know, I'm going to tell you, I find it -- I find

9    it very relevant if Wipro had a policy or has a practice of

10   directing all of its assets, all of its resources, all of its

11   energies towards securing visas for Indians and individuals of

12   South Asian nationality, to the exclusion of others -- of other

13   nationalities, that is relevant evidence.  It tends to -- it

14   tends to, doesn't -- I'm not saying it does, but tends to prove

15   the plaintiffs' point.  And so I do find those cases

16   distinguishable under the circumstances here.

17         I will say as a general matter, and I'll make this

18   finding, that visa practices are relevant to this case.  And

19   Wipro is going to be directed to disclose to the plaintiffs,

20   certainly policies and procedures, directives, mandates that

21   relate to its visas and visa practices.  RFP 8 is going to be

22   produced, to the extent those policies exist.  And I'm sure

23   that there are policies directed towards visa practice

24   generally.  I do find that relevant and discoverable.

25         Let me hear -- hear you, though, Ms. Williams, on --

42

1  with respect to RFP Number 16.  Again, I believe that those

2  sorts of reports, to the extent that they exist, are going to

3  be relevant and discoverable.  I don't know what exists though.

4  Mr. Kotchen outlined, you know, his belief that there's going

5  to be utilization reports and the like.  I have no idea what

6  Wipro maintains.

7      MS. WILLIAMS:  I may be mistaken, but I don't know

8  that we've discussed utilization reports with respect to visas

9  with Mr. Kotchen.

10     THE COURT:  Yeah.

11     MS. WILLIAMS:  Again, I may be mistaken --

12     THE COURT:  Yeah.

13     MS. WILLIAMS:  -- but I don't think we have.  I mean,

14  certainly we've already agreed to produce a wide array of

15  documents -- and have produced a wide array of documents

16  responsive to 18, you know, reports concerning hiring, and

17  staffing, and benching, and appraisals, and promotions, and

18  terminations.

19     We have not agreed to produce any such reports

20  related to visas, nor do I believe we've ever discussed with

21  Mr. Kotchen these utilization reports --

22     THE COURT:  Right.  What I'm --

23     MS. WILLIAMS:  -- he seems to be contemplating.  And

24  I don't know, sitting here right now, what is out there in the

25  world.

1          THE COURT:  Fair enough.  And I didn't hear from Mr.

2   Kotchen anything definitive that these things actually do

3   exist, and you may or may not have had these discussions.

4          For present purposes, I am finding that any business

5   plans and regularly created reports with respect to Wipro's

6   visas generally are relevant and discoverable.  But that is a

7   broad ruling and with the caveat that I don't know what sort of

8   reports Wipro maintains and runs.  And so it's going to be on

9   counsel to meet and confer, and figure out -- Mr. Kotchen, I

10  think you have to articulate to Wipro exactly what sort of

11  reports and utilization data you're looking for, and understand

12  what Wipro actually maintains and keeps.

13          MR. KOTCHEN:  Okay.  Yes, Your Honor.

14          THE COURT:  Okay; all right.  Let me skip to -- Ms.

15  Williams, you can stay up here -- to RFP number 23.  And this

16  may be a little bit of a gloss, but I understand the main

17  dispute to center around an already identified governmental

18  inquiry that was addressed by the court in Phillips.  Is that

19  the only, to your knowledge, I'll use quotes, "investigation"

20  that would be responsive to RFP 23 as it relates to visas?

21          MS. WILLIAMS:  I believe so, yes, Your Honor.

22          THE COURT:  Okay.  We pulled some information from

23  the docket in Phillips -- and please stop me if there's

24  anything that you don't feel comfortable addressing in open

25  court, but these were documents that were pulled publicly.  My

44

1  understanding is that the inquiry was discontinued, and that is

2  the basis that the Court, in its minute order, denied the

3  request for Wipro to produce any responsive materials.

4          I want to stop there and leave it to you to discuss

5  what you're comfortable articulating in open court with respect

6  to that inquiry.

7          MS. WILLIAMS:  May I have a moment, Your Honor --

8          THE COURT:  Absolutely.

9          MS. WILLIAMS:  -- to confer with my client.

10         THE COURT:  Please.

11                        (Pause)

12         MS. WILLIAMS:  Your Honor, we're not comfortable

13  discussing this in open court.

14         THE COURT:  All right, fair enough.  Let me -- let me

15  then say broadly -- well, Mr. Kotchen, let me ask you this.  Is

16  -- do you agree that this one identified inquiry is what's

17  really at issue with respect to RFP 23?

18         MR. KOTCHEN:  I think that's the case.  I mean, we

19  don't know, but I'll take Ms. Williams' word for it.

20         THE COURT:  Okay.  Let me say this.  I appreciate

21  that the court in Phillips denied the request to compel Wipro

22  to produce materials related to that inquiry based on an in-

23  camera review of whatever was supplied to the court.  I don't

24  know what that is.  I don't know what the court reviewed.  I

25  know what we pulled from the docket, and I know that the court

1 issued a minute order without explanation or reasoning, and

2 without making any, you know, off-the-cuff judgments about what

3 the court was thinking, I just don't know.  And so I am

4 absolutely sympathetic to Wipro's position in light of what the

5 court in Phillips did, but I don't really know what the court

6 in Phillips did except from -- except for deny the request to

7 compel.

8        And what I would suggest, to deal with RFP 23, is you

9 go back and you confer with your client, re-review the notice

10 of filings for in-camera review.  And if there is a limited set

11 of materials, even if it is exactly what you produced ex parte

12 and in-camera to the court in Phillips, I'm happy to take a

13 look at it myself.  I think that's about as much as we can do

14 if you're not comfortable discussing in open court the status

15 of that inquiry.

16        I will say, Mr. Kotchen, I mean, based on what I

17 understand, and it is limited, you know, it's going to -- it's

18 going to be, I think, a tall order to convince me to do

19 something different than what the court in Phillips did.  But I

20 think I owe it to the plaintiffs to at least take a look, all

21 right?

22        MS. WILLIAMS:  Thank you, Your Honor.

23        THE COURT:  All right.  So let's say within two

24 weeks, you can supply to the Court -- and I'll leave it to your

25 judgment what to supply to the Court.  Obviously, I'd prefer

46

1  not to look at 15,000 documents.

2             MS. WILLIAMS:  Understood.

3             THE COURT:  I don't -- if I'm looking at this

4  correctly, I don't anticipate that there will be a fulsome

5  universe of materials, but you can supply the Court whatever

6  you think is appropriate for the Court to make a judgment.  And

7  if I have, you know, further questions or directions, I'll let

8  you know.

9             MS. WILLIAMS:  Okay.

10            THE COURT:  You can supply that ex parte to our

11  orders account two weeks from today, okay?  File a public

12  notice that you've done that, all right?  And I'll take a look,

13  and I'll issue a follow-up order.

