# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## TRENTON DIVISION

| | |
|---|---|
| GREGORY MACLEAN, *INDIVIDUALLY* ) *AND IN HIS REPRESENTATIVE* *CAPACITIES, et al.,* | Case No. 3:20-cv-03414-GC-JBD |
| Plaintiffs, | Clarkson S. Fisher Building & U.S. Courthouse |
| versus | 402 East State Street Trenton, New Jersey 08608 |
| WIPRO LIMITED, | October 15, 2024 |
| Defendant. | 11:45 a.m. |

TRANSCRIPT OF PLAINTIFF'S MOTION FOR LEAVE TO FILE A SECOND
AMENDED COMPLAINT (DOC 67)
BEFORE HONORABLE J. BRENDAN DAY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES VIA MICROSOFT TEAMS:

For the Plaintiffs:        The Law Offices of Jonathan Rudnick LLC
                           By:  JONATHAN RUDNICK, ESQ.
                           788 Shrewsbury Ave, Suite 204
                           Tinton Falls, NJ 07724

                           Kotchen & Low LLP
                           By:  DANIEL A. KOTCHEN, ESQ.
                                LINDSEY GRUNERT, ESQ.
                           1918 New Hampshire Avenue, NW
                           Washington, DC 20009


ESR/COURTROOM DEPUTY:      Christopher Yoos

TRANSCRIPTION SERVICE:     TRANSCRIPTS PLUS, INC.
                           435 Riverview Circle
                           New Hope, Pennsylvania 18938
                           215-862-1115
                           CourtTranscripts@aol.com


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

```
APPEARANCES VIA MICROSOFT TEAMS:
(continued)

For the Defendant:        Gibson Dunn & Crutcher LLP
                          By:  STEPHANIE SILVANO, ESQ.
                               GRACE E. HART, ESQ.
                          200 Park Avenue
                          New York, NY 10166-0193

                          Gibson Dunn & Crutcher LLP
                          By:  GRETA B. WILLIAMS, ESQ.
                          1700 M Street, N.W.
                          Washington, D.C. 20036-4504

                          Wipro Limited
                          By:  UMUNG VARMA, ESQ.
                          Associate General Counsel
```

1    <u>TRENTON, NEW JERSEY  TUESDAY,  OCTOBER 15, 2024  11:45 A.M.</u>

2            (Call to order of the Court)

3            THE COURT:  All right.  Good morning, everyone.

4    We're here on the record in MacLean versus Wipro Limited,

5    Docket Number 20-3414.

6            May I have the appearances of counsel, starting with

7    the plaintiffs?

8            MR. KOTCHEN:  Good morning, Your Honor.  Daniel

9    Kotchen and Lindsey Grunert from Kotchen & Low for plaintiffs,

10    and with us is Jonathan Rudnick, as well.

11            THE COURT:  Good morning, Counsel.

12            And for defendant?

13            MS. WILLIAMS:  Good morning, Your Honor.  Greta

14    Williams for Wipro, and I'm joined by my colleagues, Grace Hart

15    and Stephanie Silvano, who's acting as local counsel.  Also on

16    the line with us today is Umung Varma, Associate General

17    Counsel at Wipro.

18            THE COURT:  All right, good morning to you all.

19            Before the Court is a motion that the plaintiffs have

20    filed to file a second amended complaint.  The Court has

21    received and reviewed in depth briefs by the plaintiff, both

22    the moving brief and a reply brief, as well as the defendant's

23    opposition.

24            Mr. Kotchen, let me hear from you.  You can assume my

25    familiarity, both with the case and the arguments, but I did

1  want to hear oral argument from counsel.

2          MR. KOTCHEN:  Yes, Your Honor.  Look, I think the

3  motion to amend is pretty -- is a simple argument for us.

