**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**TRENTON DIVISION**

| | | |
|---|---|---|
| GREGORY MACLEAN, *INDIVIDUALLY AND IN HIS REPRESENTATIVE CAPACITIES, et al.*, | ) | Case No. 3:20-cv-03414-GC-JBD |
| Plaintiffs, | ) | Clarkson S. Fisher Building & U.S. Courthouse |
| versus | ) | 402 East State Street Trenton, New Jersey 08608 |
| WIPRO LIMITED, | ) | December 15, 2025 |
| Defendant. | ) | 11:04 a.m. |

TRANSCRIPT OF STATUS CONFERENCE
BEFORE HONORABLE J. BRENDAN DAY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES VIA MICROSOFT TEAMS:

For the Plaintiffs:
The Law Offices of Jonathan Rudnick LLC
By: JONATHAN RUDNICK, ESQ.
788 Shrewsbury Ave, Suite 204
Tinton Falls, NJ 07724

Kotchen & Low LLP
By: DANIEL A. KOTCHEN, ESQ.
LINDSEY GRUNERT, ESQ.
1918 New Hampshire Avenue, NW
Washington, DC 20009

ESR/COURTROOM DEPUTY: Christopher Yoos

TRANSCRIPTION SERVICE:
TRANSCRIPTS PLUS, INC.
435 Riverview Circle
New Hope, Pennsylvania 18938
215-862-1115
CourtTranscripts@aol.com

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

APPEARANCES VIA MICROSOFT TEAMS:
(continued)

For the Defendant:

Gibson Dunn & Crutcher LLP
By: STEPHANIE SILVANO, ESQ.
GRACE E. HART, ESQ.
SOPHIE WHITE, ESQ.
200 Park Avenue
New York, NY 10166-0193

Gibson Dunn & Crutcher LLP
By: GRETA B. WILLIAMS, ESQ.
1700 M Street, N.W.
Washington, D.C. 20036-4504

Wipro Limited
By: UMUNG VARMA, ESQ.
Associate General Counsel

* * *

THE COURT: All right, good morning, everyone. We're here on the record in MacLean, et al. versus Wipro Limited, Docket Number 20-3414.

May I have the appearances of counsel, starting with the plaintiffs.

MR. KOTCHEN: Good morning, Your Honor. Daniel Kotchen and Lindsey Grunert from Kotchen and Low, and with us is our colleague, Jonathan Rudnick.

THE COURT: Counsel, good morning. And for Wipro?

MS. WILLIAMS: Good morning, Your Honor. This is Greta Williams with Gibson Dunn. I'm joined by my colleagues, Sophie White, Grace Hart, and Stephanie Silvano, who's serving as our local counsel, as well as Umung Varma, who's the global head of litigation at Wipro.

THE COURT: All right, good morning to you all.

All right, we're here following the filing of a joint status letter addressing ongoing discovery issues, which the Court has been dealing with the parties at length for the better part of 2025. That joint letter was filed on November 6th at Docket Number 112, and continues on from earlier discussions in both September and June.

At my request or my order, rather, I directed Wipro to file and disclose to plaintiffs a year-by-year breakdown of custodial data that had been collected to date for the 26 agreed upon custodians. A dispute has fully ripened in my

view as to the adequacy of Wipro's collection of custodial data.

I've reviewed the dispute set forth in the parties' joint letter. I do want to have a discussion with counsel. I've got some questions for both sides. I'll be transparent at the outset. I have concerns for both sides with respect to the positions that have been taken.

And so, Mr. Kotchen, let me hear from you first. Obviously, we're going to be focusing on the early part of the class discovery period in 2014. I'm familiar with the arguments, but let me hear from you first.

MR. KOTCHEN: Yes, Your Honor. Look, I mean, I think that what we have from Wipro is a chart of a volume of documents by year by custodian. It's not separated out by source, such as email versus OneDrive. So we don't really -- we don't have as much information as, I think, we were hoping to have.

But at the 30,000-foot level, we think that the data trends support exactly what we were -- what we've been concerned about, which is as you walk through the years that custodial documents are being lost over time, and it makes sense, is the way things work. You have the issue of --

THE COURT: Being lost over time or the chart reflects lost data from that 2014 time period prior to the 0365 migration?

MR. KOTCHEN: Both. Both, Your Honor. I think that certainly before the 0365 migration, you see shockingly limited document production, document amounts, volumes.

But even -- once you get to the migration of the 0365, that the later years, by and large, have more documents. More documents exist in the later years than in prior years.

As we understand it, the practice at Wipro was to delete emails and to use .psts. And certainly what we see in the data chart supports kind of what we understand the practice to be. And so I think at the big picture level, the notion – and this is something that we've been trying to secure from Wipro for the better part of two years – the notion that relevant ESI may have been lost, it actually appears to be true.

And so we're not saying this is not an issue of spoliation or anything like that. This is more --

THE COURT: No, I understand that.

MR. KOTCHEN: This is more of an issue of making sure that we have core information about the claims at issue. And to give you a sense for why this is important, at the very beginning of the discovery period, in the class period in this case, Wipro made the decision not to be an affirmative action vendor, a federal contractor, because its business model didn't support the sort of affirmative action goals that were required to do work for the federal government.

And so there was early on recognition, in our view, that there were systematic problems in their staffing practices that we think are very important to the ultimate goal here as to whether or not intentional discrimination can be proven.