14            MS. WILLIAMS:  Okay.

15            THE COURT:  Okay?

16            MS. WILLIAMS:  Thank you, Your Honor.

17            THE COURT:  All right.  Anything else, Mr. Kotchen?

18            MR. KOTCHEN:  No, Your Honor.

19            THE COURT:  I don't think there's anything --

20            MR. KOTCHEN:  I mean, if -- I'm -- I'm grateful that

21  you're going to look at it.  If you reach the same conclusion

22  as the court in Texas, I understand.

23            THE COURT:  All right.  Mr. Kotchen, let me hear from

24  you then on Request 22.

25            MR. KOTCHEN:  Request 22.  Okay.  Request 22 --

1          THE COURT:  Let me understand exactly what you --
2    what you really want.  And I'll say this with sort of a concern
3    that notwithstanding my finding of relevance, grievances,
4    complaints, internal investigations, litigation materials,
5    that's going to be highly over-inclusive.
6          MR. KOTCHEN:  Okay.
7          THE COURT:  And so I think, at a minimum, you need to
8    distill exactly what you're looking for.
9          MR. KOTCHEN:  There's a -- they will -- Wipro has a
10   complaint process.
11         THE COURT:  Yeah.
12         MR. KOTCHEN:  So I think -- and as I understand it,
13   complaints are, to a large extent, centrally stored.  And so I
14   think that there's a corpus of documents that should be
15   accessible.  And the question is, what will they produce?  And
16   so I think that they would -- they have already agreed to
17   produce -- if there's a complaint that, you know, I'm being
18   discriminated -- if someone's being discriminated against
19   because of a preference or a certain type of, you know, someone
20   of Indian descent or South Asian national origin, they have
21   agreed to produce that.  What I was --
22         THE COURT:  As to -- as to how to allocate that
23   employee to be staffed?
24         MR. KOTCHEN:  Correct.  If it -- like, for example,
25   you'll have complaints about people being put on the bench, and

1  they're not getting roles.  They will -- you know, when you're

2  on the bench, it's a very uncomfortable place to be.  And so

3  people -- it is, you know, where you're put a lot of times

4  before you're fired.  And so there's a lot of complaints about

5  that.

6        There's complaints about, you know, "I'm not being

7  promoted and a preferred category of individual is."  If you

8  look at the data, you will see that, you know, individuals of

9  Indian national origin are promoted at, you know, disparate

10  rates, greatly disparate rates.  But I think that that's not a

11  dispute.  I think that they're saying, "Yes, we'll produce

12  those."

13        I want to make sure if there are race complaints --

14  so for example, there will be complaints about someone saying I

15  have suffered some sort of consequence, or they're not

16  promoted, or I'm not being staffed or getting fired because

17  I'm African American or I'm Hispanic.  Or that there's a

18  preference for visa employees.  I want to make sure that

19  those --

20        THE COURT:  Well, no, we're going to put the separate

21  race issue to the side.

22        MR. KOTCHEN:  Okay.

23        THE COURT:  I'm still focused on visas for the

24  (indiscernible - multiple speakers).

25        MR. KOTCHEN:  Oh, for visas, I got it.  Okay.  If

49

1  there are complaints -- because there is a -- you know, people

2  that work at Wipro understand that when you're talking about

3  visa employees, what you're talking about is Indian nationals.

4  That is a -- that is a common understanding.  And so if there's

5  a complaint saying, "I was displaced, and I had to train an

6  H-1B visa holder to take my job," that should be a complaint

7  that's produced.  Because that's what happens, is that there

8  will be someone who receives a visa, is visa-ready, sitting in

9  India, they come over and take someone else's job, but that

10 person has to train them.

11         THE COURT:  Let me ask, Ms. Williams, has Wipro

12 agreed, to the extent that there are internal complaints or

13 grievances as to preference for Indians or South Asians, you've

14 already agreed to produce that data.

15         MS. WILLIAMS:  Yes, Your Honor.  We've agreed to

16 produce complaints and internal grievances --

17         THE COURT:  Right.

18         MS. WILLIAMS:  -- alleging discrimination in favor of

19 South Asian and against individuals who are not South Asian --

20         THE COURT:  All right.

21         MS. WILLIAMS:  -- and not Indian.

22         THE COURT:  As just a matter of common sense and

23 reality, I don't know what employee is going to specify their

24 complaint is because this worker had an H-1B visa as opposed to

25 -- but, you know, that might be a null set.

1            MR. KOTCHEN:  Excuse me?  That -- that --

2            THE COURT:  That might be a null set, to the extent

3    you're asking Wipro to go in and identify additional

4    complaints, additional grievances that they haven't previously

5    agreed to produce --

6            MR. KOTCHEN:  Right.

7            THE COURT:  -- to the extent somebody's complaining

8    about visa discrimination.

9            MR. KOTCHEN:  Correct.  I mean, it is -- it is -- it

10   could be a null set, it could -- but there will be people who

11   are -- that have to train H-1B visa holders for jobs.  And

12   there -- I mean, if -- you know, there very well may be

13   complaints about, "I had to train this H-1B visa employee.  I'm

14   being displaced from a job.  I'm losing -- you know, I'm going

15   to get fired."  That is a complaint that wouldn't technically

16   say I'm being discriminated against because of my race or

17   national origin.  But the effect of it is, look, they're

18   training to -- you know, they're these folks -- that everyone

19   knows H-1B visa employees are folks -- are Indian nationals.

20   We think that it should have to be produced.

21            And that's -- and as I understand it, that is a --

22   not within the scope of what they're willing to produce.

23            THE COURT:  I think that's probably fair.

24            MR. KOTCHEN:  Oh, yeah.  So --

25            THE COURT:  I'll hear from Ms. Williams in a second.

1          MR. KOTCHEN:  And --

2          THE COURT:  All right, thank you, Ms. Williams.

3          MR. KOTCHEN:  Yeah --

4          THE COURT:  All right.  Anything else on the visa?

5          MR. KOTCHEN:  On the complaints issue in general?

6          THE COURT:  Yeah.

7          MR. KOTCHEN:  I mean, look, if there's age, sex,

8    those are out, per your earlier order.

9          But if there are complaints about discrimination

10   against an African American based on race, or discrimination

11   against an Hispanic, because a lot of times the discrimination

12   is not "I'm being discriminated against because I'm a non-South

13   Asian," that's not how a lot of folks will express their -- the

14   type of discrimination at issue.  You look at the data, you

15   know, African American employees will be terminated at very

16   high rates, almost certainly.  Hispanics at very high rates,

17   almost certainly.  They -- their complaints could sound in race

18   discrimination, but race discrimination against African

19   Americans, even though who they're displaced by, is, for

20   example, an Indian national.