4  There -- the -- under the schedule, the deadline to -- for

5  leave to amend, just under the schedule as to amend was October

6  13th of 2023.  After that date, two things happened.  One was

7  the *Rajaram* case from the Ninth Circuit was issued in June of

8  2024.  That is the first and very well done decision by a court

9  of appeals that held that citizenship discrimination is

10 actionable under 1981.  That is one event that occurred post

11 the October 2023 date in the schedule.

12          The second is in November -- in late November, Wipro

13 produced a rotation policy.  And it had iterations -- the

14 policy itself reflected -- it had iterations going back to the

15 2012 or so time frame of a rotation policy that we think is a

16 facially neutral policy that would -- that would satisfy the

17 Court's disparate impact standards to address -- pursue a

18 disparate impact theory under Title VII.

19          And so what we're doing is we are seeking to amend

20 the complaint for the simple proposition of adding a

21 citizenship discrimination claim, and to allege a disparate

22 impact claim under Title VII.  So we would still have a 1981

23 claim.  We would still have a Title VII claim.  We would just

24 add citizenship discrimination and disparate impact to those

25 claims.

1          As a practical matter, the addition of those

2    allegations would have no effect on discovery -- on the scope

3    of discovery.   The discovery -- discovery, as Your Honor knows,

4    is -- we're still in the process of pursuing custodial

5    discovery, ESI, and so forth.   And the scope of what we would

6    be seeking would not be enlarged at all by the addition of our

7    amendments.

8          The rotation policy was produced as a matter of

9    discovery in this case.   It's clearly part of this case.

10   Iterations -- Wipro has committed to producing to us all

11   iterations of the rotation policy going back in time.

12         And the citizenship discrimination claim, as well,

13   because -- one of the mechanisms by which Wipro achieves what

14   we think of as a discriminatory preference in this case is

15   utilizing visa employees from India, the race and national

16   origin allegations overlap a lot with the citizenship

17   allegations such that there's no enlargement of discovery.   So

18   we think that -- that under the cases that we cite, that

19   there's good cause to adjust the schedule to allow this -- to

20   allow the amendments post the deadline in the existing

21   schedule.

22         And if you look at the *Taylor, Jani, McGrath* cases

23   that we cited, when there are developments in discovery that

24   occur in a case, leave is freely granted to allow amendments to

25   an existing complaint to comport with that discovery.   And we

1 think that -- so we think there's good cause to adjust the

2 schedule.

3      We think under the Rule 15 factors, that we meet each

4 and every one of the Rule 15 factors.  There's no undue delay

5 here.  You have the Ninth Circuit decision that was issued in

6 June of 2024.  The rotation policy, we reviewed and understood

7 that policy in February of 2024 as we were briefing discovery

8 issues with the Court.  And there -- so we promptly -- there

9 was a four-month or so gap between when we reviewed it,

10 understood it, and sought for leave to amend.  We think in this

11 case, that would not constitute any sort of undue delay.

12      There's no bad faith here.  This isn't something that

13 -- where we are trying to cover up for some shortcoming in the

14 case.  These are factors that -- these are issues that we

15 learned about in discovery, and we're acting on it as part of

16 our obligations to our clients.

17      There's no repeated failures to use this information

18 to amend the complaint and we haven't been successful.  We

19 don't -- there's nothing like that in the record here.

20      There's not undue prejudice to Wipro.  I mean, these

21 -- Wipro, for example, produced the rotation policy.  That

22 policy is part and parcel of the case as it stands in its

23 existing state.

24      The Ninth Circuit decision is consistent with a lot

25 of the facts and circumstances that we have in this case, and

1  it simply allows another legal claim to be brought under the

2  1981 framework.  We don't think that it expands discovery at

3  all.  And certainly, there could be no argument that there's

4  undue prejudice here.