And so that kind of, at the big picture level, is what I would say about the chart.

THE COURT: Let me --

MR. KOTCHEN: The second issue --

THE COURT: Let me just --

MR. KOTCHEN: Okay.

THE COURT: Let me focus on that for a second, because I want to crystallize --

MR. KOTCHEN: Okay.

THE COURT: -- exactly what the dispute is here. I mean, I'm looking at the chart, and I hear you on the 2014 time period from June to December. Right?

MR. KOTCHEN: Right.

THE COURT: It does not take an IT expert to see the comparative volume of information between 2014 and the later years.

MR. KOTCHEN: Right.

THE COURT: I'm not sure I agree with you, though, on the broader concept, that over time, as the discovery period goes on, that you're seeing trends of lost data. I mean, some of the custodians have more data in 2016 than they do in 2022,

2023, and the like. And so I hear you on the 2014, but I don't see any sort of, like, significant trend one way or another across the discovery period, just in terms of volume.

MR. KOTCHEN: Your Honor, well, look, I think it's a fair point. And there's a -- you know, it's not as if we've done a regression analysis to show --

THE COURT: Yeah, yeah, yeah.

MR. KOTCHEN: -- data trends and so forth.

THE COURT: Right.

MR. KOTCHEN: But there are an example -- like, so Mr. Muthusamy, for example, had 16 gigabytes of data in 2014; 33 in 2015. By 2018 that jumps up to 160 gigabytes. Certainly that is one data point. I get your point --

THE COURT: Yeah, but you can --

MR. KOTCHEN: -- that there --

THE COURT: I mean, you can go one way or another.

MR. KOTCHEN: Yes, you can.

THE COURT: I mean, 2015, 33, compared to '23, there's even less. So -- right? I mean --

MR. KOTCHEN: I know.

THE COURT: Right?

MR. KOTCHEN: I get your -- look, I get your point. I think what you're saying makes sense. And I'm not saying here that every year shows exactly the same trend. I think in the aggregate, it does.

What would have been helpful just -- and I anticipated your question on this issue and how I would respond to it. What would have been helpful for us is if we had the data broken out by source. Because really, what we're concerned about, there -- I'll give you two examples.

There could be data on the OneDrive, a share drive, for example, that is, you know, stays consistent over time, but you see huge fluctuations in emails. Just by way of example, and I'm making this up at this point because I don't know. But if we had it by source, we would be able to at least address that.

At your last hearing, Your Honor, you had suggested -- we had asked, can we please have Wipro provide the data it has available by source? Email, OneDrive, Skype, Teams, and so forth.

Your Honor said, no, but you cautioned Wipro, to the extent that the more information they share, the better off it will be for everyone.

And so we have repeatedly asked in the interim that they share that data with us, but we just haven't gotten it.

THE COURT: I guess what I'm not --

MR. KOTCHEN: And the --

THE COURT: And I remember that, and I made that decision consciously, and --

MR. KOTCHEN: Yes.

THE COURT: And I stand by that.

MR. KOTCHEN: Yes.

THE COURT: I guess what I'm not fully appreciating or understanding is how that information would move the ball along.

MR. KOTCHEN: Well, I think, as we understand it -- I mean, this -- again, this is -- I -- and I will be the first to admit, this is -- we are -- this is just our understanding. This isn't something that we can show to you as a matter of fact, okay?

THE COURT: Um-hum.

MR. KOTCHEN: That the practice involved emails. And first of all, .psts were created to store emails, and then emails were deleted frequently.

THE COURT: Right.

MR. KOTCHEN: And email boxes. And that's the practice.

Wipro functions largely as an email-oriented organization.

THE COURT: Right. That's exactly my point, Mr. Kotchen, is I'll tell you this -- I also lack a factual basis for this. But I'm looking at this, and I'm sort of practically assuming that the bulk of this data is email data, right? I mean, that's just a practical assumption that, you know – Ms. Williams will correct me when I hear from her that that's an

assumption that shouldn't be made. But I think that that's a fair thing to assume, at least at this juncture.

And so if that's so, and if you're operating under the assumption that this business operated, by and large, through email, then requiring Wipro to tell you how much is, you know, Skype data, doesn't really move the needle.

MR. KOTCHEN: Your Honor, look, I mean, I am not so sure that's -- I mean, I -- it is, by and large, an email-oriented organization. I don't know how much data, for example, is stored on share drives, or how they source that information. And that's why I would not -- I hear you, and I understand that you would assume this would be email mostly, but I don't know that to be true actually. And I just -- because we don't -- we lack information to pressure-test that assumption. That's -- walking into this exercise before we even had the last hearing, that's what we would assume, too. But we're just concerned why -- if that was the case, we're concerned as to why Wipro wouldn't share with us the volume by data source.

And so that's -- I mean, it doesn't seem like that would be a big lift at all because they have to have it. And so I don't know, I just don't know if that assumption is true or not, but I understand what you're saying.

THE COURT: I mean, the -- so the -- what has been represented — and I'll confirm again with Ms. Williams — my

understanding, that all of this custodial data in the aggregate reflects all of that, the emails that had been saved, the OneDrive, the like, right, for a particular custodian. And so it's sort of -- at least the way I'm thinking about this, it is what it is. Right?