21         And so we want to make sure that those are

22   encompassed with this --

23         THE COURT:  I guess my concern, though, is I think

24   you need to tie it more directly to the theory of your case,

25   right?  And I can imagine and envision a whole set, and I see

1  them every day, right, a -- what I'll refer to as a more

2  routine, typical employment discrimination type case, a hostile

3  work environment, right, alleging that somebody's supervisor

4  was hostile --

5              MR. KOTCHEN:  Right.

6              THE COURT:  -- towards them --

7              MR. KOTCHEN:  Right.

8              THE COURT:  -- because of their race.  And that's not

9  really germane to what you're arguing here.

10             MR. KOTCHEN:  Well, if there's a complaint, for

11 example, against -- by an African American, saying, "I'm an

12 African American, I was replaced by an Indian, or my Indian

13 supervisor is," that -- I think that tracks squarely with what

14 we're alleging in this case.  And even though -- I mean, it's

15 literally form over substance to say, "I'm African American" --

16 I'm saying "I'm African American, I'm concerned about race

17 discrimination because my -- I'm being displaced in favor of an

18 Indian employee."  It's no different than saying "I'm now a

19 South Asian being displaced by an Indian employee."  And we

20 want to make sure that those complaints are captured in what's

21 produced.

22             THE COURT:  One second.

23                       (Pause)

24             THE COURT:  All right.  Thank you, Mr. Kotchen.

25             MR. KOTCHEN:  Okay.  Yes, Your Honor.

1          THE COURT:  Ms. Williams?

2          MS. WILLIAMS:  Thank you, Your Honor.

3          Just to be very clear about what we have agreed to

4   produce and not to produce, right?  We've agreed to produce

5   documents regarding complaints and internal grievances where

6   the thrust of the complaint is discrimination in favor of South

7   Asian and against individuals who are not South Asian and not

8   Indian.  So if there's a complaint, whether it's from a white

9   person, a Hispanic person, or what have you, that says, "I'm

10  being discriminated against in favor of an Indian person or a

11  South Asian person," we've agreed to produce those.  Those are

12  fair game.

13         What we're trying to prevent -- and that's Mr.

14  Kotchen's whole theory of his case, of course.  What we're

15  trying to prevent here is a fishing expedition into internal

16  complaints and grievances for, for example, the Hispanic

17  employee who says he's being, you know, discriminated against

18  in favor of the white person.  Those issues are not germane to

19  this case at all.  And so we are trying to confine it to what

20  is proportional to the needs of this case.  And we believe that

21  the line we have drawn here is proportional, and that it's also

22  consistent with the case law.  We've cited that case law at

23  Page 18 of our joint letter --

24         THE COURT:  Just out of curiosity, Ms. Williams, I

25  mean, is the repository, and the complaint, and grievance

1  system, like, that granular where you can easily tell that

2  somebody's making the complaint that they're being

3  discriminated against in favor of an Indian or South Asian or

4  not?

5         MS. WILLIAMS:  I mean, I think you have to go down

6  and do some digging.  But, like, it's also -- they're not just

7  seeking internal complaints, right?  They're seeking EEOC

8  charges.

9         THE COURT:  Sure.

10        MS. WILLIAMS:  They're seeking other types of

11  complaints and litigation materials.  So, yes, there are the

12  eyesight sort of internal complaints where you have a general

13  sense of what's what.  And I think we do have a pretty general

14  sense of what's what in terms of the type of discrimination

15  alleged and, you know, the race and national origin of the

16  players involved.

17        But, again, their request goes beyond just internal

18  complaints, and it goes much broader.  And, of course, we're

19  talking about over a decade of time, and I know we'll get to

20  that.  But it's really a lot of information, and they're asking

21  for all documents, you know, related to these complaints and

22  grievances.

23        THE COURT:  All right.  Yeah, I've thought a lot

24  about this.  Mr. Kotchen, I take the point, but I do agree with

25  Wipro on proportionality grounds, provided that Wipro

1  understands, and based on our colloquy with Ms. Williams, I

2  think we're on the same page.  I expect there to be a fulsome,

3  meaningful investigation, right, into the nature of --

4  particularly with respect to internal complaints and disputes

5  to understand exactly what is being alleged or complained

6  about.  And if in substance the complaint is "I'm being

7  discriminated against" or "somebody else is given preferential

8  treatment because I'm not an Indian or South Asian," whether

9  phrased in those terms or not, those types of materials, I

10 believe, are relevant.

11         With that caveat, with that proviso, I do agree that

12 other forms of alleged race discrimination, while perhaps not

13 irrelevant as a practical matter or under the law, given the

14 scope of what's at issue here, the time period that we're

15 talking about on proportionality grounds, I am going to limit

16 the request for internal grievances and other complaints in

17 Request 22 to the type of discrimination that's alleged in this

18 case, okay.

19         MS. WILLIAMS:  Thank you, Your Honor.

20         THE COURT:  All right.  All right, that brings us, I

21 believe, to -- C and D, we've covered.  All right, the time

22 period.  Mr. Kotchen?

23         MR. KOTCHEN:  So, Your Honor, in preparing for this

24 hearing, I mean, it really -- I think the temporal period here

25 -- the temporal scope is something -- it relates completely to

56

1  the statute of limitations issue.  And that is an issue that

2  Wipro and the Court addressed upon the motion to dismiss.

3       And so the American Pipe discussion, the Court

4  addressed that in its motion to dismiss order on Pages 25 -- on

5  Pages 27, and 28, and 29.

6       Wipro briefed China Agritech, the Blake decision in

7  its motion to dismiss.  These are issues that the Court

8  decided, at least as to the individual claims at issue in this

9  case.  And so we have, for example, two plaintiffs.  One is Mr.

10  Valles, who was fired in January, 2015.  And Mr. Gibbs, who

11  left, constructive discharge, we say, but left in September of

12  2015.

13       And so the issue is we have -- the Court addressed,

14  at least on the individual claims, kind of the statute of

15  limitations issue.  If Wipro wants to re-argue the statute of

16  limitations as it pertains to the class, I think the

17  appropriate time to do that is at class certification.  And

18  so --

19       THE COURT:  I could not agree with you more.

20       MR. KOTCHEN:  Okay.

21       THE COURT:  And let me just say at the outset, I'm

22  not going to make any sort of judgment or ruling on the

23  applicability of American Pipe tolling, China Agritech --

24       MR. KOTCHEN:  Okay.

25       THE COURT:  -- in -- for today's purposes.

1              MR. KOTCHEN:  Okay.

2              THE COURT:  All right?  That's not to say I'm ruling

3  in your favor.

4              MR. KOTCHEN:  I understand.

5              THE COURT:  But I'm not making --

6              MR. KOTCHEN:  Okay.

7              THE COURT:  -- any sort of legal pronouncements for

8  discovery purposes that's going to put everybody in an awkward

9  position before the District Judge when and if that issue gets

10  teed up.

11             MR. KOTCHEN:  Understood.  And so then what that

12  leaves is a dispute about whether the temporal period should be

13  January, 2013 forward or March, 2015 forward.

14             THE COURT:  Say that one more time.  What dates are

15  you working with?