5        And we don't think that there's anything that's

6  futile about our amendments.  The rotation policy is a facially

7  neutral policy that satisfies the Court's decision on the

8  motion to dismiss to advance a facially neutral policy to

9  pursue a disparate impact claim.  And we think the *Rajaram* case

10  from the Ninth Circuit is well-reasoned.  It's the -- it's the

11  very first -- the very first court of appeals decision to

12  address this issue, and we think that it should be followed by

13  the Court.  And it's certainly -- it's certainly a more

14  persuasive, and well-reasoned, and thorough decision than the

15  prior decision from the Fifth Circuit in the 1970s, the

16  *Chaiffetz* decision.

17        So for those reasons, Your Honor, we think that

18  moving to amend -- amendment, as we proposed, is appropriate.

19  And we would be happy to address any questions that you may

20  have (indiscernible - multiple speakers).

21        THE COURT:  Yeah, I do.  Thank you, Mr. Kotchen.  I

22  have a few questions.  Of course, you know, you mentioned that

23  the plaintiffs haven't, you know, brought this amendment in bad

24  faith.  Of course, under Rule 16, you face a higher standard.

25        With respect to the global rotation policy, perhaps

1  you could comment on how you were diligent in finding and

2  locating the policy on which your motion to amend is now based,

3  at least with respect to disparate impact.

4          MR. KOTCHEN:  Well, that -- that rotation policy was

5  produced on November 21st of 2023.  And so this is not -- this

6  is not something that sat in -- in our -- in our system for,

7  you know, a significant period of time.  We were reviewing

8  documents.  We identified the rotation policy.  We identified

9  it in a brief -- in a document re -- leading up to a joint

10 letter brief to the Court at the beginning -- beginning of

11 March, so in the February or so time frame.

12          And, you know, as a -- I think that there -- there

13 could be -- if you look at the *Taylor*, the *Jani*, and the

14 *McGrath* cases, the amount of time that can pass -- I mean, the

15 *Jani* case, for example, seven months had passed before

16 something was brought to the Court's attention in the form of a

17 motion to amend.

18          Here, we had several months from when we identified

19 it, and then we moved to amend.  We -- I -- we approached

20 Wipro, I think, July 12th after, you know, reviewing documents

21 in the February, late February time frame of 2024.  As -- you

22 know, we're (indiscernible - multiple speakers) --

23          THE COURT:  So, I mean, would you agree -- I mean,

24 essentially your position reduces to between November -- what

25 was it, the 21st, did you say?

 1                MR. KOTCHEN:  It was produced on November 21st, yes.

 2                THE COURT:  And July 26th.  So, eight months is not

 3    unreasonable.  Is that -- I mean, is that your position?

 4                MR. KOTCHEN:  I mean, we don't think that's

 5    unreasonable, correct.

 6                THE COURT:  All right.  With respect to citizenship

 7    discrimination, help me understand why the Ninth Circuit's

 8    decision was sort of this, you know, sea change that now

 9    supports amendment when, to my understanding, there was no

10    controlling, binding, or even perhaps persuasive case law on

11    the issue in the Third Circuit, either way.

12                MR. KOTCHEN:  There hadn't been a court of appeals

13    decision that squarely addressed this issue.  I know there was

14    the *Chaiffetz* decision from the Fifth Circuit, but that was a

15    decision where the counsel -- the plaintiff's counsel all but

16    admitted that citizenship discrimination would not be

17    actionable under 1981.  And so -- and that was -- it dealt with

18    the issue in just a -- in a single paragraph.  The sole issue

19    before the Ninth Circuit was can citizenship discrimination be

20    appropriate?

21                THE COURT:  Yeah, I mean, which way does that cut

22    though, Mr. Kotchen?  I mean, your view is that the decision

23    out of the Fifth Circuit was so poorly reasoned and so, you

24    know, sort of -- I mean, I think the decision refers to

25    alienage, right?  Not citizenship.

1          MR. KOTCHEN:  Correct.

2          THE COURT:  Right?  And so, you know, on the merits,

3  it seems like there would be no logical reason not for you to

4  bring a citizenship discrimination claim in this case in the

5  first instance.

6          MR. KOTCHEN:  Your Honor, the -- we had alleged it.

7  And I will tell you, we've alleged it in other cases, and we

8  have lost based on the existing case law.