Now, to the extent that 2014 reflects significantly lower volume than the other years, I hear you. And the question, at least as I'm thinking about this, is what do we do?

MR. KOTCHEN: Right.

THE COURT: Right?

MR. KOTCHEN: I --

THE COURT: And I don't think it's nothing, and I'll tell you that right now. I mean, I don't think that we do nothing. I just don't know that requiring Wipro to break out the source type -- or the data type is the right response.

MR. KOTCHEN: Understood, Your Honor. I -- look, I think, from the get-go, you've been practical, I think, very practical in how you've approached this exercise.

And the one pushback I would have about, you know, your comment, "it is what it is," I largely agree with that, except for the issue of .psts.

THE COURT: I --

MR. KOTCHEN: (Indiscernible - multiple speakers).

THE COURT: That's where I'm headed. Right?

MR. KOTCHEN: Okay.

THE COURT: And so if you assume — and this is sort of how I've understood this dispute — that .psts were created as a matter of practice prior to the O365 migration, and stored somewhere, right, then the task is what to require Wipro to do in terms of figuring out whether there are .psts for this time period for these custodians. Agreed?

MR. KOTCHEN: I think that makes sense.

THE COURT: Okay. Based on our call in September, it was my general understanding — and I don't think there was necessarily a dispute about this — that everybody was working from the standpoint of if there are .psts that are available, they are on some physical device, as opposed to some shared network. Also fair?

MR. KOTCHEN: Correct.

THE COURT: All right. And so the dispute, as least as I read this letter, and I think sort of started to tee it up in September, is what to do about requiring Wipro to locate and search physical devices to locate these .psts. I mean, is that -- that's sort of what I really view the core dispute is today.

MR. KOTCHEN: You know, look, I would say I think the dispute is a little bit broader than that in my mind, because there issue -- the issue of backups and so forth.

THE COURT: Okay.

MR. KOTCHEN: But I think a practical middle ground here involves the .psts. I just think that that's -- and preparing for this hearing is, like, I -- I would have bet that's how you would view the situation, and I think it'd be right.

THE COURT: I mean, backups -- I mean, let me know what you think, though. The backups is sort of an umbrella term, as I'm thinking about it. Right?

MR. KOTCHEN: Right.

THE COURT: A .pst could be a backup. Email backup tapes could be another. Are there other possible areas that you're thinking about where this electronic data theoretically might reside?

MR. KOTCHEN: The one thing anyone at Kotchen Low would tell you is I'm the furthest thing from a techie.

(Laughter)

MR. KOTCHEN: But as I understand, there are basically two things. One are backups. Like, that Wipro has to make of its own electronic processes, that are separate and apart --

THE COURT: Right.

MR. KOTCHEN: -- from .psts.

THE COURT: Right.

MR. KOTCHEN: And those were the two corpus --

THE COURT: Got it, right.

MR. KOTCHEN: -- of document repositories.

THE COURT: Okay. Okay. How many of these custodians -- these 20 -- the 22 custodians who were employed at Wipro in 2014 were U.S.-based, if you know?

MR. KOTCHEN: My understanding -- well, Ms. Grunert would probably have a more informed view of that, but I think almost all of them, if not all of them.

THE COURT: Okay.

MR. KOTCHEN: Ms. Grunert, am I getting (indiscernible - multiple speakers) --

MS. GRUNERT: Yeah.

MR. KOTCHEN: -- on this one?

MS. GRUNERT: We -- I don't think we have an exact number, but I do think it was at least the majority, if not --

THE COURT: Okay.

MS. GRUNERT: -- closer to all.

THE COURT: All right, here's my dilemma. But let me -- you know what, let me come back to you, Mr. Kotchen. I want to give Ms. Williams a chance to chime in on some of these questions. I will come back to you.

MR. KOTCHEN: Okay.

THE COURT: Because I'll preview for you, I do see a burden, obviously, associated with individual collection of all of the devices for these 22 employees, which may pan out to absolutely nothing. Right? And I am fully conscious of the

possibility that I require Wipro to search the ends of the earth for, call it 30 devices, and you get zero .psts out of it. Right? I'm fully cognizant of that.

I don't necessarily know that the answer is to not require them to do anything, but let me give you that nugget while I hear from Ms. Williams.

MR. KOTCHEN: Okay.

THE COURT: And we'll go from there.

Ms. Williams?

MS. WILLIAMS: Thanks, Your Honor.

Just -- and I know we're focused on this 2014 period, but just backing up, that is a small slice of an 11-year discovery period, over which we've collected nearly 31 million documents from 26 custodians. I would agree with you that the email data is going to be the bulk of it. We are not in a position at this point to provide a further breakdown because our investigation and collection of at least SharePoint data is ongoing.

However, I agree with you, Your Honor, that providing that is just -- we're going to be back in the same place. Mr. Kotchen is still going to be taking the position that the email data -- and, you know, I don't dispute -- I see this, we're all looking at the same chart. I see that the volume there is --

THE COURT: Right.

MS. WILLIAMS: -- is lower. Although I don't agree that that sort of trends over time, or that that --

THE COURT: Right.

MS. WILLIAMS: -- continues as was --

THE COURT: Yeah.

MS. WILLIAMS: -- was being suggested.