16             MR. KOTCHEN:  Our date -- our preferred date is

17  January 1st, 2013.

18             THE COURT:  All right.

19             MR. KOTCHEN:  Wipro, what they are -- have agreed to

20  is March 30th, 2015.  And look, I mean, the question -- I mean,

21  the reason why we chose the 2013 date is because we filed --

22  and I know we're getting into American Pipe -- things that

23  we're not -- that we're not going to decide today.  But we

24  filed the Phillips case in 2017, so that was the logic to going

25  back to 2013.  And if class claims do -- if it is appropriate -

1  - if <u>American Pipe</u> does -- does apply at the class

2  certification stage, we think it's totally appropriate to go

3  back to 2013.  Separate and apart from that, even if you're

4  talking about individual claims of Valles and Gibbs, you're

5  going to need discovery prior to 2015 to show, for example,

6  termination patterns, you know, failure to promote, and so --

7  and those types of things.

8          THE COURT:  When were they -- they were terminated

9  when?

10         MR. KOTCHEN:  So Gibbs left September 15th of 2015.

11  Valles, January 31st of 2015.  So it puts -- you know, by

12  choosing the March, 2015 beginning points of discovery, as

13  Wipro has -- suggests or argues here, it puts those claims,

14  even as to those individuals, setting aside the class issues,

15  and very -- it is very difficult for us to show what happened

16  leading up to 2015 on the discovery.  That is --

17         THE COURT:  As to those individuals.

18         MR. KOTCHEN:  As to those individuals.  And, again,

19  we would -- I think there is a good logic that even if we're

20  limited on statute of limitations further than, you know, if

21  the -- if Judge Cantor [sic] doesn't agree that it goes back to

22  2013, and we think that she should, but if she doesn't, we

23  still want to show a pattern or practice over time to show

24  commonality, to show that there's a known -- a known

25  discriminatory intent, in effect, of the policies and practices

1 at issue.

2           THE COURT:  You don't dispute, do you, that the

3 <u>Phillips</u> data set will cover materials in some sense --

4           MR. KOTCHEN:  Yes.

5           THE COURT:  -- going back to 2013?

6           MR. KOTCHEN:  Correct, I -- I --

7           THE COURT:  So you're going to get some, right?

8           MR. KOTCHEN:  We're getting some, yes.  I agree with

9 that.

10           THE COURT:  Okay.

11           MR. KOTCHEN:  And we think that, you know, 2014 is

12 important because Wipro dropped its affirmative action program

13 then because its business, you know, its business practices and

14 kind of its business, you know, policies didn't lend itself to

15 show compliance with affirmative action.  I mean, those --

16           THE COURT:  Listen, I'm going to tell both of you,

17 and I'll hear from you why I shouldn't do this, but it is now

18 June 4th, 2014 [sic] --

19           MR. KOTCHEN:  Yes.

20           THE COURT:  -- right?  A clean even proportional

21 proposal that the Court has is June 1, 2014.  That's 10 years

22 ago.  From your perspective, is there a problem with that?

23           MR. KOTCHEN:  Judge, we're -- we -- I, again, in

24 preparing for this, I figured that's where you were going to

25 go.  I think that's the right approach.

1          THE COURT:  All right; thank you.

2          MR. KOTCHEN:  Okay.

3          THE COURT:  Ms. Williams?

4          MS. WILLIAMS:  Your Honor, I don't think I need to

5     waste too much more of our time if we're not getting into China

6     Agritech and American Pipe tolling because that's the whole

7     basis of our position for why we think discovery should just go

8     back to 2015.  And, you know, all I was just going to say is

9     that as is cited in our papers, discovery going back more than

10    a decade is routinely found to be unduly burdensome.  So, I

11    think the Court's approach makes good sense.

12         THE COURT:  Yeah, that's exactly what I'm going to

13    do.  I'm absolutely sensitive to the burdens, particularly in

14    light of, you know, the issues that I anticipate you all will

15    be having with respect to lost and destroyed ESI generally, and

16    those are going to be more and more of a problem the farther

17    and farther back you go, number one.  Combined with the fact

18    that the plaintiffs will be getting, in some sense, I don't

19    know how much, but at least to Mr. Kotchen's candid admissions,

20    which I appreciate, will cover the 2013/2014 time period; I'm

21    going to cut it off at 10 years.  And so the time period that

22    we're going to use, aside from the Phillips data that has

23    already been reproduced, and that is what it is, is June 1,

24    2014, okay?

25         MS. WILLIAMS:  Thank you, Your Honor.

1            THE COURT:  All right.  Payroll data, Subcategory F.

2  Mr. Kotchen?

3            MR. KOTCHEN:  Judge, the issue here is -- is pretty

4  simple.  The -- the visa program at issue is the H-1B visa

5  program.  And there, the visa -- there are certain wage

6  requirements for H-1B employees.  They have to be paid, for

7  example, at least as much as American counterparts.  The visa

8  issues to the --

9            THE COURT:  Mr. Kotchen, one second.

10                        (Pause)

11           THE COURT:  All right.  Thank you, Mr. Kotchen.

12           MR. KOTCHEN:  Yes.  You want -- should I proceed?

13           THE COURT:  Yeah, go ahead.

14           MR. KOTCHEN:  Okay.  So the -- on the H-1B visa

15  program, the visa issues to the employee.  And so that gives a

16  corporation like Wipro extraordinary power because if that

17  employee has any complaints about Wipro, and Wipro terminates

18  the employee, that person is going to be deported except in the

19  unlikely circumstance of someone who immediately decides to --

20           THE COURT:  Gets married or --

21           MR. KOTCHEN:  Yeah.  So what we -- what we think we

22  will see in discovery is that H-1B employees are going to be

23  treated very poorly by Wipro.

24           THE COURT:  Poorly.

25           MR. KOTCHEN:  Poorly.

1             THE COURT:  Okay.

2             MR. KOTCHEN:  Yes.  They are -- they're indentured to

3  the corporation.  Their visa is tethered to the corporation.

4  And we think, among other things, that they're going to be

5  underpaid relative --

6             THE COURT:  Isn't that contradictory to what your

7  theory is, though?

8             MR. KOTCHEN:  No, it's -- it's one of the reasons why

9  there's a preference.

10             THE COURT:  Oh, I see.

11             MR. KOTCHEN:  There's a --

12             THE COURT:  I see.  I see.

13             MR. KOTCHEN:  There's a cultural preference for --

14  for -- because the employee will come, they will accept it.

15  They -- basically the workplace norms that apply --

16             THE COURT:  I see.

17             MR. KOTCHEN:  -- in India are going to be applied

18  here.  We think it's perfectly consistent with it.

19             And so the payroll data we think will show

20  underpayment of H-1B employees.  And we think that that goes to

21  the issue of indenture.