9          And so it was -- you know, no one wants to -- if

10  we're going to allege something and we're going to pursue

11  something, we're going to do it with a firm basis that we're

12  going to prevail on it.  And so I think that the Ninth Circuit

13  -- there has been -- if you look at the district courts, for

14  example, in the Ninth Circuit, there are cases that go both

15  ways on that.  We pursued a case, a citizenship discrimination

16  case in the Ninth Circuit -- in a district court in the Ninth

17  Circuit, in the Northern District of California, and lost.  We

18  pursued it in the Southern District of New York; we lost.  We

19  think when -- when -- when judges --

20          THE COURT:  But you pursued it -- you pursued it is -

21  - is the sort of fundamental point.  Whether you lost or not,

22  right, you asserted it, correct?

23          MR. KOTCHEN:  We asserted it.  But I -- I think -- I

24  mean, I would respectfully push back on that and say, the

25  fundamental point is we lost it.  We're not interested in

1   pursuing something that we're going to lose.

2           And so when you look at the language of the Ninth

3   Circuit decision, how it construed the statute, we can think --

4   we can think of no better basis to pursue it in this case in a

5   way that -- that -- you know, if -- if Your Honor, or Judge

6   Castner, or whoever is looking at it, and looking at the

7   language of the statute, coupled with the Ninth Circuit

8   decision, we think it gives a firm basis to say, "Yup, this is

9   an appropriate action under 1981."

10          Could we have -- could we have alleged it in the

11  first instance?  We certainly could have.  Our track record on

12  this has been, we were batting zero percent.  Literally zero.

13  And so we could have alleged a lot of other things that I think

14  we would have lost on, as well.  But once we get the Ninth

15  Circuit decision, we think it's an appropriate -- it's an

16  appropriate reason and basis, and if you look at the *Abraxis*

17  case, appropriate basis to -- to reassert or to assert a

18  citizenship discrimination claim here.

19          Well, Your Honor, you're right that we certainly

20  could have alleged it in the first instance.  We just -- we

21  just hadn't had success in that.

22          THE COURT:  Okay.  Next -- thank you, Mr. Kotchen.

23  Next question, can you -- I'm looking at proposed new

24  Paragraphs 24 and 25 in the proposed second amended complaint.

25  You know, Judge Wolfson, in her opinion, on my read, you know,

1  she clearly, you know, dismissed the disparate impact claim for

2  failure to identify a facially neutral policy.  But it seems to

3  me that her decision went -- also went a little bit deeper than

4  that and said, look, this entire case really sounds in

5  discriminatory treatment, disparate treatment.

6          And I guess, you know, if I understand Wipro's

7  argument, is notwithstanding the allegations in the complaint -

8  - in the new proposed complaint -- that this policy is facially

9  neutral, generally applicable, what's really going on here is

10 Wipro treating your clients, and clients like your clients,

11 putative class members, different based on their national

12 origin and the like.  And perhaps you could just help me

13 understand why this policy, as alleged, truly is neutrally --

14 you know, generally applicable neutral policy as opposed to

15 something that's applied in a discriminatory way.

16          MR. KOTCHEN:  So under the policy, you have -- once

17 you -- once you have -- you have two things going on.  One is

18 it's a policy that applies for offshore resources to be rotated

19 into roles.  So there's a prior -- they're prioritized for

20 roles in the U.S.

21          It's also a policy by which individuals are rotated

22 out of roles.  So, for example, if you hit a three-year time

23 frame.  And so nothing about that says anything about race,

24 national origin, and the like.  Nothing about it.

25          But if you have a scenario where one individual is

1  rotated out of a role and another individual is rotated into

2  the role, and the individual who's rotated out of the role is

3  put in non-productive status, it's referred to as being

4  benched, benched and then fired, if you look at the data, it's

5  going to have a disparate impact, we believe, on one group of

6  folks over others.  Even though the rotation policy itself says

7  nothing about what the characteristics, either race, or

8  national origin, or what have you, the characteristics are

9  about the individuals who, for example, are rotated out of the

10  roles.  But that is -- that's where the disparate impact

11  happens.