We have, in the course of our investigation to date, found -- we've collected 59 .pst files that are found in the OneDrive, and that belong to eight different custodians. Nine of these are definitively from 2014 to 2016, and several more may contain data from the 2014 period, but we'd need to do further investigation in order to confirm that.

So I wanted to --

THE COURT: Are those .psts reflected in the chart or not?

MS. WILLIAMS: No.

THE COURT: Okay.

MS. WILLIAMS: I believe some of this is additional information that we've continued as we go down --

THE COURT: No, yeah, super helpful.

MS. WILLIAMS: -- this route.

THE COURT: Super helpful, yeah.

MS. WILLIAMS: Meaning that we've discovered after we submitted the chart.

THE COURT: Yeah, got it.

MS. WILLIAMS: So I share that with you to say, we are actively looking for the .psts.

I also agree that .psts are a form of backup, and then I'm using that term loosely. Right?

THE COURT: Yeah.

MS. WILLIAMS: That it's a form of backup data and something that someone could do to sort of back up their own data.

To find other .psts at this point would, you know, require the wild goose chase of tracking down, you know, dozens of physical devices around the world. Which, as you --

THE COURT: Can I just ask you a question, Ms. Williams, on that?

MS. WILLIAMS: Sure.

THE COURT: Because it's actually a very helpful, you know, data point. You were able to locate .pst files for individual custodians that cover some of the 2014 time period. And if I heard you correctly, you said you located the .psts on these custodians' OneDrive?

MS. WILLIAMS: Yes.

THE COURT: Okay.

MS. WILLIAMS: Yes. And I'm sorry, Your Honor, my colleague has just corrected me that the .psts are reflected in the charts.

THE COURT: They are; okay.

MS. WILLIAMS: Yes.

THE COURT: So that -- I mean, just thinking about how .psts can be generated, I mean, you can generate a .pst file with one email, right? Or you can generate a .pst file with, you know, 10,000 emails, whatever the inbox limit permits.

I guess my question then is, without knowing what is in those particular .psts, is there -- has the OneDrive review been exhausted for these custodians? Is there -- is it possible that other .psts are going to be found in the OneDrive, before we get to the hardware reviews?

MS. WILLIAMS: It's ongoing. We've identified the ones that we can so far. Right? And you're exactly right, Your Honor. Right? A .pst could have one email or it could have, you know, all your emails from a given time period --

THE COURT: Right.

MS. WILLIAMS: -- or on a given topic. Right? It's, you know, it's -- it could be any of those. Any of those things. But we have not reviewed every last email in every, you know, one of the .pst files that we found.

THE COURT: Okay.

MS. WILLIAMS: But -- right? So anyway, I mean, point being, I -- we've -- from our view, we've complied with the order. A further breakdown is not really called for. I think we will be right back here having the same fight.

THE COURT: Yeah.

MS. WILLIAMS: And, you know, in order to do more, you know, it would require us to do all this physical device-collection from all over the world, which, you know, could result in not having us in a meaningfully different position and we could end up with no .psts. We just don't know.

THE COURT: All right.

MS. WILLIAMS: And the amount of burden and effort required to get there is significant. And, you know, our position is this sort of discovery into the discovery is tremendously burdensome. And we're ready to get the show on the road in terms of negotiating search terms.

And, you know, I want to go back to one thing that Mr. Kotchen said, which is that relevant data has certainly, you know, definitely been deleted. We don't know that. Right? This is a very small slice of time across the whole 11-year discovery period. And it seems though, you know, he's asking us to prove a negative at this point. And we've done a lot, a lot to --

THE COURT: Yeah.

MS. WILLIAMS: -- investigate these issues.

THE COURT: It is just a slice. But as I said, I mean, you know, the discordance, almost, between the 2014 column, and even the 2015 column, you know, causes me to raise my eyebrows for many of these custodians. I mean, Rohan

Kamath, 0.28 in the latter half of 2014, and then almost 40, what I assume is gigabytes, the next year. Right? That -- something is happening. I mean, that's just a consistent observation through many of these custodians, right?

And I certainly agree with Mr. Kotchen that we're not talking about spoliation. I mean, this is data retention. And I'm -- I don't -- I hesitate to even use the word "spoliation" because that's -- nothing could be further from my mind. It's what is available? And has Wipro done a sufficient amount to assure me and assure the plaintiffs that whatever is out there has been collected to a reasonable ability of the defendant. And that's really what I'm trying to get at. Right?

And so it's hard to not think that there is missing data, just looking at this one column. Now, whether there's a remedy to that is what I'm trying to figure out.

MS. WILLIAMS: Your Honor, I -- just the -- the one example you gave, Rohan Kamath, he started in December of 2014. So I think that is at least one --

THE COURT: All right.

MS. WILLIAMS: -- possible explanation of that. And I -- you know, look, I hear you, there is less data from 2014. We're not --

THE COURT: Yeah, that --

MS. WILLIAMS: We're not disputing that.

THE COURT: That was just one that I picked. I mean,

you can go to the next one, right, and he was --

MS. WILLIAMS: Right.

THE COURT: That person -- so, poor example, I suppose.

MS. WILLIAMS: I totally hear you. There are a lot of names to keep track of. And, look, I think, you know, we're not -- we're not disputing that there's less. I think our main bottom line point is that we've done a search of the reasonable, accessible, custodial sources at this point.

THE COURT: Yeah, okay.