22             THE COURT:  Underpayment relative to non-H-1Bs?

23  Underpayment in a broad sense?  What do you mean?

24             MR. KOTCHEN:  Relative to their non-Indian

25  counterparts.  So they are supposed to be paid at least as much

63

1  as other folks in similar geographies and similar experience.

2  We don't think that's happened -- that that happens.  That's

3  the relevance of it.

4          THE COURT:  What sort of universe of -- how many

5  employees are we talking about here over a 10-year period?  I

6  mean, it could be --

7          MR. KOTCHEN:  It's going to be a lot.

8          THE COURT:  -- hundreds of thousands of employees?

9          MR. KOTCHEN:  Not a hundred --

10         THE COURT:  Ten --

11         MR. KOTCHEN:  Not hundreds of thousands, but it'll --

12         THE COURT:  Fifty thousand employees?

13         MR. KOTCHEN:  Order of magnitude, I'm just guessing,

14  fifty to 60,000.  I mean, it's going to be not a trivial

15  amount --

16         THE COURT:  Okay.

17         MR. KOTCHEN:  -- which we understand.

18         THE COURT:  Is there -- and you -- as you sit here,

19  you don't have any reason to dispute that this data is going to

20  be with ADP or --

21         MR. KOTCHEN:  I don't --

22         THE COURT:  -- a payroll --

23         MR. KOTCHEN:  Yeah, I don't have any reason doubt --

24  to dispute that.

25         THE COURT:  Okay; all right.

1          Ms. Williams, is this -- you're not making a

2     relevance argument.  This is a burden argument, is that

3     correct?

4          MS. WILLIAMS:  Well, I'm going to focus on the

5     burden --

6          THE COURT:  Okay.

7          MS. WILLIAMS:  -- the burden argument.  I mean, we

8     think this obviously is not a, you know, pay discrimination

9     case, or anything like that.  We -- and I will address a couple

10    of his comments on relevance in a minute.

11          But I want to just start with burden here.  You know,

12    we appreciate the Court's time, and the way that we went into

13    detail in explaining, and thinking through, and engaging with

14    us on the burden of producing the staffing data.  This is a

15    very similar problem and situation, Your Honor.  Collecting the

16    payroll data for tens of thousands of employees going back ten

17    years who worked in the U.S. would be unduly burdensome and

18    disproportional to the needs of the case.

19          THE COURT:  Do you happen to know the answer to my

20    question?  I mean, how many -- how many employees, roughly,

21    we're talking about over ten years?

22          MS. WILLIAMS:  Tens of thousands, I believe.

23          THE COURT:  Okay.

24          MS. WILLIAMS:  I don't -- I don't have a --

25          THE COURT:  Yeah, I'm just -- I'm just curious.  I'm

1  not --

2          MS. WILLIAMS:  I don't have a better number, sitting

3  right here.

4          THE COURT:  Fair enough.

5          MS. WILLIAMS:  So the payroll data for U.S.

6  employees is primarily stored on ADP systems.  And pulling the

7  data would require input from a variety of teams at Wipro:

8  payroll, IT, legal, data privacy, as well as ADP, who would

9  likely require --

10         THE COURT:  Help me understand that, though.  Why is

11 that?  Why would it take so many different teams if you just

12 could go to ADP?

13         MS. WILLIAMS:  You can't just go to ADP.  We need

14 input from all these different people.  They've used multiple -

15 - there's -- this is not just a simple push of the button at

16 ADP, and we'd have to go through a bunch of these different

17 departments to understand what's available, who's in play.  And

18 internally, there is not some simple report that just has

19 everybody's salary.  It's -- there's not a report -- just like

20 in the staffing data case, right?  That he wanted a certain

21 type of staffing data.  We said that's just not how we store

22 the data, and here's all the extra hoops we would have to -- to

23 go through to get the data in the requested form.  It's an

24 analogous situation here, Your Honor.

25         And then preparing the data for production would be

1  another issue, and hurdle, and burden, right?  The payroll

2  information has a lot of PII.  There would be a lot of -- you

3  know, things like Social Security numbers would need to be

4  redacted and, you know, courts have recognized, as we cited in

5  our brief, that this is another -- you know, where significant

6  redactions would need to be made, this also is -- can --

7       THE COURT:  But that's sort of a self-imposed burden,

8  right?  I mean you have a confidentiality order, right?

9       MS. WILLIAMS:  Right, we have a --

10      THE COURT:  There's a discovery confidentiality

11 order, right?

12      MS. WILLIAMS:  Sure.  But we'd still have to

13 imply [sic] redactions, and courts have -- recognizing that

14 having to apply significant redactions, you know, can counsel

15 against production of --

16      THE COURT:  But what I'm saying is you could produce

17 the data without redacting Social Security numbers pursuant to

18 the provision of the discovery confidentiality order, right?

19 Whether you elect to do so, right, is a burden of your own

20 choosing, is that correct?

21      MS. WILLIAMS:  I see, Your Honor; yes.

22      THE COURT:  Yeah, okay.

23      MS. WILLIAMS:  Yes.  Regarding the need for this

24 data, we think those arguments are unavailing.  You know, one

25 of the arguments that they're making here effectively is that

1  inequitable pay shows their -- shows Wipro's propensity to

2  violate the discrimination laws.  And evidence regarding our

3  propensity to discriminate is plainly -- it's not what

4  discovery is used for, and it's not a proper basis on which to

5  seek discovery.  And we think this is just an overreach, and

6  the burden here is just -- the juice is not worth the squeeze,

7  so to speak.

8            THE COURT:  Got it.  Thank you, Ms. Williams.

9            Mr. Kotchen, I have a couple questions.

10           MR. KOTCHEN:  Yes, Your Honor.

11           THE COURT:  Does this -- these requests go to class

12  certification?  They go to merits?  They go get both?  What?

13           MR. KOTCHEN:  They do not go to class certification.

14  They go to merits.

15           THE COURT:  Okay.  And what do you ultimately intend

16  to do?  I assume, just to your prior discussion, you intend to

17  take payroll data with respect to Indians compared to non-

18  Indians at the same time, right?  Trying to do an apples-to-

19  apples comparison, and then say, look, this is evidence that --

20  of, you know, the discrimination?

21           MR. KOTCHEN:  Yeah.  This is -- this is evidence

22  showing the cultural preference.  The reason -- one of the

23  reasons why that they -- there is a, you know, a preference

24  for this type of employee, and this type of employee happens

25  not to be mistreated under, you know, any normal circumstance.

1  So --

2          THE COURT:  All right.  Here's what I think we should

3  do.  I do find that this sort of information would be relevant

4  to the plaintiffs' claims, but I am absolutely sensitive to the

5  burden that's going to be imposed on Wipro, both with respect

6  to the number of employees generally, the time period.  I take

7  Ms. Williams at her word when she says it's going to require a

8  number of different groups, even to get the information.