12          And it's something that -- it's -- you know, there's

13  nothing about -- when you look at the terms of the policy, the

14  language of the policy, there's nothing about it that has

15  anything to do with what type of person it's going to affect.

16  But when you look at the data, we think it's going to affect

17  one type of person over others.  And that is squarely, we

18  think, within the disparate impact realm of what constitutes a

19  facially neutral policy that disparately impacts one group of

20  folks over the others.

21          THE COURT:  All right.  Thank you, Mr. Kotchen.  Last

22  question.

23          MR. KOTCHEN:  Sure.

24          THE COURT:  With respect to what impact this has on

25  the case, I heard you to say, and I read your papers to say it

14

1  has no impact because there's near overlap or complete overlap

2  with the existing claims in the case.  And I just want to make

3  sure that I hear you correctly.

4         So for instance, if the Court permitted the

5  amendment, there will be no additional requests for production.

6  There will be no additional interrogatories.  Nothing is

7  changing.  Is that your view?

8         MR. KOTCHEN:  Your Honor, the amendment will not lead

9  to any additional discovery requests from our -- from our side

10  at all.  They are -- the amendments would be captured by what's

11  already been issued.  If there is a future discovery request on

12  something, it will be because of some other issue, not because

13  of these amendments at all.  So, we -- we think it would have

14  no effect on the scope of discovery.

15         THE COURT:  All right.  And then related to that,

16  does expert discovery -- the expert discovery landscape change

17  at all, you know, for example, the need for statistical

18  analyses?  I understood you to be undertaking those already,

19  albeit in the context of disparate treatment.  But does the

20  expert discovery landscape look any different if that claim is

21  permitted?

22         MR. KOTCHEN:  Not that -- no, Your Honor, it wouldn't

23  look any different.

24         THE COURT:  All right.  Thank you, Mr. Kotchen.  I'll

25  give you a brief time to respond once I hear from Ms. Hart.

1          MR. KOTCHEN:  Okay.

2          MS. HART:  Okay, thank you, Your Honor.

3          So plaintiffs, now years into this litigation, have

4   made a belated request to reopen the pleadings and add two new

5   claims.  And that motion should be denied for two primary

6   reasons.

7          First, the plaintiffs cannot show good cause for an

8   untimely amendment to add two new claims at this stage of the

9   case, as required by Rule 16.  Now that alone requires the

10  denial of plaintiffs' motion.  The Court does not need to even

11  reach the Rule 15 factors to resolve this motion in Wipro's

12  favor.

13         But even if the Court does reach the Rule 15

14  analysis, all three of the relevant factors, undue delay,

15  prejudice, and futility, all support denial of leave to amend.

16         I'll start with the Rule 16 analysis.  The plaintiffs

17  fall far short of meeting their burden of demonstrating good

18  cause for a late amendment, nearly a year after the deadline to

19  file amended pleadings.  The good cause standard under Rule 16,

20  as Your Honor alluded to earlier, focuses on the diligence of

21  the moving party.  And the record here is really crystal clear

22  that the plaintiffs have been far from diligent.

23         The plaintiffs have been aware of the purported basis

24  for the two new claims they seek to add to this case for

25  months, if not years, before filing their motion for leave to

1    amend.  This substantial delay is really the opposite of

2    diligence and forecloses any showing of good cause.

3         So starting with the citizenship discrimination

4    claim, you know, the proposed claim is premised on the legal

5    theory that Section 1981 prohibits discrimination against U.S.

6    citizens.  And, you know, as you just heard counsel discuss,

7    you know, plaintiffs' counsel has been aware of this legal

8    theory and has been pursuing it in other courts for the past

9    five years.