I guess -- let me ask you, because Mr. Kotchen, in the reply portion of the letter, points out -- this is on Page -- bear with me for a moment. They pointed out that in a letter in June, Wipro had indicated — this is your June 27th letter at Docket 100 on Page 3 — that the investigation on devices and whether backups exist was ongoing; suggesting that Wipro was actively investigating; the sources of each custodian's data.

And I will say, it was at least my impression that this summer and fall, you all were looking into whether individual devices were available, where they were, perhaps not collecting the devices themselves. But I was at least somewhat surprised that you don't -- you haven't done that yet. And so let me ask you, just what do you know about where these custodians' devices are located as of right now?

MS. WILLIAMS: Sure. I mean, we're not -- we don't have a complete picture. We have done some of -- we have done some of that work. We collected at least two retired devices from -- belonging to two custodians — Angan Guha and Ganesamoorthy Muthusamy — in order to ensure that we could provide the Court with accurate information about the process and the burden involved. I mean, part of what we've been doing is trying to get our arms around actually what that process would entail --

THE COURT: Right.

MS. WILLIAMS: -- given the volume, given where all these people are located, and so forth.

So, we can, you know -- and so just to be able to share with you what that would actually entail. To give you a little bit more -- even though we've shared a little bit about what that process would entail, we confirmed with plaintiffs, and their position seems to be, or was, at least as of a couple of weeks ago, that they're demanding that we collect every single device used by each of the 26 custodians over the 11-year discovery period to determine whether there are locally saved .psts. We think this is unduly burdensome, not consistent with the Rules, and plaintiffs haven't pointed to any authority that would require that.

We've given -- and I'm happy to go through it again with Your Honor. We gave an overview of what the process would

entail.

THE COURT: Yeah.

MS. WILLIAMS: Would you like me to go over --

THE COURT: You don't have to do that.

MS. WILLIAMS: Oh, okay.

THE COURT: I understand the process. I mean, I think you may well be right, that requiring Wipro at this juncture to go around the world and collect these devices, and search them to locate .psts that may or may not be there, for devices that may or may not turn on, that that, at this point, is unreasonable.

But as I was saying to Mr. Kotchen, I don't think that the answer is to do -- require you to do nothing. Right? And so I don't necessarily view the process of identifying where these devices are, in and of itself, as burdensome. I appreciate that it requires a manual process. I appreciate that there is some burden, but I don't view just the act of figuring out where these devices are, and how many there are and whether they are retrievable before requiring you to retrieve them is unreasonable.

And so I'm going to direct Wipro in the first instance to do that. Right? I don't know if it is a reasonable assumption to assume that, in light of most of these custodians are or were U.S.-based, to assume that their former devices are located in U.S. warehouses. Perhaps you could

speak on that, to the extent you know. Is that a reasonable assumption or not necessarily?

MS. WILLIAMS: That they're in U.S. warehouses?

THE COURT: Yes.

MS. WILLIAMS: I don't think that is a reasonable assumption.

THE COURT: All right. Explain that to me. So a U.S. employee's device may have been shipped overseas to be stored in a warehouse elsewhere?

MS. WILLIAMS: I believe so. And also, there was a question earlier about -- for example, we already have two devices located in India for -- or we already know that there are two devices located in India for two of the custodians.

THE COURT: I see.

MS. WILLIAMS: And there was a question earlier about the majority of -- are the majority of the custodians U.S.-based. I don't think we've ever represented that. I don't have those exact numbers --

THE COURT: Okay.

MS. WILLIAMS: -- sitting here today.

But one question, or just point of clarification, Your Honor, if that is where you are going here with the ask in terms of identifying where they are. All of the focus today has really been on the 2014 time period. Are you --

THE COURT: Yeah.

MS. WILLIAMS: Are you just asking us to figure out sort of the laptops for custodians who worked at Wipro in 2014?

THE COURT: Yeah. So, there's 20 -- there's 22 of those custodians, right? So four of the custodians, I understand that were not employed by Wipro during the 2014 time period, right? So we're only talking about a universe of 22 custodians, correct?

MS. WILLIAMS: Correct.

THE COURT: All right. And then the way I'm thinking about this is the 0365 migration started in the latter part of 2014, sort of proceeded on through the early part of 2015. For any individual custodian, I don't know that -- you may have this, but I don't have, like, a sort of concrete date on which the migration happened. It was sort of a moving process, as I understand. Is that accurate?

MS. WILLIAMS: Right. There wasn't, like, one fixed date for every single (indiscernible - multiple speakers).

THE COURT: Right. So the way I am thinking about this is the data that I am most concerned about, which I think Mr. Kotchen and his colleagues are most concerned about, is the data in that 2014/early 2015 time period, right? Which the table appears at least to be consistent with the idea that there is missing data.

And so the way I'm thinking about this is if there

are .psts on local devices, right, that's a -- I mean, aside from you finding sort of the mother lode of .pst files on individual custodian's OneDrive accounts, that's the only other logical place where they could be if they are. Right?

And so as a first step — I'll tell you where I'm going with this — is locate where the devices are, or were, for the custodians who were employed in 2014/early 2015. I don't know how many devices there are, but my assumption is it's between 22 and 30. See where they are and let's reassess. Right?