9          MR. KOTCHEN:  Okay.

10          THE COURT:  I'm not particularly persuaded by the

11  burden in redacting information, but I am sensitive to the

12  overall burden.  And so I'm not going to require Wipro to do

13  this for every employee over a 10-year period.  I think what

14  counsel should do is meet and confer on an appropriate limited

15  sample set.

16          MR. KOTCHEN:  Yes, Your Honor.

17          THE COURT:  And we'll start there.

18          MR. KOTCHEN:  Very good.

19          THE COURT:  Beyond that, I'm not going to give any

20  sort of parameters in terms of numbers or time.  But I'm

21  telling you, I'm sensitive to the burden.

22          MR. KOTCHEN:  Understood.

23          THE COURT:  And the meet and confer should absolutely

24  be tailored to that.  You know, I'll leave it there, okay?

25          MR. KOTCHEN:  Okay.

1          THE COURT:  Okay?

2          MR. KOTCHEN:  Understood, Judge.

3          THE COURT:  Fair enough, Ms. Williams?

4          MS. WILLIAMS:  Yes.  Thank you, Your Honor.

5          THE COURT:  All right.  I think that takes care of

6  all of the disputes with respect to the plaintiffs' requests.

7          MR. KOTCHEN:  Yes, Your Honor, I think that's right.

8          THE COURT:  All right.  Category G, I think -- I

9  think that's the only dispute remaining for defendant's

10 requests, correct?  With respect to the interrogatories to the

11 named plaintiffs.

12         MS. WILLIAMS:  Yes.

13         THE COURT:  Okay.  Ms. Williams, let me hear from

14 you.

15         MS. WILLIAMS:  So the last issue, Your Honor, is --

16 just involves whether that the named plaintiffs should have to

17 produce employment applications that they made for jobs outside

18 of Wipro while they were employed by Wipro.  They've agreed to

19 produce employment applications after they left Wipro, but

20 they're not agreeing to produce the ones that they -- that they

21 may have submitted while employed.  Just to put that they --

22         THE COURT:  Can I just ask just a very basic

23 question?  I mean, these are interrogatories.  So you've asked

24 for information, right?  Is there an associated RFP?

25         MS. WILLIAMS:  Yeah, there's an associated RFP, as

1  well.

2            THE COURT:  Okay.  Okay.

3            MS. WILLIAMS:  But the -- yes, but --

4            THE COURT:  Fine.

5            MS. WILLIAMS:  -- the main one here that we're

6  seeking is -- they have -- they have answered the interrogatory

7  and produced documents with respect to --

8            THE COURT:  The post employment.

9            MS. WILLIAMS:  -- post employment, but are refusing

10  to do so for ones submitted during their employment.

11            THE COURT:  Yeah, no, I got -- I got that

12  distinction.  I just wanted to make sure.  I mean, you're not

13  just seeking answers to interrogatories.  You want associated

14  documents.  The documents themselves.

15            MS. WILLIAMS:  Yes.

16            THE COURT:  Okay.  Okay.

17            MS. WILLIAMS:  So, I mean, just to -- you know, we

18  hear a burden argument from them and we hear a relevance

19  argument.  I mean, just to put the burden argument in context

20  here, we're talking about five individuals going back 10 years

21  and a couple of presumably -- potentially a few relevant

22  employment applications going off, you know, over -- over a

23  couple -- a few year period here.  You know, they may say they

24  can't find them, or whatever the case may be.  But just to put

25  the burden that we're dealing with for these five named

1  plaintiffs over, you know, a set period of time versus the

2  burden that we're dealing with for, you know, producing data

3  for, you know, a gazillion employees, it just seems like

4  there's a different set of rules.  And, you know, I just wanted

5  to put that in context.

6          THE COURT:  You don't have a problem with the June 1,

7  2014 time limitation, do you?

8          MS. WILLIAMS:  No.  No, we're good.  We said -- we

9  agreed to that.  We think that's -- that's reasonable.  But,

10 you know, plaintiffs have refused, saying that these

11 applications don't concern the core issues in the case.  That's

12 not the standard for discovery, Your Honor.  You know,

13 discovery regarding any non-privileged matter that may be

14 relevant to any party's claim or defenses is fair game under

15 the Federal Rules.  And information regarding the applications

16 that the named plaintiffs submitted during their employment at

17 Wipro is relevant for a number of reasons, right?  It could

18 contain information about plaintiffs' employment at Wipro,

19 their duties, their responsibilities, the promotions received,

20 as well as their reasons their employment ended.  The way they

21 characterize those subjects may be different than the way

22 they're now characterizing them in the complaint.  They may be

23 helpful to Wipro's defenses, or not.  But we're entitled to

24 test that, and we're entitled to discovery on those issues.

25 They like --

1          THE COURT:  You know what, that -- let me -- a

2    practical question.  You don't doubt, do you, that these five

3    individuals may not have perfectly clear memories as to every

4    position they may or may not have applied for?  I can't imagine

5    what my records going back 10 years look like.  I mean, those

6    are just sort of practical problems you may run into.

7          MS. WILLIAMS:  Of course.

8          THE COURT:  And if the answer is, "To the best of our

9    knowledge and recollection, and to the best that a reasonable,

10   diligent search can uncover, this is what we got," right?

11         MS. WILLIAMS:  Of course, Your Honor.  Of course.

12   And I think I was alluding to that -- to that before.  They may

13   say they don't remember, but we're asking for them to, you

14   know, conduct a reasonably diligent search.  You know, for

15   example, search their email box.  You know, did they apply

16   through something through LinkedIn?  Did they use Indeed?  Do

17   they happen to remember, you know, someone they reached out to

18   about potential employment?  You know, I don't know what more

19   we can really ask for here, but we think that's reasonable and

20   well, you know, within the bounds of the case here.  And --

21         THE COURT:  And only the named plaintiffs.

22         MS. WILLIAMS:  Yes, only for the named plaintiffs,

23   Your Honor.

24         THE COURT:  All right.

25         MS. WILLIAMS:  This is really a pretty narrow, you

1  know, body of information we're seeking here.  You know, we've

2  noted in our -- in our letter brief that other courts have

3  ordered this information produced, and we think this is a

4  pretty narrow and reasonable request.

5          THE COURT:  Got it.

6          Mr. Kotchen?

7          MR. KOTCHEN:  Judge, we'll agree.

8          THE COURT:  Thank you.

9          MR. KOTCHEN:  Yes, I -- I can read the tea leaves.

10          THE COURT:  I appreciate it.

11          MR. KOTCHEN:  Okay.

12          THE COURT:  Listen, I mean, it is what it is.

13          MR. KOTCHEN:  Yeah.

14          THE COURT:  If your clients, you know -- they are

15  expected to conduct --

16          MR. KOTCHEN:  Okay.

17          THE COURT:  -- a reasonable -- reasonable, diligent

18  investigation, right?