10        In other words, this is not a novel legal theory that

11   was only recently recognized for the first time.  Nothing

12   prevented the plaintiffs' counsel from asserting the exact same

13   type of claim in this case that they have been pursuing in

14   other courts for years.  Plaintiffs' counsel simply made the

15   strategic decision not to assert that type of claim in this

16   case.  We just heard counsel kind of go through a lengthy

17   explanation of why they didn't want to file this type of

18   citizenship discrimination claim at the beginning of the case.

19   They didn't like how the precedent had shaken out for them in

20   different courts.  They seem to have the view that they were

21   entitled to wait to seek leave to amend to assert a citizenship

22   discrimination claim until they were satisfied with the, you

23   know, precedent supporting that type of claim.  That really

24   isn't the standard, and the plaintiffs don't cite any case law,

25   you know, recognizing that as the standard for good cause for a

1  late amendment.

2         The plaintiffs, you know, also emphasize that the

3  *Rajaram* case out of the Ninth Circuit was the first circuit

4  court decision to recognize a citizenship discrimination claim

5  under Section 1981.  And while that is true, that does not

6  provide good cause for a late amendment because, you know, as

7  we demonstrated in our papers, and as plaintiffs' counsel just

8  discussed, that -- you know, the absence of circuit court

9  authority for this type of claim was not a bar for them to file

10 the exact same claim in courts across the country.  So there

11 was nothing that prevented them from doing so here and

12 asserting that claim, you know, at the beginning of this

13 litigation, or really at any point before the October, 2023

14 amended pleading deadline.

15        THE COURT:  You would agree though, Ms. Hart, that

16 that gave the plaintiff, you know, additional ammunition,

17 right?  I mean, it's -- it's wind at its back once the Ninth

18 Circuit comes out, no?

19        MS. HART:  I mean, it's certainly another, you know,

20 non-binding persuasive decision recognizing this type of

21 citizenship discrimination claim.  But, you know, as we laid

22 out in our papers, that type of persuasive authority existed

23 before the amended pleading deadline.  You know, we cited as

24 one example a District of Oregon case from 2021, you know,

25 adding another persuasive non-binding decision, you know, after

1 the amended pleading deadline does not constitute good cause.

2 And, you know, plaintiffs do not cite any cases, you know,

3 supporting that view of the good cause standard, and we are not

4 aware of any either.

5           So for those reasons, we think there is not good

6 cause for the plaintiffs to, you know, file a late amendment to

7 assert a citizenship discrimination claim.

8           Turning next to the disparate impact claim, you know,

9 we think the lack of good cause and the lack of diligence here

10 is even more clear.  You know, as counsel explained, Wipro

11 produced the global rotation policy on November 21st, 2023,

12 which was just a few weeks after the amended pleading deadline.

13 But the plaintiffs did not file their motion for leave to amend

14 until eight months later, in late July of 2024.

15           And one fact that plaintiffs' counsel did not mention

16 in their argument, but I think is worth highlighting for the

17 Court is, you know, the production that we made on November

18 21st, 2023 that contained the global rotation policy included

19 only 18 documents that totaled 177 pages.  You know,

20 plaintiffs' counsel just told you that they did not discover

21 the policy in that production until February.  So it appears

22 that they did not review our production for three months.

23           But even after they discovered the policy in February

24 of 2024, they sat on it for five months before filing a motion

25 for leave to amend, which, you know, is really the opposite of

diligence.  And kind of looking at the total course of conduct
here, the fact that the plaintiffs had this policy in their
possession for eight months before they filed a motion for
leave to amend is really a textbook lack of diligence that
forecloses a showing of good cause.  And it's important to note
that courts in this District have found there's no good cause
for an untimely amendment based on even shorter delays.

For example, the *Fermin* case that we cited in our
papers, the Court found there was not good cause for a late
amendment where the plaintiff waited six months to seek leave
to amend after obtaining the relevant evidence that formed the
basis of their proposed amendment.