I'm inclined -- I'm not ordering at this at this point, but I'm inclined, rather than to force Wipro to undergo a manual search of however many devices there are, is to figure out where they are, require you to locate a small subset of those devices, and do a test review. Right? And if -- I'm just sort of previewing where I'm going with this, with limitations. I mean, I'm -- you know, I don't know exactly what makes the most sense because I don't know where these devices are. Right?

Mr. Kotchen, I'm not inclined to require Wipro just to go full throttle and review 22, 30, 35 devices. But if a review of some subset of devices reflects reason to believe that there are a lot of .pst files on them, then we can go further. If not, then not.

And I think that that's sort of a reasonable middle

ground to not impose an unknown and substantial burden on Wipro while, you know, probing whether there is available data out there.

That was a lot. But, Ms. Williams, that's sort of where I'm going.

MS. WILLIAMS: Okay. Your Honor, just a couple of clarifying things. One, you asked about the date for the email migration to the new system that had the larger --

THE COURT: Yeah.

MS. WILLIAMS: -- storage limits.

THE COURT: Yep.

MS. WILLIAMS: As you said, that happened over a period of time. It didn't happen on one set date.

THE COURT: Yeah.

MS. WILLIAMS: But it was concluded by early 2015 for everyone. Given the focus on the data from the 2014 --

THE COURT: Yeah.

MS. WILLIAMS: -- period, we would suggest that in trying to identify and locate those devices, that we could limit it to devices that were actually in use during that period. Does that make sense?

THE COURT: As opposed to what?

MS. WILLIAMS: Well, people got different laptops --

THE COURT: Right.

MS. WILLIAMS: -- every couple of years, right?

THE COURT: Right.

MS. WILLIAMS: They were traded out. So if somebody had a laptop in 2021 that is no longer -- that was used from 2021 to 2024 --

THE COURT: Yeah.

MS. WILLIAMS: -- you know --

THE COURT: I see where you're going.

MS. WILLIAMS: -- it seems to me that --

THE COURT: So, in other words, just hypothetically, I'm just using the first custodian, Angan Guha. Right? That individual was employed from January 3rd, '94 to November 18th, 2022.

MS. WILLIAMS: Right.

THE COURT: And you're suggesting that to the extent that I'm going to require Wipro to locate devices --

MS. WILLIAMS: Right.

THE COURT: -- that that individual used, I limit that requirement only to the devices that that person used in 2014/early 2015.

MS. WILLIAMS: Correct.

THE COURT: That's what I have in mind.

MS. WILLIAMS: Okay.

THE COURT: Mr. Kotchen, on the assumption that -- or on the understanding that the migration after that time was going to capture all of the email data anyway. Right? And so

in other words, if that -- am I thinking about this right, Ms. Williams? If --

MS. WILLIAMS: Yes, absolutely.

THE COURT: If Angan Guha was creating .pst files, and saving them locally on a device in 2019, obtaining that .pst file would be superfluous because those emails would have been archived under the 0365 system anyway.

MS. WILLIAMS: Yes.

THE COURT: Okay. All right. Yes, that's the way I'm thinking about this, Ms. Williams.

MS. WILLIAMS: Okay.

THE COURT: Mr. Kotchen, let me give --

MS. WILLIAMS: That makes sense.

THE COURT: I'm sorry, you had a couple of other questions.

MS. WILLIAMS: Well, not so much a question. We can endeavor to find that out for the sort of laptops that were in use for the custodians in the 2014/early 2015 time period.

We -- as I -- as I previewed at the start of the conference, there are certain custodians who have .psts where we already have them, where we know that they have emails from the 2014 to 2016 --

THE COURT: Yeah.

MS. WILLIAMS: -- time period. So, again, that is another source where we have that information. You know, I

don't know if we're --

THE COURT: Yeah.

MS. WILLIAMS: -- going to be able to locate where their laptops are, but we may be able to provide that, as well.

THE COURT: I'm making a note of that. Thank you, Ms. Williams. I don't know -- right? If those .psts gave me reason to think that there were -- was a whole bunch of data on .psts located on OneDrives that's not reflected in this chart already, that -- that may have -- that may be -- give me more comfort. But if that data is already included in the appendix, it's not -- it doesn't really inspire much confidence that those eight .psts, you know, have a tremendous amount of data. Right?

MS. WILLIAMS: Okay.

THE COURT: I'll come back to you.

Mr. Kotchen, let me give you a chance to weigh in on the way I'm thinking about this.

MR. KOTCHEN: Yeah, look, let me -- let me just kind of -- a couple of points.

One is kind of in the -- first in the weeds, and then a big picture point. In the weeds, if Ms. Williams is saying that all emails, once you're migrated to O365, it captures all emails, that that's Wipro's position. And so anything that's in a .pst will not -- will be captured in O365. If that's -- if that's true, then your point --

THE COURT: Post-migration.

MR. KOTCHEN: Post-migration, then your point makes perfect sense.

The problem is, I don't think that's true at all. And I think that the .psts continue to be -- to exist because custodians continued to delete -- to delete email [sic], even post-migration.

So if Wipro is representing to the Court that everything that's in O365 will be captured, you know, if the .psts, the documents in the .psts will be captured by O365, I think your point makes perfect sense. The problem I have, I don't think that's true.

THE COURT: Okay. Well, then we --

MR. KOTCHEN: The second --

THE COURT: We definitely need to get to the bottom of that, because my entire understanding this year has been built on the premise that O365 was archiving all custodians' emails up to the 1.5 terabyte limit. And so if that's wrong, then I need to know that.