19          MR. KOTCHEN:  Yeah.

20          THE COURT:  Not a cursory one.

21          MR. KOTCHEN:  Okay.

22          THE COURT:  They are required to rack their brains --

23          MR. KOTCHEN:  Okay.

24          THE COURT:  -- and respond.

25          MR. KOTCHEN:  Okay.

74

1              THE COURT:  I think these --

2              MR. KOTCHEN:  Understood.

3              THE COURT:  -- interrogatories are perfectly

4    reasonable.

5              MR. KOTCHEN:  Thank you, Judge.

6              THE COURT:  All right.  I think that takes care of

7    everything, is that correct?

8              MS. WILLIAMS:  Your Honor, I have just two other

9    quick --

10              THE COURT:  Sure.

11              MS. WILLIAMS:  -- quick issues I wanted to just close

12    the loop on.

13              THE COURT:  Please.

14              MS. WILLIAMS:  Unfortunately, it relates back to the

15    backups -- backups issues.  My colleague, Alex, here just told

16    me earlier that you had asked sort of -- you gave a

17    hypothetical about, okay, well Employee X, you know, left in

18    2015 or --

19              THE COURT:  Yeah.

20              MS. WILLIAMS:  -- you know, whatever year, and he's

21    not on a litigation hold, and what information is available

22    with respect to email specifically, because I think we've given

23    you the answer that you were looking for with respect to the

24    share drives and so forth.  So my understanding is, is that

25    email would be deleted after 30 days after that employee leaves

1  if no litigation hold is in place.

2          THE COURT:  And if that employee didn't create a PST,

3  etc.

4          MS. WILLIAMS:  Correct, if that employee didn't --

5  didn't create a PST.

6          THE COURT:  All right.  I mean, that's sort of an

7  off-the-cuff in court representation to the sorts of things

8  that we were talking about.  And I expect that as you get into

9  the individual meet and confers or -- the meet and confers on

10 individual custodians, if that sort of is the overall answer to

11 the email question, that's what Mr. Kotchen was looking for, so

12 I appreciate that.  But thank you for clarifying it with me.

13         MS. WILLIAMS:  Sure.  And just one other thing on a -

14 - on a slightly related topic.  With respect to the lost and

15 destroyed ESI, we had taken issue with one of the RFP

16 instructions.

17         THE COURT:  Oh, right, yeah.

18         MS. WILLIAMS:  And I don't think we quite closed the

19 loop on that.

20         THE COURT:  Yeah, let me -- this was one of the

21 category I didn't really understand there to be a whole lot of

22 delta between the parties, so maybe you can help me, right?

23 They cite the -- you know, the K-Dur case, and that's the

24 standard that you want to employ?

25         MS. WILLIAMS:  That is, but they won't agree to that.

1          THE COURT:  Okay.  Mr. Kotchen, with respect to that

2   instruction, what exactly are you looking for?

3          MR. KOTCHEN:  I mean, what we're looking for, if

4   there's -- if there is information that has been lost or

5   destroyed and that's requested in -- I guess, in this situation

6   that they've agreed to produce.  I mean, this is something --

7          THE COURT:  Right, yeah.

8          MR. KOTCHEN:  -- that's been -- and I think that that

9   is an important caveat that dovetails with where we were

10  earlier today, then they should have to identify that, and kind

11  of the circumstances.  That -- that's it.  Not --

12         THE COURT:  I don't understand them to be saying

13  anything different.  Are you, Ms. Williams?  That's what I --

14  that's why I'm -- I was totally befuddled by the dispute here.

15         MS. WILLIAMS:  I can pull up the request, but the

16  request goes much broader than just explaining the

17  circumstances of why a document is lost or destroyed.  We don't

18  have issue with that in terms of the -- relying on what was set

19  forth in the case that plaintiff cited --

20         THE COURT:  Yeah, listen, Mr. Kotchen, let me just

21  say, hopefully we can just cut to the chase.  We're not going

22  to go to, like, super mini investigations --

23         MR. KOTCHEN:  No.

24         THE COURT:  -- and scorch the earth, right?  I think

25  it's incumbent on Wipro to explain reasonably in good faith the

77

1  circumstances in which documents or ESI is lost or destroyed.
2  But we're not going to have an inquest with every document
3  that's lost or destroyed.
4          MR. KOTCHEN:  That's fair enough, Judge.  I think --
5  I think that the parties can work this out.
6          THE COURT:  I certainly hope so.
7          MR. KOTCHEN:  Yeah.
8          MS. WILLIAMS:  Okay; thank you.
9          THE COURT:  All right.  But, I mean, just to be
10 clear, right, I see both sides are citing the K-Dur case, and
11 we will use that as the governing standard.  You need to
12 explain in good faith reasonably why data is lost or destroyed.
13         MS. WILLIAMS:  Right.
14         THE COURT:  And we're going to leave that sort of as
15 the directive with the understanding of what I just said.
16 We're not, like, you know, doing full-blown mini litigations
17 every time a document has been lost.
18         MS. WILLIAMS:  Got it.  And I totally understand
19 that, and that makes sense.  But the request --
20         THE COURT:  I got it.
21         MS. WILLIAMS:  The instruction, as written, went far
22 beyond that and a multi pronged --
23         THE COURT:  Got it.
24         MS. WILLIAMS:  -- approach of information that we
25 needed to provide, which we think goes well beyond this K-Dur

1 case that is cited in their papers.

2          THE COURT:  Got it.

3          MS. WILLIAMS:  So I hear you, and we will go with

4 what the standard that was -- and the instruction in the --

5          THE COURT:  Yeah.

6          MS. WILLIAMS:  -- K-Dur case that plaintiffs cited in

7 their papers.

8          THE COURT:  Excellent.

9          MS. WILLIAMS:  Okay; thank you.

10          THE COURT:  All right.  Now, I think we're complete.

11          MR. KOTCHEN:  I think so.

12          THE COURT:  Mr. Kotchen?

13          MR. KOTCHEN:  I think so, Judge.  We --

14          THE COURT:  Is there anything else that you needed to

15 address today?

16          MR. KOTCHEN:  No, Your Honor.

17          THE COURT:  All right.

18          MR. KOTCHEN:  We appreciate it.

19          THE COURT:  Ms. Williams?

20          MS. WILLIAMS:  No, that's it; thank you.

21          THE COURT:  All right.  I appreciate counsel's

22 thought and care into laying out these issues.  I think we have

23 a working plan.  We will do our best to embody all of this in a

24 short and succinct written order.  For, I think, clarity's

25 sake, what we may do is email a draft copy of the order out to

1 counsel just to make sure that there's no confusion.  It's not

2 my typical practice, but I want to make sure that everybody is

3 on the same page.  I may do that.  I want to give that some

4 thought.