So, you know, we think the lack of diligence is
clear.  We haven't, you know, heard from plaintiffs' counsel in
their motion, in their reply brief, or in their argument today
really why it took them so many months, nearly a year to file
their motion for leave to amend after we produced the policy.

So, you know, for these reasons, we think the
plaintiffs have not met their burden of showing good cause
under Rule 16 for either of their proposed amendments.  And
that alone requires the denial of their motion.  So the Court
does not even need to consider the Rule 15 factors to deny the
plaintiffs' motion for leave to amend.  But if the Court
reaches those factors, again, all three support the denial of
plaintiffs' motion.

1          You know, the first factor undue delay, I'm not going
2    to go into because I think that overlaps a lot with the
3    material that I just covered in terms of the good cause
4    standard.
5          On prejudice, you know, just to respond briefly on
6    the point that plaintiffs' counsel made.  You know, I think
7    that, kind of, if we take a step back and look at where we are
8    in the case, you know, we're more than four years into this
9    litigation.  Wipro answered the complaint nearly two years ago.
10   We've been engaged in discovery for more than a year.  Parties
11   have collectively served hundreds of discovery requests, you
12   know, exchanged dozens of pages in meet and confer
13   correspondence.  We've had multiple lengthy discovery
14   conferences before Your Honor.  You know, we're --
15          THE COURT:  Today being one of them.
16          MS. HART:  Yes, exactly, today being one of them.
17                    (Laughter)
18          MS. HART:  You know, we're pretty far along.  Wipro -
19   - we've produced more than 60,000 documents in this case.  You
20   know, to, at this stage of the proceedings, essentially reopen
21   the pleadings and put into flux, you know, the scope of the
22   case and what the claims actually are is just going to delay
23   the case even further and push off, you know, the point at
24   which the case can ultimately be resolved.
25          THE COURT:  Help me understand that, though.  Because

1  Mr. Kotchen has committed, both in his papers and here today,

2  that there's going to be no additional discovery requests.  I

3  mean, it is, with that commitment, sort of difficult to

4  envision there being any delay because of the amendment, if the

5  Court permits it.  You know, delays in these cases are what

6  they are.  I mean, the age of the case is sort of, you know,

7  doesn't -- the case was stayed for a significant period of

8  time.  So four years isn't really four years in which this case

9  was being actively litigated.

10      I share everybody's concern about moving this case

11  forward expeditiously.  I'm just having a hard time thinking

12  about how this -- how the amendment actually truly will cause

13  further delay.

14      MS. HART:  Sure, Your Honor, I'm happy to address

15  that, and I have two responses.

16      First is, you know, in terms of setting a schedule

17  for the case, if the amendment is allowed, Wipro intends to

18  file a motion to dismiss.  And, you know, we expect it will

19  likely take months, potentially longer, for the parties to

20  brief and the Court to decide a motion to dismiss.

21      So we have a hard time seeing how the parties could

22  complete discovery, and how the Court could set a meaningful

23  schedule for discovery and dispositive motions if the scope of

24  the claims in the case are in flux and we don't even know when

25  we will have certainty on which claims are in the case and

1  which claims are not.

2          But to talk about discovery specifically, my second

3  point.  You know, I heard plaintiffs' counsel commit to not

4  serving additional RFPs and interrogatories if the amendment is

5  allowed, but I don't think that, you know, provides certainty

6  that the scope of discovery won't be expanded.  I mean, we are

7  currently in the process of negotiating custodians.  There

8  currently are two essentially identical disparate treatment

9  claims in the case.  And as my colleague, you know, explained

10 earlier, the plaintiffs had provided a proposed custodian list

11 that has almost a hundred people.  You know, if disparate

12 impact and citizenship discrimination are added to the case, it

13 could impact the scope of the custodians, which, you know,

14 we're already talking about very large numbers of custodians.

15 It could impact the depositions that are taken in this case,

16 you know, expert discovery, data production in response to the,

17 you know, RFPs that have already been served.  You know, and

18 that is to not even say anything about Wipro's defenses to

19 those claims.