MR. KOTCHEN: Okay. I think that's a really important point.

THE COURT: I agree with you.

And, Ms. Williams --

MS. WILLIAMS: That is correct, Your Honor.

THE COURT: -- can you answer that?

MS. WILLIAMS: Yes, Your Honor.

THE COURT: All right.

MS. WILLIAMS: That is correct.

THE COURT: And so if any individual post-O365 migration was deleting emails from their inbox, those emails nonetheless would get captured because they were being archived. Is that correct?

MS. WILLIAMS: That is my understanding.

THE COURT: Okay.

MR. KOTCHEN: (Indiscernible - multiple speakers).

THE COURT: We ought to be absolutely certain about this because --

MR. KOTCHEN: Yeah. If that's -- if I'm wrong about that — and I've been wrong about stuff a lot of times in my life, I promise you that. If I'm wrong about that, then I think your point is a good one. Okay?

Big picture. Here's -- you know, it's interesting that -- this hearing's interesting. Very interesting to sit and listen to the discussion, because if Your Honor will remember, I think it was this past summer where Wipro's position was it wasn't necessarily true that people actually used .psts. And I had to sit here and -- and kind of fight for the fact that I think people used .psts and it's on the OneDrive. The .psts are on the OneDrive.

In the most recent letter that they sent to Your

Honor, they effectively are filing for a protective order so they wouldn't have to search .psts because it was too burdensome when, in fact, they already had them in their possession. And no one knew about that.

And so it's kind of like, this is -- this is -- if I can just, you know, from the heart just for a little bit, and maybe I'm just venting more than anything, these are issues that we should have addressed with Wipro during a 26(f) conference about two years ago.

And so the fight here has always been for us we are dealing with imperfect information on our side, and by extension on your side, that Wipro has solely in its possession. And it's only through this incremental process of trying to ferret out exactly what the details are that we get bits and pieces here and there. And it's become concerning at this point. And I don't -- I don't mean to -- it's just -- this is a vent as opposed to, you know, an action item that I'm requesting, but I'm just concerned about that.

MS. WILLIAMS: Can I respond to that, Your Honor?

THE COURT: Sure.

MS. WILLIAMS: I really take issue with that. We have now -- we've now collected the data for all of the custodians. That process was not completed until this fall. And we -- it's -- that's a personal preference as to -- and practice whether some custodians make .psts and some don't, and

we’ve seen that for ourselves in collecting the data. Some custodians have .pst folders and some don’t.

And so, you know, whether in an organization of tens of thousands of employees, there’s some standard practice, it’s really hard to say, and we’ve seen variation over that. There is nothing nefarious going on here. And I’m trying to be transparent about what we have discovered with respect to the .psts.

Just after some initial checking, I appreciate your point that, you know, you’ve been working under the assumption, Your Honor, that after the migration, you know, even if a custodian deleted an email, there would still be an archive of that on the OneDrive. That is true. You really can’t double-delete that. We’ve seen things in the collection that have deleted folders, and deleted items, and so forth. So I have comfort saying that to you today.

THE COURT: Okay. All right. Mr. Kotchen used the word “incremental.” And I think that that word captures this process very well. And it has been an incremental process. I appreciate that it has been a slower process than plaintiffs may prefer. But I think that taking an incremental approach with the discovery has actually been beneficial. And we don’t know what we don’t know. But that’s also true, Mr. Kotchen, for defense counsel. Right? And I do think that counsel is doing their level best to figure out what the status is and

represent it accurately and fairly to the Court.

I'm very mindful of sort of going down rabbit holes that don't yield what you're looking for. Right? As I said a number of times already, that doesn't mean that we don't at least put our foot in a hole, so to speak, and see what might be there.

And so we're going to continue with an incremental process. I don't know when these individual .psts were located, and it may well have been just because counsel was doing the review that they said that they were undertaking.

Now, Ms. Williams, for your part, I said this last conference, I'll say it again, the more information you're able to share on a real time and ongoing basis with plaintiffs' counsel, I think, would assuage some of their concerns that you're hearing today. Right? And so if you locate more .psts, I think it's prudent for you to tell plaintiffs' counsel that we found more .psts. Right? And it seems to me that that's only going to enure to Wipro's benefit if you're locating .psts on the OneDrive, right, because that may obviate the amount that the Court's going to require Wipro to force you to go and locate devices that could be scattered throughout the world.

And so please continue to share information as you learn it. And I'm not saying you haven't. I'm just saying, you know, I'm hearing Mr. Kotchen. And so to the extent that

this helps facilitate this incremental process, it helps everyone.

MS. WILLIAMS: Understood, Your Honor. And I just -- we're [sic] not been hiding the ball on the location --

THE COURT: Yeah.

MS. WILLIAMS: -- of the .psts. We were collecting and processing the data. You'll recall, there was the, you know, delay --

THE COURT: Yeah.

MS. WILLIAMS: -- with switching vendors. And, in fact, the last joint letter --

THE COURT: Yeah.

MS. WILLIAMS: -- deadline, we had asked Mr. Kotchen for an extension of that, in part because we had -- which was in October, we had just located .pst files and wanted to -- and they agreed. And we asked for an extension on that basis because we were getting this information in real time in October.