5          In terms of next steps, the <u>Phillips</u> data is under

6 review --

7          MR. KOTCHEN:  Yes, Your Honor.

8          THE COURT:  -- yes, Mr. Kotchen?

9          MR. KOTCHEN:  Yes, Your Honor.

10          THE COURT:  To the extent that there are any

11 lingering or disputes that arise out of that data, you're going

12 to meet and confer, and you'll be back, and I will not hold my

13 breath --

14          MR. KOTCHEN:  Okay.

15          THE COURT:  -- but hopefully you can work out --

16          MR. KOTCHEN:  All right.

17          THE COURT:  -- whatever disputes you have.

18          From your perspective, where are we -- where do we go

19 from here?

20          MR. KOTCHEN:  Judge, you know what's -- I just -- why

21 (indiscernible) -- I don't -- what does the -- the schedule --

22 I do not have a schedule before me.

23          THE COURT:  Yeah, I don't -- I don't either.

24          MR. KOTCHEN:  That is -- I mean, I think that --

25          THE COURT:  Put aside timing for a minute.

1     MR. KOTCHEN:  Okay.

2     THE COURT:  I'm less concerned with timing.

3     MR. KOTCHEN:  Okay.

4     THE COURT:  But just sort of process where we are.

5     MR. KOTCHEN:  So I think what I -- from my

6 perspective, I think that both sides have their homework.  That

7 we should start conferring in short order on probably

8 custodians and so forth.  And I think that your judge has given

9 us plenty of guidance on both your rulings and where you're

10 going to go with issues, that we can work on custodians, and

11 then what's going to be searched.  I think that -- that is the

12 next -- as a practical matter, that's the next step for us.

13     THE COURT:  Okay.  Agreed, Ms. Williams?

14     MS. WILLIAMS:  Yes, I agree, Your Honor.  That does

15 make sense.  But I -- just -- just to quickly address the

16 schedule.  I think we -- discovery was supposed to be complete

17 last month, so you have temporarily stayed all deadlines --

18     MR. KOTCHEN:  Yeah, right.

19     MS. WILLIAMS:  -- in the case.

20     THE COURT:  Right, that's correct.

21     MS. WILLIAMS:  Just to refresh everyone.

22     MR. KOTCHEN:  Correct.

23     THE COURT:  That's correct.

24     MS. WILLIAMS:  So --

25     THE COURT:  All right.

1          MS. WILLIAMS:  -- that's where we are in terms of the
2     -- of -- of the schedule.

3          MR. KOTCHEN:  Okay.

4          THE COURT:  How much -- just best estimates as we sit
5     here today, I'm not holding anything -- anybody to anything --
6     to negotiate custodians to get relevant requests out with
7     respect to custodians, I mean, how -- are we talking about 60
8     days?  Thirty days?  Forty-five days?  I'm -- give me a sense
9     what you think that's going to look like.

10         MR. KOTCHEN:  So what I think -- I mean, 60 days was
11    what I thought.  But there's two things that need to happen:
12    One is the custodians themselves, and that -- that's one issue.
13    But then there's kind of search terms and so forth --

14         THE COURT:  Right.

15         MR. KOTCHEN:  -- that -- that were also -- and that
16    is going to -- that's a more time-consuming endeavor because I
17    think that it's going to require search hits and so forth.

18         MS. WILLIAMS:  Yeah.

19         MR. KOTCHEN:  That what I would recommend is that
20    we -- 60 days sounds like a reasonable time frame for us to,
21    like, work those issues out.  I understand that the search term
22    is going to -- is going to be the more time-consuming aspect of
23    that.  So perhaps it -- hopefully we can reach an agreement
24    within 60 days, or perhaps report back to you within 60 days.

25         THE COURT:  On the custodians or on the --

82

1    MR. KOTCHEN:  On both, custodians and then search

2 terms.

3    THE COURT:  You don't have a problem -- I don't see -

4 - that was my next question.  There's no reason why you can't

5 also be working on search terms generally --

6    MR. KOTCHEN:  We -- we --

7    THE COURT:  -- starting now, right?

8    MR. KOTCHEN:  We can start that process.

9    THE COURT:  You can start the process, right?

10    MR. KOTCHEN:  Yeah.

11    THE COURT:  Okay.

12    MR. KOTCHEN:  The custodian issue, I think -- I think

13 we can start the search term process.

14    THE COURT:  Why don't we just do this?  I think 60

15 days is --

16    MR. KOTCHEN:  Okay.

17    THE COURT:  -- a reasonable estimate.  I appreciate

18 that the search terms may be a more developed conversation.

19    MR. KOTCHEN:  Okay, right.

20    THE COURT:  Why don't we -- with the understanding

21 that you're going to get into, and hopefully agree on, a

22 custodian list, make progress on the search terms discussion.

23    MR. KOTCHEN:  Okay.

24    THE COURT:  We'll have a call in about 90 days.

25    MR. KOTCHEN:  Okay.

83

1          THE COURT:  All right?  I'll ask you in advance of

2    that call to meet and confer, submit a joint status letter, a

3    short one, not a dispute letter --

4          MR. KOTCHEN:  Yes.

5          THE COURT:  -- proposing a -- letting me know where

6    we are with everything, and proposing a schedule going forward

7    from that 90-day period.  We'll get on the phone and we'll sort

8    it out.

9          MR. KOTCHEN:  Perfect.  That sounds good, Judge.

10         THE COURT:  Okay?  So for now, all discovery

11   deadlines will remain stayed.

12         MR. KOTCHEN:  Okay.

13         THE COURT:  But my -- our order will outline the date

14   for a call and a status letter -- a status report in advance.

15         MR. KOTCHEN:  Okay.

16         THE COURT:  Fair enough?

17         MS. WILLIAMS:  Yes.

18         MR. KOTCHEN:  Thank you very much.

19         MS. WILLIAMS:  Thank you, Your Honor.

20         THE COURT:  All right.  Thank you, Counsel.  Mr.

21   Kotchen, I hope you back is still intact.

22         MR. KOTCHEN:  I appreciate it.  I'll give you an

23   update in 90 days about --

24                         (Laughter)

25         THE COURT:  Counsel, sir, it was nice to meet you.

1              MR. KOTCHEN:  Okay.

2              THE COURT:  Thank you for being here.  Save travels,

3    everyone.  We're adjourned.

4              MR. KOTCHEN:  Thank you very much.

5              COURTROOM DEPUTY:  All rise.

6        (Whereupon, at 1:05 p.m., the hearing was adjourned.)

7

8                    CERTIFICATE OF TRANSCRIBER

9

10        I, KAREN HARTMANN, a certified Electronic Court

11   Transcriber, certify that the foregoing is a correct transcript

12   from the electronic sound recording of the proceedings in the

13   above-entitled matter.

14

15

16

17   *Karen Hartmann*

18

19   Karen Hartmann, AAERT CET 475  Date: June 11, 2024

20   TRANSCRIPTS PLUS, INC.

21

22

23

24

25