20          You know, regardless of whether the plaintiffs intend

21 to serve additional requests to seek evidence to support their

22 claims, you know, Wipro is certainly entitled to seek discovery

23 to support their defenses to the claims.  And, you know, given

24 the differences between disparate treatment claims and

25 disparate impact claims, I don't expect our defenses, if the

1  amendment is allowed, to be a total one-to-one.

2          So, you know, I think it's really far from the clear

3  picture that Mr. Kotchen painted that, you know, the scope of

4  discovery won't be impacted at all if these amendments are

5  allowed.

6          So, I'll just conclude by briefly addressing

7  futility, which Your Honor touched on.  You know, the

8  citizenship discrimination claim we address in our papers, and

9  unless Your Honor has questions on that, I'm happy to let that

10 rest on the papers.

11         In terms of the disparate impact claim, you know, Mr.

12 Kotchen raised at the beginning of his argument, and also in

13 his papers, you know, we had argued in our -- in our opposition

14 brief that the plaintiffs lack standing to assert their

15 disparate impact claim because the global rotation policy

16 underlying their proposed claim was issued in July, 2023, which

17 is years after all of the named plaintiffs left the company.

18         You know, Mr. Kotchen's argued that because, you

19 know, there's a version history in the policy that lists

20 different versions going back to 2012, you know, his clients,

21 therefore, you know, must have been subject to this policy and,

22 therefore, must have been injured by it and, therefore, have

23 standing.  You know, that certainly is not stated on the face

24 of the policy.  That, you know, it has been in effect in the

25 same form for the past 12 years.  That's not alleged in the

1  complaint and, you know, counsel's assumptions about, you know,

2  what policies may have been in effect in the past is certainly

3  not enough to establish that the plaintiffs have been injured

4  by such a policy and to establish standing.

5          So, you know, in addition to the reasons explained in

6  our papers, which, you know, concerning the failure to allege a

7  facially neutral employment policy, you know, we also think

8  there's lack of standing to assert a disparate impact claim.

9          So, in addition to all of the other reasons I

10 explained, the proposed amendment would be futile, as well.

11 So, for all of those reasons, we ask that the motion to amend

12 be denied.

13         THE COURT:  Thank you, Ms. Hart.

14         Mr. Kotchen, briefly.

15         MR. KOTCHEN:  Your Honor, look, I'll -- I'll largely

16 rest.  I think that when you look at the *Abraxis* case, when you

17 look at the *Jani* case, when you look at the *Taylor* case, when

18 you look at the *Norfolk* case, there's -- nothing about this

19 would constitute undue delay in terms of our moving for

20 amendments.

21         We obviously disagree with Ms. Hart's recitation --

22 her arguments about the futility, about undue delay, about, you

23 know, our, you know, we could have advanced a claim that we

24 didn't feel strong about in the first instance before the Ninth

25 Circuit decision, but I think it'd be redundant with the

1  arguments I had made to you previously.

2          So, I think we'll largely rest, and I'm confident

3  that you've -- you understood the issues, in addition to the

4  briefing.

5          THE COURT:  All right.  Thank you very much, Counsel.

6          I'm not going to rule today.  I'm going to reserve,

7  and I will issue a written opinion in fairly short order.  But

8  thank you, Ms. Hart and Mr. Kotchen, for your arguments today

9  and the briefing, as well.

10         We can go off the record, Chris.

11         (Whereupon, at 12:17 p.m., the hearing was adjourned.)

12

13                 CERTIFICATE OF TRANSCRIBER

14

15     I, KAREN HARTMANN, a certified Electronic Court

16  Transcriber, certify that the foregoing is a correct transcript

17  from the electronic sound recording of the proceedings in the

18  above-entitled matter.

19

20  *Karen Hartmann*

21

22  Karen Hartmann, AAERT CET 475   Date: November 17, 2024

23  TRANSCRIPTS PLUS, INC.

24

25