So certainly it's not fair to suggest that in June, we had .pst files and we didn't know about that.

THE COURT: And I --

MS. WILLIAMS: That's absolutely not the case.

THE COURT: I understand.

MS. WILLIAMS: But I take your point.

THE COURT: I understand.

Just to -- I think I asked this question already, but I want to just ask it again, Ms. Williams. The review of OneDrive accounts for these 26, or really the 22 custodians that I'm most focused on for the moment, has been exhausted in terms of locating .pst files, or not necessarily?

MS. WILLIAMS: I wouldn't say it's been totally exhausted. It has -- it is -- it is in process, but we have a -- I mean, I shared the numbers that I did. That's what we know so far. There's perhaps a bit more work to do in that regard. But I -- you know, I've shared what I can for now, and we will --

THE COURT: Okay.

MS. WILLIAMS: -- share more information --

THE COURT: Yeah.

MS. WILLIAMS: -- in that regard with Mr. Kotchen, you know, to the extent it becomes available.

THE COURT: Particularly for that time period. Right?

MS. WILLIAMS: Of course.

THE COURT: I mean, if that --

MS. WILLIAMS: Of course.

THE COURT: If that, you know, bumps these -- the data volumes up for that time period, right, that is educational for Mr. Kotchen and for me.

MS. WILLIAMS: Sure. Thank you.

THE COURT: Right? In the interim, I would double back, Ms. Williams, and be absolutely certain on the archiving question that we discussed for 0365 because it really is driving the way I'm looking at this. And I think it's consistent generally with the data that's being reflected, but I would be absolutely certain that what you're saying is accurate as to the archiving of emails post migration.

MS. WILLIAMS: Okay.

THE COURT: Okay? On that assumption, however, I'm going to direct Wipro to undertake the process to locate the device or devices that each of the 22 custodians who worked for Wipro during the 2014 and into 2015 time period, and I think first quarter is a reasonable cutoff, the June 1, 2014 to the end of March, 2015, to locate the devices that each one of those 22 custodians used during that time period, figure out whether the devices are available, and where they are. All right?

MS. WILLIAMS: Understood, Your Honor.

THE COURT: All right. From there, I'm likely to select some number of example devices, and require Wipro to undergo a search of those devices and to see what's there. I don't know what the number is. I don't know what the sample is. I don't know what custodians we're going to see; what's available; and where the devices are. And we'll go from there. And that is incremental, and it's not terribly efficient, but

given the concerns I have about rabbit holes, and burden, and the like, I think that that's the reasonable compromise here.

MS. WILLIAMS: Thank you, Your Honor.

THE COURT: All right?

All right. Mr. Kotchen, what else do we have? I understand that some search terms have been proposed. You guys are going back and forth on search terms?

MR. KOTCHEN: We're going back and forth. That process is really just undertaken, so that is a -- that's an ongoing process.

THE COURT: Yeah.

MR. KOTCHEN: And, Your Honor, look, I appreciate your -- I appreciate your approach here. I think it's sound.

THE COURT: Anything else we need to address today, Mr. Kotchen.

MR. KOTCHEN: No, Your Honor; thank you.

THE COURT: All right.

Ms. Williams, for you.

MS. WILLIAMS: No, nothing else, Your Honor; thank you.

THE COURT: Okay. I hesitate to ask, but how long do you think this will take?

MS. WILLIAMS: Well, I mean, we have the holidays coming up. I would really need to confirm with our client how long that would take. I -- certainly not before the end of the

year, I don't think.

THE COURT: Oh, no, no, no. I understand that. Why don't -- can you file a letter -- why don't you file a letter by January 5th, just updating me on how long -- how long you anticipate this process to take.

MS. WILLIAMS: Okay.

THE COURT: I don't need -- we don't need results by the 5th. I just want to get a better sense. Whether this is going to be, you know, a 30-day-from-there estimate or something more.

MS. WILLIAMS: Okay.

THE COURT: All right?

MS. WILLIAMS: That sounds good.

THE COURT: All right. Thank you, all. Appreciate it. We'll continue the discussion. I'm well aware of the issues.

If anything comes up that sort of changes the way that I've been thinking about this, different answers to any of my questions, or information that you learn, please let the other side know. You can always file a letter. But in the interim, and if I hear -- if I don't hear anything else, I'll get the letter from Wipro on the 5th. We'll probably issue an order from there. If not, set up another joint telephone conference sometime in January or February. Okay?

MR. KOTCHEN: Very good.

MS. WILLIAMS: Thank you, Your Honor.

THE COURT: All right, everyone.

MR. KOTCHEN: Thank you, Your Honor.

MS. WILLIAMS: Thank you.

THE COURT: Have a lovely, and safe, and restful holiday.

MR. KOTCHEN: You, too.

THE COURT: And we'll touch base in the new year.

MR. KOTCHEN: Great. Very good; thank you.

MS. WILLIAMS: Thank you.

THE COURT: All right. Take care, everyone.

MR. KOTCHEN: Take care.

THE COURT: Bye.

(Whereupon, the hearing was adjourned.)

CERTIFICATE OF TRANSCRIBER

I, KAREN HARTMANN, a certified Electronic Court Transcriber, certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/ *Karen Hartmann*

Karen Hartmann, AAERT CET Date: December 19, 2025

TRANSCRIPTS PLUS, INC.